UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**BRANDON SODERBERG**, *et al.*,

*Plaintiffs*,

**v.**

**HON. W. MICHEL PIERSON**, *et al.*,

*Defendants.*

Case No. 1:19-cv-01559-RDB

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

ADAM HOLOFCENER  (No. 19579)
MARYLAND VOLUNTEER LAWYERS FOR
    THE ARTS
120 W. North Ave., Suite 305A
Baltimore, MD 21201
Tel.:   410-752-1633
adam@mdvla.org

NICOLAS Y. RILEY *  (No. 810809)
DANIEL B. RICE  (No. 20874)
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW
Washington, DC 20001
Tel.:   202-662-4048
Fax:   202-662-9248
nr537@georgetown.edu
dbr32@georgetown.edu
* Admitted *pro hac vice*

Dated:  August 2, 2019

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ....................................................................................................................2

    A.    The Public's Right of Access to Maryland Trial-Court Recordings ..............2

    B.    Maryland's Ban on Broadcasting Criminal Matters............................................3

    C.    Plaintiffs' Inability To Publish or Disseminate Court Recordings ................3

LEGAL STANDARD ............................................................................................................6

ARGUMENT ..........................................................................................................................6

I.      Plaintiffs have standing to seek pre-enforcement review of § 1-201....................6

    A.    Section 1-201 has had a severe chilling effect on Plaintiffs' speech. ..............7

    B.    Plaintiffs face a credible threat of prosecution under § 1-201......................9

    C.    There is no basis for applying the prudential standing doctrine. .................13

II.    Plaintiffs have stated a valid First Amendment claim...........................................14

    A.    The First Amendment protects the right to disseminate truthful information contained in publicly available court records. ..........................15

    B.    Defendants have not identified a "state interest of the highest order" to justify § 1-201's blanket ban on broadcasting publicly available court recordings......................................................................................................18

    C.    Section 1-201 is not narrowly tailored to achieve Defendants' stated objectives...........................................................................................................19

    D.    Defendants' remaining arguments are unavailing............................................23

III.   Plaintiffs have stated a valid void-for-vagueness claim. ......................................25

    A.    Section 1-201 is subject to exacting vagueness scrutiny.................................25

    B.    The term "broadcast" is not defined in § 1-201 and prescribes no objective standard of conduct. ........................................................................27

    C.    Section 1-201's remaining language fails to clarify the meaning of "broadcast."........................................................................................................30

IV.   Plaintiffs have not failed to name any indispensable defendants.........................32

V.    Plaintiffs have stated valid claims against the court reporters.............................34

CONCLUSION ....................................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*American Gen. Life & Accident Ins. Co. v. Wood,*
  429 F.3d 83 (4th Cir. 2005) .......................................................................32

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ........................................................................... 10, 12

*Barron v. Trikeriotis,*
  No. 24C-19-2626 (Baltimore City Cir. Ct. Jul. 1, 2019) ...............................12

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001) ...................................................................15, 22, 25

*Benham v. City of Charlotte,*
  635 F.3d 129 (4th Cir. 2011) .........................................................................7

*Case v. State,*
  No. 117053003, 2019 WL 1579778 (Md. Ct. Spec. App. Apr. 12, 2019)...................29

*Coates v. City of Cincinnati,*
  402 U.S. 611 (1971) .....................................................................................31

*Cooksey v. Futrell,*
  721 F.3d 226 (4th Cir. 2013) .........................................................................7

*Cox Broadcasting Corp. v. Cohn,*
  420 U.S. 469 (1975) ..............................................................................*passim*

*Craig v. Harney,*
  331 U.S. 367 (1947) .....................................................................................17

*Davison v. Randall,*
  912 F.3d 666 (4th Cir. 2019) .......................................................................10

*Dish Network Corp. v. Arrowood Indem. Co.,*
  772 F.3d 856 (10th Cir. 2014) .....................................................................27

*Doe v. Cooper,*
  842 F.3d 833 (4th Cir. 2016) ................................................................ 27, 30

*Dubinsky v. Liberty Surplus Ins. Corp.,*
  No. CV 08-06744, 2010 WL 11506086 (C.D. Cal. June 15, 2010).............................27

*Florida Star v. B.J.F.,*
  491 U.S. 524 (1989) ..............................................................................*passim*

*Georgia Pac. v. Farrar,*
  432 Md. 523 (2013) ...........................................................................................29

*Gooding v. Wilson,*
  405 U.S. 518 (1972) ..........................................................................................26

*Grandison v. State,*
  425 Md. 34 (2012) .............................................................................................22

*Greenville Women's Clinic v. Comm'r,*
  317 F.3d 357 (4th Cir. 2002) ............................................................................30

*Hart Book Stores, Inc. v. Edmisten,*
  612 F.2d 821 (4th Cir. 1979) ............................................................................26

*Henson v. State,*
  212 Md. App. 314 (Ct. Spec. App. 2013) .........................................................29

*Home Buyers Warranty Corp. v. Hanna,*
  750 F.3d 427 (4th Cir. 2014) ............................................................................32

*In re Murphy Brown,*
  907 F.3d 788 (4th Cir. 2018) ......................................................................28, 30

*Kenny v. Wilson,*
  885 F.3d 280 (4th Cir. 2018) ...................................................................7, 10-11

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) ..........................................................................................13

*Manning v. Caldwell,*
  No. 17-1320, 2019 WL 3139408 (4th Cir. July 16, 2019) ...................... 25-26, 31

*Matter of Search Warrant Application,*
  923 F.2d 324 (4th Cir. 1991) ............................................................................21

*Murphy v. Baltimore Gas & Elec. Co.,*
  290 Md. 186 (1981) ...........................................................................................29

*Nebraska Press Ass'n v. Stuart,*
  427 U.S. 539 (1976) .....................................................................................18, 20

*Norman v. Century Athletic Club,*
  193 Md. 584 (1949)......................................................................................28-30

*Norvell v. Safeway Stores,*
  212 Md. 14 (1957)..............................................................................................29

*Oklahoma Publishing Co. v. District Court,*
  430 U.S. 308 (1977) ..........................................................................................18

*Ostergren v. Cucinelli,*
  615 F.3d 263 (4th Cir. 2010) ................................................................................ 20, 25

*Owens-Illinois, Inc. v. Meade,*
  186 F.3d 435 (4th Cir. 1999) ................................................................................ 32, 34

*Reed v. Town of Gilbert,*
  135 S. Ct. 2218 (2015) ............................................................................................. 23

*Roberts v. State,*
  298 Md. 261 (1983) .................................................................................................. 29

*Skilling v. United States,*
  561 U.S. 358 (2010) ................................................................................................. 24

*Smith v. Daily Mail Publishing Co.,*
  443 U.S. 97 (1979) ................................................................................................... 15

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ............................................................................................... 6

*State v. Syed,*
  463 Md. 60 (2019) ................................................................................................... 22

*Steffel v. Thompson,*
  415 U.S. 452 (1974) ................................................................................... 12, 14, 28

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ................................................................................................. 13

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,*
  413 U.S. 548 (1973) ................................................................................................. 30

*United States v. Shelnutt,*
  No. 4:09-CR-14, 2009 WL 3681827 (M.D. Ga. Nov. 2, 2009) .................................. 32

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
  455 U.S. 489 (1982) ................................................................................................. 26

*Virginia v. American Booksellers Ass'n,*
  484 U.S. 383 (1988) ............................................................................................ 12-13

*Wong-Wing v. State,*
  156 Md. App. 597 (Ct. Spec. App. 2004) ................................................................. 29

*Wright v. State,*
  411 Md. 503 (2009) ................................................................................................. 29

*WTAR Radio-TV Corp. v. Commonwealth,*
  217 Va. 877 (1977) ................................................................................................. 27

## Constitutional Provisions

U.S. Const. amend. VI ....................................................................................... 19, 33

## Legislative Materials

1981 Md. Laws ch. 748 ..............................................................................................31

2019 Md. H.B. 853 ...................................................................................................11

Md. Code, Crim. Proc. § 1-201 .......................................................................... 3, 31

## Other Authorities

Heather Cobun, *Transcript: Tyrique Hudson's Peace Order Hearing*, MD. DAILY RECORD, May 1, 2019 ..............................................................................................9

MD. COURTS, JOURNALIST'S GUIDE TO MARYLAND'S LEGAL SYSTEM (3d ed. 2019).....9

MD. LEGAL ENCYCLOPEDIA: TELECOMMUNICATIONS (June 2019 ed.) ........................11

OFFICE OF COURT REPORTERS, PRINCE GEORGE'S COUNTY, CD ORDER FORM..........8

OXFORD ENGLISH DICTIONARY ...........................................................................27

PUBLIC ACCESS TO COURT ELECTRONIC RECORDS, DIGITAL AUDIO RECORDING PROJECT....................................................................................................22

REPORT OF THE COMMITTEE TO STUDY EXTENDED MEDIA COVERAGE OF CRIMINAL TRIAL PROCEEDINGS IN MARYLAND (2008) ........................................... 8, 14

## Rules

Md. Rule 15-205 ......................................................................................................35

Md. Rule 16-504 ........................................................................................ 2-3, 17, 21

Md. Rule 16-601 ......................................................................................................31

Md. Rule 16-603 ......................................................................................................22

Md. Rule 16-605 ......................................................................................................11

## INTRODUCTION

Defendants argue at length in their motion that the "First Amendment does not guarantee a right to broadcast a criminal trial."  ECF No. 23 (MTD) at 2.  But Plaintiffs are not asserting some freestanding right to broadcast criminal trials.  Rather, they are asserting a right to disseminate recordings of criminal proceedings that the *State itself* provided to them and that the *State itself* continues to make publicly available.  That right is hardly novel or controversial.  Indeed, the Supreme Court has long recognized—and repeatedly reaffirmed—that the First Amendment commands "that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection."  *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 495 (1975).

Defendants have not identified any basis for dismissing this case, and many of the theories they do offer conflict with their own recent actions.  They argue, for instance, that the statute Plaintiffs seek to challenge is "moribund," MTD 10, but they have threatened multiple journalists under the statute over the past few months, *see* MTD Exs. 3 & 4.  They argue that disseminating recordings of court proceedings would harm the privacy interests of criminal defendants, MTD 16-17, but they themselves continue to make those same recordings available to the public.  And they argue that the challenged statute prohibits a clear and "identifiable core" of conduct, MTD 29, but they refuse to say whether that "identifiable core" includes Plaintiffs' intended speech— or even how Plaintiffs might find out if their speech is prohibited.

Even setting aside these internal contradictions, Defendants' motion also misses its mark as a legal matter.  As explained below, Plaintiffs have standing to bring this suit and they have stated valid claims under both the First Amendment and the Due Process Clause.  Defendants' motion should therefore be denied.

## BACKGROUND

### A.    The Public's Right of Access to Maryland Trial-Court Recordings

Many Maryland trial courts electronically record all proceedings that occur before a judge.  ECF No. 1 (Compl.) at ¶ 9.  Some jurisdictions, like Baltimore City, maintain both video and audio recordings of their proceedings, while others, like Prince George's County, maintain only audio recordings.  *Id.* ¶¶ 9, 11.  In every jurisdiction, however, members of the public have a qualified right of access to the recordings.

The contours of that right are set forth in court rules adopted by the State's judiciary.  *See* Compl. ¶¶ 9-12.  Those rules require trial courts to allow "any person" to view and listen to audio and video recordings at the courthouse.  *See* Md. Rule 16-504(i) ("Right to Listen to and View Audio-video Recording").  And, as relevant here, the rules also require trial courts to "make a copy" of the audio recording, in virtually any case, "available to any person upon written request."  Md. Rule 16-504(h) ("Right to Obtain Copy of Audio Recording").

Trial courts retain authority under the rules to redact certain portions of court recordings before the recordings are released to the public.  Specifically, if a court finds that certain portions of a recording "should and lawfully may be shielded from public

access and inspection, the court shall direct that appropriate safeguards be placed on that portion of the recording." Md. Rule 16-504(g).

### B.    Maryland's Ban on Broadcasting Criminal Matters

Despite the court rules mandating public access to court recordings, Maryland law imposes limits on what the public may do with those recordings. Specifically, Maryland Code of Criminal Procedure § 1-201 makes it unlawful to "broadcast any criminal matter . . . that is held in trial court." Md. Code, Crim. Proc. § 1-201 (a)(1). Those who violate the statute may be held in contempt, *id.* § 1-201(c), and subjected to "a full range of sanctions, including incarceration," MTD 33. Maryland officials construe § 1-201 to cover not only broadcasts of live court proceedings but also broadcasts of court *recordings* that the State itself has made available to the public. *See* Compl. ¶ 26; MTD 30.

### C.    Plaintiffs' Inability To Publish or Disseminate Court Recordings

Plaintiffs are a group of journalists and community organizations who seek to publish and disseminate recordings of Maryland criminal proceedings as part of their reporting, advocacy, and community-education efforts. They have refrained from doing so, however, because they fear being sanctioned under § 1-201.

Plaintiffs Brandon Soderberg and Baynard Woods are Baltimore-based journalists who are currently working on a book and a documentary film about the Baltimore Police Department's Gun Trace Task Force. Compl. ¶ 21. In recent years, the Baltimore City Court Reporter's office has provided these Plaintiffs with copies of

3

several audio recordings, as well as one video recording, of local court proceedings. *Id.* Mr. Soderberg and Mr. Woods "intend to use these recordings in their documentary film, among other reporting projects." *Id.*

Plaintiffs Open Justice Baltimore (OJB) and Baltimore Action Legal Team (BALT) are organizations that support community-centered efforts to improve the criminal-justice system, including by enhancing its transparency. Compl. ¶ 22. OJB and BALT have both lawfully obtained audio recordings of local court proceedings from the Baltimore City Court Reporter's office. *Id.* They intend to use these recordings in their efforts to educate the public about Baltimore's legal system. In particular, OJB and BALT "plan to post the recordings online, play them at community events (including know-your-rights events for community members and legal training for volunteer lawyers), share them on social media, and potentially include them on podcasts." *Id.*

Plaintiff Qiana Johnson is a community organizer in Prince George's County and the founder of Plaintiff Life After Release, an organization that seeks to empower people and communities affected by the criminal-justice system. Compl. ¶ 23. Life After Release coordinates a court-watching program aimed at promoting accountability within Prince George's County's judicial system. *Id.* The organization also supports people facing criminal charges by helping their family and community members remain informed and involved in the adjudicative process. *Id.* Ms. Johnson and Life After Release have lawfully obtained audio recordings of local court proceedings from the

Prince George's County Office of Court Reporters. *Id.* The recordings come from proceedings in which Ms. Johnson was invited to address the court on behalf of criminal defendants who asked her to advocate for them. *Id.* Ms. Johnson and Life After Release "plan to post the recordings on their websites and play them at meetings in order to highlight the impact of their participatory-defense work and teach others how to become effective community advocates." *Id.*

On May 2, 2019, Mr. Soderberg, Mr. Woods, OJB, and BALT (the Baltimore Plaintiffs) submitted letters to Baltimore City's administrative judge, Defendant W. Michel Pierson, to notify him of their plans to disseminate the recordings in their possession. *See* Compl., Ex. A (Letter from B. Soderberg & B. Woods); Compl., Ex. B (Letter from OJB & BALT). In the letters, the Baltimore Plaintiffs asked if Judge Pierson knew of any harms that might result from the dissemination of the recordings, noting that they would consider his views before acting on their plans. The Baltimore Plaintiffs also sought clarity as to whether their intended uses of the recordings—such as sharing the recordings on social media—would constitute "broadcasting" under § 1-201. Court officials never responded to either letter, or to a follow-up email from Plaintiffs' counsel three weeks later. Compl. ¶ 29.

On May 14, 2019, Ms. Johnson and Life After Release (the Prince George's County Plaintiffs) submitted a similar letter to the administrative judge for Prince George's County, Defendant Sheila R. Tillerson Adams. *See* Compl., Ex. C (Letter from Q. Johnson & Life After Release). Like Judge Pierson, Judge Tillerson Adams never

responded to the letter from the Prince George's County Plaintiffs, or to a follow-up inquiry one week later. Compl. ¶ 31.

Defendants' failure to respond to Plaintiffs' repeated inquiries has left Plaintiffs in the dark as to whether (and, if so, how) they may disseminate the various court recordings in their possession. On May 28, 2019, Plaintiffs filed this action to obtain answers to those questions. Their complaint asserts that § 1-201 violates the First Amendment and is unconstitutionally vague. They seek a declaratory judgment that § 1-201 is unconstitutional, at least insofar as it prohibits Plaintiffs from disseminating court recordings that they lawfully acquired from their local courthouses.

## LEGAL STANDARD

Defendants' opening brief sets forth the proper legal standards for evaluating motions to dismiss under Federal Rules of Civil Procedure 12(b)(1), (6), and (7).

## ARGUMENT

### I. Plaintiffs have standing to seek pre-enforcement review of § 1-201.

To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Here, Defendants contend that Plaintiffs lack standing because they "have not been injured by the presence of § 1-201 in the Criminal Procedure Article." MTD 8. As explained below, that argument lacks merit.

### A.      Section 1-201 has had a severe chilling effect on Plaintiffs' speech.

A plaintiff seeking purely prospective relief "must establish an ongoing or future injury in fact." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018). This requirement is "commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression." *Id.* at 289 n.3 (quoting *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013)). "Government action will be sufficiently chilling when it is 'likely [to] deter a person of ordinary firmness from the exercise of First Amendment rights.'" *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) (citation omitted).

Here, Plaintiffs have censored themselves by refraining from publishing or disseminating publicly available recordings of court proceedings out of a fear of contempt sanctions under § 1-201. *See* Compl. ¶¶ 20-26 (describing the "severe chilling effect on Plaintiffs' protected speech and reporting activities"). Defendants do not deny that the act of disseminating those recordings (all of which were acquired lawfully) would constitute expressive activity. Instead, they argue that any chilling effect § 1-201 might have on Plaintiffs' expression is "subjective" in nature and, therefore, insufficient to confer standing. *See* MTD 9 (citing *Laird v. Tatum*, 408 U.S. 75, 89 (1972)).

That argument is unavailing. The chilling effect Plaintiffs have identified is an objectively reasonable—and entirely foreseeable—response to Defendants' actions. *See Cooksey*, 721 F.3d at 235 ("Any chilling effect must be objectively reasonable." (citation omitted)). In recent years, Defendants have repeatedly threatened to hold journalists

in contempt under § 1-201, including twice in the past five months alone.  *See* Compl. ¶ 26.  Those threats were expressly designed to deter the very speech activities that Plaintiffs seek to pursue here: the publication and dissemination of publicly available court recordings.  Plaintiffs' self-censorship, then, is not an unexpected overreaction to Defendants' threats—it is precisely the outcome Defendants themselves intended.

In addition to threatening journalists, Defendants have also used § 1-201 in other ways to deter people from disseminating court recordings.  For example, they highlight the statute in bold lettering on the official forms that they require members of the public to submit when requesting copies of court recordings.  *See, e.g.*, MTD Ex. 4, at 3 ("By my signature, I acknowledge that Maryland Criminal Procedure Article 1-201 provides that a person may not broadcast any proceeding in a criminal matter.").[1]  Defendants' representatives have also made numerous public statements over the years, including in official reports, reaffirming their commitment to preventing the dissemination of court recordings.[2]  In fact, the State Judiciary's handbook for journalists—which was re-issued this summer—explicitly states that § 1-201 "prohibits the recording or broadcasting of criminal proceedings."  MD. COURTS, JOURNALIST'S GUIDE TO

---

[1]  *See also* OFFICE OF COURT REPORTERS, PRINCE GEORGE'S COUNTY, CD ORDER FORM, https://perma.cc/2VSC-KFAM ("ANY/ALL DUPLICATION AND/OR BROADCAST IS STRICTLY PROHIBITED.").

[2]  *See, e.g.*, REPORT OF THE COMMITTEE TO STUDY EXTENDED MEDIA COVERAGE OF CRIMINAL TRIAL PROCEEDINGS IN MARYLAND 2 (2008) ("2008 JUDICIARY REPORT ON MEDIA COVERAGE") (recommending "that the Maryland Judiciary oppose any revision to Md. Code Ann., Crim. Proc. § 1-201"), *available at* https://perma.cc/L9ZL-S5H3.

MARYLAND'S LEGAL SYSTEM 20 (3d ed. 2019), https://online.flippingbook.com/view/691761/20/.

Given Defendants' actions and public statements, Plaintiffs' self-censorship is plainly reasonable.  Indeed, most Maryland-based news outlets have censored themselves in exactly the same way, cognizant of the threat § 1-201 poses to their reporting efforts.  *See, e.g.*, Heather Cobun, *Transcript: Tyrique Hudson's Peace Order Hearing*, MD. DAILY RECORD, May 1, 2019 (reprinting a transcript of a court proceeding while noting that Maryland law "prohibit[s] copying or transmitting the *recording* of a proceeding and a willful violation is punishable as contempt of court" (emphasis added)).  This widespread reluctance to publish recordings of court proceedings is not some incidental side effect of § 1-201's enactment; rather, as Defendants themselves acknowledge, it was the statute's objective from the beginning.  *See* MTD 1 ("For 38 years, Criminal Procedure § 1-201 has thus *limited the way the public and the press publicly convey information* about criminal trials." (emphasis added)).

### B.     Plaintiffs face a credible threat of prosecution under § 1-201.

The chilling effect that Plaintiffs have identified is sufficient, on its own, to confer standing here.  But even if it were not, Plaintiffs would still have standing to challenge § 1-201 for another reason: namely, because they face a credible threat of prosecution under the statute.

A plaintiff can satisfy Article III standing—even absent a showing of chilling effects—if he or she "allege[s] 'an intention to engage in a course of conduct arguably

affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Kenny*, 885 F.3d at 288 (quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  Here, Defendants do not dispute that Plaintiffs intend to engage in "a course of conduct arguably affected with a constitutional interest" (i.e., publishing and disseminating publicly available court recordings).  *See* Compl. ¶¶ 20-24.  Nor do they dispute that at least some of that conduct is "proscribed" by § 1-201.  Compl. ¶¶ 14-15.  Defendants' argument turns solely on whether Plaintiffs face "a credible threat of prosecution."  *See* MTD 9-11.

Plaintiffs unquestionably face such a threat here.  As the Fourth Circuit has explained, a credible threat of prosecution "exists so long as it 'is not imaginary or wholly speculative, chimerical, or wholly conjectural.'"  *Davison v. Randall*, 912 F.3d 666, 678 (4th Cir. 2019) (citation omitted).  The "[t]hreat of prosecution is especially credible when defendants have not 'disavowed enforcement' if plaintiffs engage in similar conduct in the future."  *Id.* (citation omitted).  Here, Defendants have not only refused to disavow future enforcement of § 1-201 (despite multiple opportunities to do so)— they have *actively threatened* to enforce the statute against multiple people.  Moreover, Defendants continue to invoke § 1-201 in other ways, including on official court forms, to stop people from publishing or disseminating publicly available court recordings.  *See supra* Part I.A (recounting Defendants' efforts to deter such activity).  These actions make clear that the threat Plaintiffs face "is not imaginary or wholly speculative, chimerical, or wholly conjectural."  912 F.3d at 678 (citation omitted).

10

That threat is especially credible in light of § 1-201's text which, on its face, prohibits some of the activities Plaintiffs seek to pursue.   Indeed, "there is a presumption that a 'non-moribund statute that facially restricts expressive activity by the class to which the plaintiff belongs presents . . . a credible threat [of prosecution].'" *Kenny*, 885 F.3d at 288 (quoting *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999)).

Defendants seek to evade this presumption by arguing that § 1-201 is "moribund." *See* MTD 10-11.  But that argument clashes with the actions of Maryland's legislators, judges, and lawyers, all of whom continue to treat the statute as good law. Over the past decade, Maryland lawmakers have introduced numerous proposals to amend § 1-201 to permit the broadcast of certain criminal proceedings.  *See, e.g.*, 2019 Md. H.B. 853, https://perma.cc/2TZT-R5YQ (proposing "an exception to the prohibition against broadcasting a criminal proceeding").  All of those proposals would have been unnecessary if § 1-201 were in fact moribund.  Similarly, the Maryland Judiciary recently adopted a new rule that refers explicitly to § 1-201—a reference that would make little sense if the statute were a dead letter.  *See* Md. Rule 16-605 (allowing media coverage of court proceedings except where "prohibited by Code, Criminal Procedure Article, § 1-201").  And Maryland lawyers and legal commentators continue, uniformly, to characterize § 1-201 as enforceable law.[3]

---

[3] *See, e.g.*, 21 MD. LEGAL ENCYCLOPEDIA: TELECOMMUNICATIONS § 33 (June 2019 ed.) (discussing the ban on "[b]roadcasting criminal matters").

Defendants' own conduct confirms that § 1-201 still has the force of law.  After all, if the statute were truly moribund, then their repeated threats to enforce it against journalists would have been an exercise in futility.  So, too, would their citations to the statute on official court forms and in recent court filings.  Just last month, Defendants Pierson and Trikeriotis cited § 1-201 in a brief defending their newly imposed restrictions on the public's access to Baltimore City Circuit Court recordings.  *See Barron v. Trikeriotis*, No. 24C-19-2626, Mot. Dismiss at 11 n.4 (Baltimore City Cir. Ct. Jul. 1, 2019) (arguing that the new restrictions "comport[] with the statutory provision prohibiting the broadcasting of criminal proceedings" and citing § 1-201).  That citation would serve no purpose if § 1-201 were moribund; if anything, it would undermine Defendants' argument.

In any event, Plaintiffs need not wait to be prosecuted under § 1-201 before challenging its constitutionality.  The Supreme Court has repeatedly held that plaintiffs may challenge the constitutionality of statutes that have not yet been enforced.  *See, e.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 299-303 (1979) (holding that a farmworkers union had standing to challenge the constitutionality of a criminal statute that "ha[d] not yet been applied and may never be applied" against the union or its members).[4]  Those cases make clear that plaintiffs can establish a credible threat of

---

[4] *See also Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (permitting a challenge to a criminal statute that had yet to be enforced because "[t]he State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise"); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary

prosecution under a given law, even absent "an actual arrest, prosecution, or other enforcement action" against them. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (noting that such enforcement is "not a prerequisite to challenging the law").

### C.      There is no basis for applying the prudential standing doctrine.

Defendants contend that, even if Plaintiffs establish Article III standing, this case should be dismissed under the "prudential standing" doctrine.  MTD 12-14.  That argument "is in some tension with [the Supreme Court's] recent reaffirmation of the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'"  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (internal quotation marks and citation omitted).  More importantly, however, the argument fails on its own terms.

For instance, Defendants' claim that Plaintiffs are trying to assert the rights of other people is simply wrong.  *See* MTD 12.  As noted, Plaintiffs are asserting their *own* rights to disseminate recordings in their *own* possession.  Compl. ¶¶ 20-25.  And even if Plaintiffs were seeking to assert other people's rights, that still would not provide a "prudential" basis for dismissal in a First Amendment case.  *See American Booksellers*, 484 U.S. at 392-93 ("[I]n the First Amendment context, '[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause

---

that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.").

others not before the court to refrain from constitutionally protected speech or expression.'" (citations omitted; alterations in original)).

Defendants' purported federalism concerns also fall flat. Although Defendants suggest that this case belongs in state court, MTD 13, they do not explain why a state court would be better equipped to decide the *federal* constitutional questions at the heart of this case. *See Steffel v. Thompson*, 415 U.S. 452, 475 n.22 (1974) ("Since we do not require petitioner first to seek vindication of his *federal* rights in a state declaratory judgment action, consideration of abstention by the District Court would be inappropriate unless the action . . . could be shown to present a substantial and immediate possibility of obviating petitioner's federal claim by a decision on state law grounds." (emphasis added; citations omitted)). Nor do they acknowledge that state-court litigation would pose unique challenges here. After all, state judges not only help to enforce § 1-201 but also *actively lobby against* every legislative attempt to repeal or amend the statute. Only a decade ago, a committee of state judges "recommend[ed] that the Maryland Judiciary oppose any revision to [§ 1-201]," noting that the "Judiciary [had] opposed the prior bills [to amend the statute], in principle and as written." 2008 JUDICIARY REPORT ON MEDIA COVERAGE 2, 12. That documented hostility toward Plaintiffs' position casts further doubt on Defendants' federalism arguments.

## II.   Plaintiffs have stated a valid First Amendment claim.

Defendants contend that Plaintiffs are asserting a "constitutional right to broadcast the faces and voices of [litigants], witnesses, victims, judges, or jurors who

participate in a criminal trial." MTD 17. But the right Plaintiffs have asserted is, in fact, much more modest. Specifically, Plaintiffs assert a right to publish and disseminate recordings of court proceedings that *Defendants themselves* have made available to the public. And that right—unlike the right Defendants attack in their motion—is plainly protected by the First Amendment.

### A. The First Amendment protects the right to disseminate truthful information contained in publicly available court records.

"As a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'" *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (citation omitted). The Supreme Court distilled this longstanding First Amendment principle into a simple test in *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979). Under that test, if a member of the press or the public "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Id.* at 103.

The Court applies this test in cases like the present one, where the government seeks to prevent the dissemination of information contained in publicly available sources. For instance, in *Florida Star v. B.J.F.*, 491 U.S. 524 (1989), the Court considered whether a newspaper could be held liable in tort for publishing the name of a sexual-assault victim whose identity the newspaper had learned from a publicly available police report. *Id.* at 527. Relying on *Daily Mail*, the Court held that the First Amendment

shielded the newspaper from liability because it had obtained the victim's name lawfully and no "state interest of the highest order" justified the statute's ban on publication. *Id.* at 541.

In reaching that conclusion, the Court identified "three separate considerations" that supported the *Daily Mail* rule. 491 U.S. at 533. First, the Court noted, "because the *Daily Mail* formulation only protects the publication of information which [was] 'lawfully obtain[ed],' the government retains ample means of safeguarding significant interests upon which publication may impinge." *Id.* at 534. In other words, "a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts." *Id.* Second, the Court observed, "punishing the press for its dissemination of information which is *already publicly available* is relatively unlikely to advance the interests in the service of which the State seeks to act." *Id.* at 535 (emphasis added). Thus, "where the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release." *Id.* Finally, the Court noted, punishing the media "for publishing certain truthful information" would likely cause "timidity and self-censorship" among the press. *Id.* (citation and quotation marks omitted). Taken together, the Court concluded, these considerations mandated robust protections for the dissemination of lawfully acquired, truthful information.

Those protections apply with special force to the information Plaintiffs seek to disseminate here because the information comes directly from courthouse records. In

*Florida Star*, the Court repeatedly noted that the *Daily Mail* principle applied most clearly to information "obtained from courthouse records . . . open to public inspection." 491 U.S. at 532. Those records, after all, "by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975); *see also Florida Star*, 491 U.S. at 532 (noting "the important role the press plays in subjecting trials to public scrutiny and thereby helping guarantee their fairness"). For that reason, the Court has expressly held that the First Amendment "command[s] nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." *Cox Broadcasting*, 420 U.S. at 495; *see also Craig v. Harney*, 331 U.S. 367, 374 (1947) ("If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt.").

Here, Plaintiffs purchased copies of courtroom recordings from their local courthouses under procedures set forth in Maryland law. Compl. ¶¶ 10-11, 21-23. All of the recordings depict proceedings that occurred in open court, and copies of the same recordings remain available for public viewing and listening (and, in some cases, for purchase) at the courthouses where Plaintiffs obtained them. Compl. ¶ 20; Md. Rule 16-504(i). The recordings thus constitute "official court records open to public inspection," and Plaintiffs' efforts to disseminate them cannot be restricted absent "a state interest of the highest order." *Florida Star*, 491 U.S. at 541.

**B.    Defendants have not identified a "state interest of the highest order" to justify § 1-201's blanket ban on broadcasting publicly available court recordings.**

The only justification that Defendants have offered for § 1-201's "broadcasting" ban is the state's need to "protect[] the due process interests of criminal defendants in a fair trial." MTD 19. That justification, however, does not constitute a "state interest of the highest order." Indeed, the Supreme Court has made clear that trial-fairness concerns will rarely, if ever, justify restrictions on the dissemination of truthful information about criminal cases.

For instance, in *Nebraska Press Association v. Stuart*, 427 U.S. 539 (1976), the Court explicitly rejected the argument that a criminal defendant's due-process rights justified a pretrial order barring the press from "publishing or broadcasting" information about evidence disclosed at pretrial hearings. *See id.* at 541, 570. Although the Court acknowledged the importance of safeguarding the defendant's right to a fair trial, it held that "prohibiting reporting or commentary on judicial proceedings held in public" was "clearly invalid." *Id.* at 570.

Similarly, in *Oklahoma Publishing Co. v. District Court*, 430 U.S. 308 (1977) (per curiam), the Court held that a state trial judge could not prohibit the press from publishing the name and photograph of a juvenile defendant whose trial had occurred in open court. The Court did not dispute that the state had an interest in protecting the juvenile's identity, and it even acknowledged that state law favored closed trials for juvenile cases. *See id.* at 309-10. Nevertheless, because the judge had declined to close

the courtroom during the trial, the Court concluded, the First Amendment did "not permit a state court to prohibit the publication of widely disseminated information obtained at court proceedings which were in fact open to the public." *Id.* at 310.

The outcomes of these cases are not surprising.  After all, the notion that public scrutiny of the judicial process would *undermine*—rather than enhance—the fairness of criminal trials inverts the very constitutional interests that *Daily Mail* and its progeny protect.  As noted above, one of the main reasons the government cannot prohibit the press from publishing information contained in court records is because of "the important role the press plays in subjecting trials to public scrutiny and thereby helping guarantee their fairness."  *Florida Star*, 491 U.S. at 532 (emphasis added); *see also Cox Broad.*, 420 U.S. at 495 ("With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice.").  The Constitution itself recognizes as much by guaranteeing the "right to a . . . *public* trial."  U.S. Const. amend. VI (emphasis added).  Defendants' contention that § 1-201 is needed to ensure fair criminal trials, therefore, gets the logic of the *Daily Mail* principle exactly backwards.

### C.     Section 1-201 is not narrowly tailored to achieve Defendants' stated objectives.

Even if fair-trial concerns might justify a *temporary* ban on disseminating a *specific* court recording, they cannot justify § 1-201's *permanent* ban on disseminating court recordings in *all* criminal cases.  *Florida Star* made clear that any restriction on the

dissemination of lawfully obtained, truthful information must be "*narrowly tailored* to a state interest of the highest order." 491 U.S. at 541 (emphasis added). By definition, a blanket ban on disseminating recordings from any criminal "trial, hearing, motion, or argument" cannot be narrowly tailored—particularly when the government itself has already made those recordings available to the public.

The Supreme Court has repeatedly recognized that "punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." *Florida Star*, 491 U.S. at 535; *see also Nebraska Press Ass'n*, 427 U.S. at 562 (noting that the trial court had other "alternatives" to barring publication of information about pretrial proceedings, to ensure trial fairness). The Court employed that logic in *Cox Broadcasting*, for example, when it held that a television station could not be held liable for disclosing a rape victim's name in a broadcast because the victim's identity had already been revealed in court records. 420 U.S. at 495-96. The Court reasoned, "[b]y placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served." *Id.* at 496; *see also id.* ("Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it.").

This rule applies even when the government's disclosure of information is inadvertent and even when the information is highly sensitive. In *Ostergren v. Cucinelli*, 615 F.3d 263 (4th Cir. 2010), the Fourth Circuit held that the plaintiff could not be

punished for posting property records containing the social security numbers (SSNs) of thousands of Virginia residents on her website because she had obtained the records from various county clerks' websites.   The court explained that "Virginia's failure to redact SSNs before placing land records online means that barring [the plaintiff]'s protected speech would not be narrowly tailored to Virginia's interest in protecting individual privacy." *Id.* at 286-87.   Thus, the court concluded, "[u]nder *Cox Broadcasting* and its progeny, the First Amendment does not allow Virginia to punish [the plaintiff] for posting its land records online without redacting SSNs when numerous clerks are doing precisely that." *Id.* at 286.

As it happens, Maryland law already provides a more narrowly tailored means of ensuring that sensitive information contained in specific court recordings is not widely disseminated.   As noted, the same court rule that gives the public a right of access to recordings also contains a provision expressly authorizing judges to redact sensitive portions of those recordings in individual cases. *See* Md. Rule 16-504(g).   That provision illustrates why § 1-201's sweeping breadth is not necessary to achieve Defendants' stated goal of ensuring fair trials. *Cf. Matter of Search Warrant Application*, 923 F.2d 324, 329 (4th Cir. 1991) ("The reason that fair trials can coexist with media coverage is because there are ways to minimize prejudice to defendants without withholding information from public view.").   And the fact that numerous other jurisdictions around the country also make court recordings publicly available—without blanket restrictions on how the public may use them—further suggests that § 1-201 reaches more broadly

than necessary.[5]

At the same time, § 1-201 is also too *narrow* to achieve Defendants' stated goals. For instance, the statute does not prohibit the broadcast of criminal appellate proceedings, even though those proceedings involve the same subject matter and litigants as criminal trial-court proceedings.   Nor does the statute prohibit the broadcast of civil proceedings, like habeas corpus cases, which may also involve the same subject matter.  *See Grandison v. State*, 425 Md. 34, 55 (2012) (noting that "[p]ostconviction relief" is "considered to be civil in nature" (citation omitted)).   In fact, Maryland law expressly authorizes civil proceedings to be broadcast, Md. Rule 16-603, and Maryland's highest court recently live-streamed its proceedings in *State v. Syed*, 463 Md. 60 (2019), a high-profile case revolving around the details of a murder trial.   In short, the under-inclusiveness of § 1-201's broadcasting ban shows that it is not "narrowly tailored."

Defendants argue that § 1-201 need not be perfectly tailored to achieve its goals because the statute is "content-neutral."  MTD 22-23.   But the *Daily Mail* rule—and its narrow-tailoring requirement—apply here regardless of whether § 1-201 is content-neutral.   The Supreme Court's decision in *Bartnicki v. Vopper*, 532 U.S. 514 (2001), illustrates this point well.   There, the Court considered a challenge to a provision of the

---

[5] *See, e.g.*, PUBLIC ACCESS TO COURT ELECTRONIC RECORDS, DIGITAL AUDIO RECORDING PROJECT (last accessed Aug. 1, 2019), https://perma.cc/7L2J-K2YW (identifying dozens of federal district courts that make audio recordings of all court proceedings available through PACER).  Many states also make recordings of trial-court proceedings available to the public.

federal wiretap statute that prohibits people from disclosing communications that they know were intercepted illegally. *See id.* at 523-24. The Court acknowledged that the provision was content-neutral, *see id.* at 526, but nevertheless held the provision unconstitutional under *Daily Mail, see id.* at 527-35; *see also id.* at 544-45 (Rehnquist, C.J., dissenting) (arguing that the majority should have applied intermediate scrutiny, rather than the stricter *Daily Mail* standard, because the statute was content-neutral).

In any event, Defendants' characterization of § 1-201 as "content-neutral" is incorrect. The statute, on its face, applies only to the broadcast of "*criminal* matter[s] . . . held in trial court or before a grand jury." Md. Code, Crim. Pro. § 1-201 (a)(1) (emphasis added). To know whether a given broadcast is proscribed, one must view or listen to the broadcast to determine whether (1) it depicts an actual Maryland court proceeding (as opposed to a reenactment or some other type of proceeding); (2) the proceeding occurred before a trial court or grand jury (as opposed to an appellate court); and (3) the proceeding occurred in a criminal matter (as opposed to a civil matter). In short, the applicability of § 1-201—by its own terms—necessarily turns on the content of the broadcast. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) (explaining that "regulation of speech is content based if a law applies to particular speech because of the topic discussed" or "subject matter" targeted).

### D.   Defendants' remaining arguments are unavailing.

Defendants contend that § 1-201 "does not prohibit 'the publication of truthful information,' because the plaintiffs remain free to publish the same information in

another form." MTD 24.  That argument fails for two reasons.

First, the *Daily Mail* framework applies no matter what method of information-dissemination the government seeks to restrict.  As the case law demonstrates, the same principles govern regardless of whether the speaker hopes to publish a photograph in the newspaper (as in *Oklahoma Publishing Company*), broadcast an audio recording over the radio (as in *Bartnicki*), televise a newscast (as in *Cox Broadcasting*), or post copies of public records on the internet (as in *Ostergren*).  The First Amendment's broad protections for the dissemination of lawfully obtained, truthful information do not disappear merely because the government permits a speaker to "publish the same information in another form."  If the government could evade its First Amendment obligations in this way, then it could suppress the spread of unfavorable news simply by requiring that it be published only in an obscure format.  Nothing in First Amendment jurisprudence contemplates such a result.

Second, an audio or video recording of a court proceeding does *not* contain "the same information" as a written transcript.  Among other differences, recordings capture the human aspects of a proceeding—a judge's tone, a witness's hesitation, or a lawyer's inflection—that cannot be documented as effectively in written form.  Recordings are also more accessible to many people, particularly those with limited literacy skills, and are free from transcription inaccuracies.  Indeed, the shortcomings of written transcripts are so well known that they form the basis for entire doctrines of trial-court deference.  *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 386-87 (2010) ("In contrast to

the cold transcript received by the appellate court, the in-the-moment *voir dire* affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service.").

Defendants also argue that *Daily Mail* and its progeny are "inapplicable because they apply to 'punishments' in the form of criminal prosecution." MTD 24 (no citation in original). But many (if not most) of the key cases applying the *Daily Mail* framework involved efforts to deter speech by imposing *civil* liability—not criminal punishment. *See, e.g.*, *Bartnicki*, 532 U.S. at 519 (civil liability under federal wiretapping law); *Florida Star*, 491 U.S. at 528 (civil liability under Florida tort law); *Cox Broadcasting*, 420 U.S. at 474 (civil liability under Georgia tort law); *Ostergren*, 615 F.3d at 269 (civil penalties under Virginia information-privacy law). And even if these cases applied exclusively to criminal sanctions, they would still govern here in light of Defendants' conspicuous refusal to disavow enforcement of § 1-201 through criminal contempt.

## III. Plaintiffs have stated a valid void-for-vagueness claim.

Section 1-201 also violates due process because it fails to specify what activities qualify as "broadcast[ing]" under the statute.

### A. Section 1-201 is subject to exacting vagueness scrutiny.

An enactment is unconstitutionally vague if it "fails to provide any standard of conduct by which persons can determine whether they are violating the statute," or if it "does not provide 'minimal guidelines to govern law enforcement.'" *Manning v. Caldwell*, No. 17-1320, 2019 WL 3139408, at *6 (4th Cir. July 16, 2019) (en banc)

(citation omitted).  Laws need not be drafted with "celestial precision," of course.  *Hart Book Stores, Inc. v. Edmisten*, 612 F.2d 821, 833 (4th Cir. 1979).  But they must be clear enough to satisfy the core demand of due process: ensuring that people can "steer between lawful and unlawful conduct."  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (citation omitted).

Critically, "a more stringent vagueness test should apply" to laws that "threaten[] to inhibit the exercise of . . . free speech."  *Hoffman Estates*, 455 U.S. at 499.  As explained above, § 1-201 has inhibited expression in Maryland for decades—and its uncertain reach has chilled these very Plaintiffs from using lawfully obtained recordings to speak on matters of public concern.  Accordingly, Maryland may "regulate in th[is] area only with narrow specificity."  *Gooding v. Wilson*, 405 U.S. 518, 522 (1972) (citation omitted).

In fact, this Court must scrutinize § 1-201 doubly stringently, for a "stricter standard" also applies "if criminal penalties may be imposed" upon violators.  *Manning*, 2019 WL 3139408, at *5 (citing *Hoffman Estates*, 455 U.S. at 498-99).  Defendants openly admit that "a full range of sanctions, including *incarceration*," may be imposed in both civil and criminal contempt proceedings to enforce § 1-201.  MTD 33 (emphasis added).  Because the potential "consequences" are equally "severe" in either context, *Hoffman Estates*, 455 U.S. at 499, this Court must apply the stricter standard in evaluating § 1-201.

**B.      The term "broadcast" is not defined in § 1-201 and prescribes no objective standard of conduct.**

Section 1-201(a)(1) prohibits the act of "broadcast[ing]" any criminal matter held in a trial court or before a grand jury.  But the statute leaves the term "broadcast" wholly undefined.  Accordingly, members of the press and the public must consult dictionaries and case law to find a "principled standard" to govern their conduct under § 1-201.  *Doe v. Cooper*, 842 F.3d 833, 843 (4th Cir. 2016).  Those sources, however, do little to clarify whether Plaintiffs' intended conduct constitutes "broadcasting."

There is no dispute that the term "broadcast" can mean "[t]o disseminate [audio or audio-visual content] from a radio or television transmitting station to the receiving sets of listeners and viewers."  OXFORD ENGLISH DICTIONARY, https://oed.com/view/Entry/23508 (last accessed July 31, 2019).  Several courts have endorsed this uncontroversial definition.  *See, e.g.*, *Dish Network Corp. v. Arrowood Indem. Co.*, 772 F.3d 856, 871 (10th Cir. 2014); *Dubinsky v. Liberty Surplus Ins. Corp.*, No. CV 08-06744, 2010 WL 11506086, at *13 (C.D. Cal. June 15, 2010); *WTAR Radio-TV Corp. v. Commonwealth*, 217 Va. 877, 881 (1977).  But this definition offers little guidance to Plaintiffs, who primarily intend to transmit court recordings through means *other* than television or radio.  *See* Compl. ¶¶ 21-23 (explaining that Plaintiffs seek, *inter alia*, to play recordings at community meetings, share them via social media, and post them online).

The other plausible dictionary definition—"[t]o scatter or disseminate widely," OXFORD ENGLISH DICTIONARY—likewise fails to offer useful direction here.  While

some courts have endorsed this definition outside of the vagueness context, none has had occasion to define (even loosely) the outer limits of this definition. *See Norman v. Century Athletic Club*, 193 Md. 584, 590 (1949) (reciting this definition). Nor has any court sought to define how widely a dissemination must extend to constitute broadcasting. Just last year, the Fourth Circuit underscored the emptiness of this concept in evaluating a gag order that barred litigants from commenting on a pending case to "public communications media." *In re Murphy Brown*, 907 F.3d 788, 800 (4th Cir. 2018). The court queried: "When and how are social media posts 'public communications media?' Does it turn on whether a post is public or private, on the account's number of followers, or on whether a reporter is among those followers?" *Id.* The court held that the gag order was impermissibly vague because it "d[id] not provide an answer" to those questions. *Id.*

Section 1-201 similarly fails to "provide an answer" to questions about how widely a court recording must be disseminated to qualify as "broadcast[ing]." Would playing a recording at a private meeting of a dozen people qualify? Would playing one at a public gathering of five hundred people? Could a journalist embed a recording in an online article subject to a paywall? Could a university student upload one to a shared internet folder accessible only to other students at the same university? There is simply no "ascertainable standard for inclusion and exclusion" within the term "broadcasting." *Smith v. Goguen*, 415 U.S. 566, 578 (1974).

No limiting construction has resolved this critical uncertainty. Section 1-201,

after all, has never been judicially construed.  And when Maryland courts have employed the term "broadcast," they have typically done so in its "general figurative" sense, *Norman*, 193 Md. at 590, rather than to refine its meaning in specific regulatory contexts. *See id.* ("It may often have been said, with reference to telegraph or newspapers, that news, gossip, a baseball game or a prize-fight was broadcasted, or with reference to a loudspeaker or amplifier, that a speech was broadcasted.").[6]  Maryland courts have even used the term in reference to intentionally *limited* disseminations.  *See, e.g.*, *Roberts v. State*, 298 Md. 261, 267 (1983) ("This description was broadcast over police radio."); *Case v. State*, No. 117053003, 2019 WL 1579778, at *7 (Md. Ct. Spec. App. Apr. 12, 2019) (certain footage was "broadcast[] on . . . closed-circuit televisions").

As a result, journalists and other citizens cannot know what § 1-201's open-ended ban on "broadcast[ing]" encompasses.  Defendants' analogy to Federal Rule of Criminal Procedure 53 (MTD 27, 31) sheds little light here, for that rule prohibits only "broadcast[s]" that occur "*from the courtroom*" (emphasis added).  And even if § 1-201 had one or more clearly constitutional applications, "th[at] fact . . . cannot save it." *Doe*,

---

[6] For additional uses of "broadcast" in this sense, see, e.g., *Georgia Pac. v. Farrar*, 432 Md. 523, 537 (2013) (a scientific breakthrough was "widely broadcast"); *Wright v. State*, 411 Md. 503, 514 (2009) (questions were "broadcast" to potential jurors); *Murphy v. Baltimore Gas & Elec. Co.*, 290 Md. 186, 191 (1981) (a legal proposition had "frequently been broadcast by this Court"); *Norvell v. Safeway Stores*, 212 Md. 14, 21 (1957) (a letter-writer "broadcast[ ] . . . charges of dishonest practices" to various recipients); *Henson v. State*, 212 Md. App. 314, 321 (Ct. Spec. App. 2013) (a robocall was "broadcast" to multiple phone numbers); *Wong-Wing v. State*, 156 Md. App. 597, 610 (Ct. Spec. App. 2004) (an answering machine "broadcast aloud" messages it received).

842 F.3d at 843 (citing *Johnson v. United States*, 135 S. Ct. 2551, 2560-61 (2015)).[7]

Ordinarily, regulated parties can "seek clarification from appropriate administrative sources." *Greenville Women's Clinic v. Comm'r*, 317 F.3d 357, 367 (4th Cir. 2002); *see also U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 580 (1973). But Plaintiffs were not so fortunate. Each of their inquiries was rebuffed, even though Judge Pierson has repeatedly warned other journalists that particular courses of action would, in his view, amount to "broadcast[ing]" under § 1-201. Compl. ¶ 26. This suit is thus Plaintiffs' sole remaining recourse, for "[s]peakers deserve to know" what they must do to avoid imprisonment. *In re Murphy-Brown*, 907 F.3d at 800.

### C.   Section 1-201's remaining language fails to clarify the meaning of "broadcast."

Nor can the broadcasting ban's history and surrounding context clarify its otherwise abstract outlines. Section 1-201 contains neither a scienter requirement nor any "limiting context," *Norman*, 193 Md. at 590, to guide its enforcement against persons who transmit court recordings through means other than television and radio.

If anything, § 1-201's enactment history introduces further confusion, for it suggests that uses of *court-created* recordings simply do not implicate the ban. From the very beginning, the ban's stated purpose was to "prohibit[ ] the recording or

---

[7]   Defendants focus on the wrong question by asking whether § 1-201 is "impermissibly vague in all of its *reasonable* applications." MTD 26. The pertinent question, as both the Fourth Circuit and the Supreme Court have made clear, is simply whether a prohibition "specifies no standard" at all. *Doe*, 842 F.3d at 843.

broadcasting, *by the use of certain equipment*, of [criminal] trial court proceedings." 1981 Md. Laws ch. 748, at 2782 (emphasis added). The 1981 law prohibited "extended coverage" of those proceedings, which it defined as "any recording or broadcasting . . . by the use of television, radio, photographic, or recording equipment." *Id.* at 2783.[8] As Defendants note, the broadcasting ban was "modified without substantive change" in 2001 and "has not been amended since." MTD 4. Accordingly, § 1-201 states explicitly that its "prohibition applies to the use of television, radio, and photographic and recording equipment." Md. Code, Crim. Proc. § 1-201 (a)(2); *see also id.*, Revisor's Note ("The scope of this section is limited to media coverage of criminal proceedings.").

Put differently, if the dissemination of court-created recordings somehow falls within § 1-201's scope, it will not have occurred through "legislative judgment." *Coates v. City of Cincinnati*, 402 U.S. 611, 613 (1971) (citation omitted). It is unsurprising that Defendants have failed to identify any "objectively discernable standards" for imposing liability in these circumstances, *Manning*, 2019 WL 3139408, at *9, given that § 1-201 (and its predecessor) sought to regulate a different type of behavior.

In fact, Defendants' own examples reveal the sheer unworkability of a ban on the dissemination of public court records. Defendants insist that § 1-201 would permit

---

[8] The Maryland Rules' provision for "extended coverage" in civil proceedings is likewise concerned only with "recording" and "broadcasting" by *nonjudicial actors* who use *their own equipment*. *See* Md. Rule 16-601(a) ("'Extended coverage' means the recording or broadcasting of court proceedings by the use of recording, photographic, television, radio, or other broadcasting equipment . . . .").

Plaintiffs to "read back [official] transcripts" or "reenact court proceedings." MTD 23. Yet it is unclear why these performances—if transmitted over television or radio—would not constitute "broadcast[ing] any criminal matter." At least one federal court has held Rule 53's "broadcasting" ban to include "sending electronic messages" that describe judicial proceedings, because those messages "make widely known the trial proceedings." *United States v. Shelnutt*, No. 4:09-CR-14, 2009 WL 3681827, at *1 (M.D. Ga. Nov. 2, 2009). That would be even more true of dramatic reenactments—especially ones that widely publicize the contents of official court transcripts.

### IV. Plaintiffs have not failed to name any indispensable defendants.

Defendants insist that this suit cannot proceed because Plaintiffs did not sue the criminal defendants in the various cases for which they obtained recordings. According to Defendants, the parties in those cases have "unique interests" in this matter that make them required parties under Federal Rule of Civil Procedure 19(a)(1). MTD 15.

Dismissal under Rule 19 is a "drastic remedy" that "should be employed only sparingly." *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 433 (4th Cir. 2014) (citation omitted); *see also Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 441 (4th Cir. 1999) ("Courts are loath to dismiss cases based on nonjoinder of a party[.]"). The burden of satisfying each element of Rule 19 "rests on the party raising the defense." *American Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005). Here, Defendants cannot satisfy their burden under Rule 19 because their argument rests on a mistaken understanding of the law and a speculative view of the facts.

First, as a legal matter, Defendants' contention that certain defendants have "unique [privacy] interests" to vindicate is unpersuasive.   MTD 16.   The privacy interests of criminal defendants cannot justify restricting the dissemination of information about criminal trials any more than they would justify closing the courtroom during the trials themselves.   *See* U.S. Const. amend. VI (guaranteeing a right to a "*public* trial" (emphasis added)).   Moreover, if criminal defendants had a cognizable privacy interest in this context, it would mean that countless judicial decisions— including *Daily Mail*, *Cox Broadcasting*, *Florida Star*, and others—were rendered in the absence of necessary parties.   Similarly, if Defendants' theory were correct, then the plaintiff in *Ostergren* would have needed to sue thousands of her fellow Virginians— everyone whose social-security numbers had been disclosed—before challenging the restrictions on her own speech.   Defendants have cited no authority to support such an expansive and novel reading of Rule 19.

Defendants' concern for the privacy interests of criminal defendants rings hollow for yet another reason: it was *Defendants themselves* who provided Plaintiffs with the recordings of the criminal defendants' cases.   As noted above, Maryland law contains ample mechanisms to ensure that releasing recordings of criminal proceedings will not impair any residual privacy interests.   *See supra* Part II.C (discussing Md. Rule 16-504(g)). Defendants chose not to invoke those mechanisms here and, even now, continue to make the same recordings Plaintiffs purchased available for public viewing and listening.   Defendants cannot obtain a Rule 19 dismissal—an exceedingly rare

occurrence—by relying on alleged privacy concerns that they themselves disregarded.

Finally, even if Defendants' legal theory under Rule 19 had merit—which it does not—dismissal would still be improper.  Defendants speculate that numerous criminal defendants would wish to be sued in order to assert any interest they "may have" in § 1-201's enforceability.  MTD 15.  But Defendants have not offered any evidence to support that highly counterintuitive belief.  Accordingly, there is no basis to conclude that "prejudice . . . will certainly result" if absent third parties remain absent from this case.  *Owens-Illinois*, 186 F.3d at 441.

### V.   Plaintiffs have stated valid claims against the court reporters.

Plaintiffs allege that the court reporters for Baltimore City and Prince George's County serve as the authorized custodians of court recordings in those jurisdictions and "share[] responsibility for enforcing § 1-201's broadcasting ban."  Compl. ¶¶ 19, 34-35. Their complaint further alleges that, "[i]n practice, court reporters view the enforcement of § 1-201 as one of their responsibilities and typically play a role in deciding how court officials will respond to violations of the statute."  Compl. ¶ 19; *see also* MTD 32 (highlighting reference to § 1-201 on official court reporter form).

Defendants now contend that the court reporters should be dismissed because they "have nothing to do with initiating contempt proceedings."  MTD 14.  That assertion, however, amounts to little more than a denial of Plaintiffs' factual allegations, which is not a proper basis for dismissal under Rule 12(b)(6).  If Defendants wish to

argue that court reporters play no role in enforcing § 1-201, they are free to submit swornevidence to that effect at summary judgment.

To the extent Defendants are arguing that the court reporters play no role in the contempt process as a *legal* matter, that argument also fails. Maryland Rule 15-205 explicitly authorizes "any person with actual knowledge of the facts constituting a constructive criminal contempt" to ask prosecutors to file a contempt petition. *See* Md. Rule 15-205(b)(5). As the custodians of court recordings for their respective jurisdictions, court reporters frequently have direct knowledge of § 1-201 violations involving those recordings. *See* Compl. ¶¶ 19, 34-35; *see also* MTD Ex. 4 (recording-request forms submitted to the court reporter's office). Their active involvement in identifying violations of the statute and making enforcement decisions under it suffices to support a claim for declaratory relief against them.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Respectfully submitted,

  */s/ Nicolas Y. Riley*

ADAM HOLOFCENER  (No. 19579)
MARYLAND VOLUNTEER LAWYERS FOR
   THE ARTS
120 W. North Ave., Suite 305A
Baltimore, MD 21201
Tel.:   410-752-1633
adam@mdvla.org

**\*** *Admitted pro hac vice.*

Dated:  August 2, 2019

NICOLAS Y. RILEY**\***  (No. 810809)
DANIEL B. RICE  (No. 20874)
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY & PROTECTION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Avenue NW
Washington, DC 20001
Tel.:   202-662-4048
Fax:   202-662-9248
nr537@georgetown.edu
dbr32@georgetown.edu

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2019, I electronically filed the foregoing brief

with the U.S. District Court for the District of Maryland by using the Court's

CM/ECF system.  Participants in the case are registered CM/ECF users, and service

will be accomplished by the Court's CM/ECF system.  A courtesy paper copy of the

brief will also be filed with the Clerk of the Court within two business days of

electronic filing.


*/s/ Nicolas Y. Riley*

NICOLAS Y. RILEY