UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**BRANDON SODERBERG**, *et al.*,

   *Plaintiffs*,

**v.**

**HON. AUDREY J. S. CARRIÓN,** *et al.*,

   *Defendants.*

Case No. 1:19-cv-01559-RDB

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

ADAM HOLOFCENER (No. 19579)
Maryland Volunteer Lawyers for
 the Arts
120 W. North Ave., Suite 305A
Baltimore, MD 21201
Tel.:  410-752-1633
adam@mdvla.org

SHELBY CALAMBOKIDIS* (No. 816008)
SETH WAYNE* (No. 816003)
Institute for Constitutional Advocacy
 and Protection
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, DC 20001
Tel.:  202-661-6599
Fax:  202-661-6730
sc2053@georgetown.edu
sw1098@georgetown.edu
* Admitted *pro hac vice*

Dated:  April 6, 2022

*Counsel for Plaintiffs*

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

FACTS .................................................................................................................. 2

A.   The Public's Right of Access to Maryland Trial Court Recordings ..................... 2

B.   Maryland's Ban on Broadcasting Recordings of Criminal Trial Proceedings ..... 4

C.   Impact of the Broadcast Ban on Plaintiffs' Speech ................................................. 5

PROCEDURAL HISTORY ................................................................................. 8

LEGAL STANDARD ........................................................................................ 11

ARGUMENT ..................................................................................................... 11

I.   The Broadcast Ban Violates the First Amendment. ........................................... 11

   A.   Legal Standards ............................................................................................. 11

   B.   The Broadcast Ban fails strict scrutiny. ........................................................ 16

      1.   The State has not substantiated that the Broadcast Ban serves any state interests of the highest order. ....................................................................... 16

      2.   The Broadcast Ban is not narrowly tailored to protect any of the interests cited by the State. ................................................................................ 22

II.   None of Defendants' Other Affirmative Defenses Are Availing. ..................... 29

   A.   There is no basis for applying the prudential standing doctrine. ................ 29

   B.   Plaintiffs' claims are not barred by waiver. .................................................... 30

CONCLUSION .................................................................................................. 34

REQUEST FOR HEARING .............................................................................. 34

# TABLE OF AUTHORITIES

## Cases

*Am. Ass'n of Pol. Consultants, Inc. v.*
  *FCC*, 923 F.3d 159 (4th Cir. 2019) .................................................................... 22

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................... 11

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
  564 U.S. 721 (2011) ........................................................................................... 12

*Ark. Writers' Project, Inc. v. Ragland*,
  481 U.S. 221 (1987) ........................................................................................... 12

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ........................................................................................... 17

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) ........................................................................................... 15

*Bruni v. City of Pittsburgh*,
  824 F.3d 353 (3d Cir. 2016) .............................................................................. 15

*Burson v. Freeman*,
  504 U.S. 191 (1992) ........................................................................................... 12

*Cent. Radio Co. v. City of Norfolk*,
  811 F.3d 625 (4th Cir. 2016) ..................................................................... *passim*

*Centro Tepeyac v. Montgomery Cnty.*,
  722 F.3d 184 (4th Cir. 2013) ............................................................................ 15

*Chandler v. Florida*,
  449 U.S. 560 (1981) ........................................................................................... 18

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ........................................................................................... 12

*City of Chicago v. Morales*,
  527 U.S. 41 (1999) ............................................................................................. 14

*Cox Broad. Corp. v. Cohn*,
  420 U.S. 469 (1975) ................................................................................. 1, 11, 33

*Curtis Publ'g Co. v. Butts*,
  388 U.S. 130 (1967) ........................................................................................... 32

*D.H. Overmyer Co. v. Frick Co.,*
  405 U.S. 174 (1972) ................................................................................ 31

*Defs. of Wildlife v. N.C. Dep't of Transp.,*
  762 F.3d 374 (4th Cir. 2014) ................................................................. 11

*Doe v. City of Albuquerque,*
  667 F.3d 1111 (10th Cir. 2012) ....................................................... 14, 15

*FEC v. Mass. Citizens for Life, Inc.,*
  479 U.S. 238 (1986) ................................................................................ 22

*First Nat'l Bank of Boston v. Bellotti,*
  435 U.S. 765 (1978) ................................................................................ 24

*Fla. Star v. B.J.F.,*
  491 U.S. 524 (1989) ......................................................................... 11, 22

*Frisby v. Schultz,*
  487 U.S. 474 (1988) ................................................................................ 12

*Fuentes v. Shevin,*
  407 U.S. 67 (1972) .................................................................................. 31

*Grandison v. State,*
  38 A.3d 352 (Md. 2012) ......................................................................... 27

*Gray v. State,*
  857 A.2d 1176 (Md. Ct. Spec. App. 2004) ........................................... 27

*In re Murphy-Brown,*
  907 F.3d 788 (4th Cir. 2018) ................................................................. 23

*Janklow v. Planned Parenthood,*
  517 U.S. 1174 (1996) ............................................................................. 14

*Johnson v. Zerbst,*
  304 U.S. 458 (1938) ................................................................................ 31

*Kolbe v. Hogan,*
  849 F.3d 114 (4th Cir. 2017) ................................................................. 12

*Landmark Commc'ns, Inc. v. Virginia,*
  435 U.S. 829 (1968) ................................................................................ 29

*McCullen v. Coakley,*
  573 U.S. 464 (2014) ......................................................................... 13, 28

*N.Y. Times Co. v. Sullivan,*
  376 U.S. 254 (1964) ................................................................................ 33

*Nat'l Pub. Radio, Inc. v. Klavans,*
 No. 21-cv-2247, 2021 WL 4197661 (D. Md. Sept. 15, 2021) .............................. 14, 26

*Overbey v. Mayor of Balt.,*
 930 F.3d 215 (4th Cir. 2019) ................................................................................... 32, 33

*Press-Enterprise Co. v. Superior Ct.,*
 478 U.S. 1 (1986) ........................................................................................................... 17

*PSINet, Inc. v. Chapman,*
 362 F.3d 227 (4th Cir. 2004) ....................................................................................... 15

*Reed v. Town of Gilbert,*
 576 U.S. 155 (2015) ........................................................................................... 12, 13, 24

*Republican Party of Minn. v. White,*
 536 U.S. 765 (2002) ............................................................................................... 12, 13

*Reynolds v. Middleton,*
 779 F.3d 222 (4th Cir. 2015) ............................................................................. 12, 13, 28

*Ross v. Early,*
 746 F.3d 546 (4th Cir. 2014) ....................................................................................... 17

*Rothe Dev. Corp. v. U.S. Dep't of Def.,*
 413 F.3d 1327 (Fed. Cir. 2005) .................................................................................... 15

*Sheppard v. Maxwell,*
 384 U.S. 333 (1966) ....................................................................................................... 18

*Smith v. Daily Mail Publ'g Co.,*
 443 U.S. 97 (1979) ................................................................................................. *passim*

*Soderberg v. Carrion,*
 999 F.3d 962 (4th Cir. 2021) ................................................................................. *passim*

*United States v. Playboy Ent. Grp.,*
 529 U.S. 803 (2000) ....................................................................................................... 27

*United States v. Salerno,*
 481 U.S. 739 (1987) ....................................................................................................... 14

*Wash. Post v. McManus,*
 944 F.3d 506 (4th Cir. 2019) .................................................................................. 16, 24

*Watt v. Energy Action Educ. Found.,*
 454 U.S. 151 (1981) ....................................................................................................... 31

*Williams v. State*,
    No. 1415, 2021 WL 6057143 (Md. Ct. Spec. App. Dec. 20, 2021)............................ 27

*Younger v. Harris*, 401 U.S. 37 (1971).................................................................... 30

**Statutes**

Md. Code, Crim. Proc. § 1-201 ........................................................................... 4, 26

**Other Authorities**

*Digital Audio Recording Project*, Admin. Office U.S. Courts,
    https://perma.cc/9ZSV-P4JR (last visited Mar. 20, 2020) ......................................... 21

*Directory of Appellate, Circuit, District, and Orphans' Courts*, Md. Courts,
    mdcourts.gov/courtsdirectory (last visited Apr. 4, 2022) ............................................. 2

Justin Fenton, *Court Officials Considered Contempt for 'Serial' Producers for Airing
    Courtroom Audio*, Balt. Sun (Dec. 21, 2016), https://perma.cc/6NW6-447R.............. 4

Justin Fenton, *Records: Baltimore Police Officer Charged with DUI After Being
    Found Lying 'in Vomit.' His Off-Duty Gun Went Missing*, Balt. Sun (Oct. 14, 2020),
    https://perma.cc/CRQ2-3EBT ..................................................................... 24

Md. Judiciary, Court Reporting Manual (2021),
    https://perma.cc/2KRN-2VLW ....................................................................... 2

**Rules**

Ariz. Sup. Ct. R. 122(h)................................................................................ 21

Conn. R. Super. Ct., Gen. Provisions, § 1-11C(a) ............................................... 21

Fed. R. Civ. P. 56 ...................................................................................... 11

Fla. R. Jud. Admin. 2.450(a) ......................................................................... 21

Mass. Sup. Jud. Ct. R. 1:19(2)....................................................................... 21

Md. Rule 16-502 ................................................................................. 2, 3, 19

Md. Rule 16-503 ......................................................................................... 2

Md. Rule 16-504 ................................................................................. 3, 4, 19

Mich. Sup. Ct. Admin. Order 1989-1(2)(a)(i)................................................... 21

Miss. R. for Elec. & Photographic Coverage of Jud. Proceedings 3 ...................... 21

N.C. R. Super. & Dist. Cts. 15(b) .................................................................. 21

N.H. R. Crim. P. 46(a) ................................................................................ 21

N.M. Sup. Ct. R. 23-107 .............................................................................. 21

Ohio R. of Superintendence for Cts. 12(A) ............................................................ 21

R.I. R. Sup. Ct., art. vii ..................................................................................... 21

S.C. R. App. Ct. 605(f)(1)(i)................................................................................ 21

Tenn. Sup. Ct. R. 30(A)(1) ................................................................................ 21

Utah Jud. Admin. Code, Rule 4-401.01(2) ........................................................ 21

Vt. R. Crim. P. 53 ............................................................................................. 21

Wis. Sup. Ct. R., ch. 61 .................................................................................... 21

# INTRODUCTION

Plaintiffs Brandon Soderberg, Baynard Woods, Open Justice Baltimore, Baltimore Legal Action Team, Qiana Johnson, and Life After Release are a group of journalists and community organizations who seek to publish and disseminate recordings of public Maryland criminal proceedings.  They want to use those recordings—all of which they obtained lawfully and all of which remain freely accessible to any member of the public—to engage in public discourse about their local courts and promote greater democratic accountability within Maryland's criminal justice system.  But Maryland law prohibits them from doing just that.  Section 1-201(a)(1) of the Maryland Code of Criminal Procedure (hereinafter "the Broadcast Ban," or simply the "Ban") makes it illegal for any person to "broadcast" digital recordings of criminal trial court proceedings, even though the State itself makes copies of those recordings publicly available.  As a result, people who lawfully obtain copies of criminal court recordings are effectively barred from using them to engage in a broader public dialogue about their judicial system.

This lawsuit challenges the validity of that law.  It rests on a simple but important principle, firmly rooted in longstanding Supreme Court precedent, that the First and Fourteenth Amendments forbid the state from punishing the publication of lawfully obtained, truthful information except where necessary to further a state interest of the highest order.  *See generally Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495–96 (1975); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 101–04 (1979).  This principle applies to Maryland's

Broadcast Ban and requires the State to satisfy strict scrutiny review. *Soderberg v. Carrion*, 999 F.3d 962, 964, 967, 969 (4th Cir. 2021).

For the reasons explained below, the Broadcast Ban cannot survive such "rigorous" review. *See id.* at 970 n.4. Strict scrutiny requires Defendants to prove that the law furthers a compelling state interest and is narrowly tailored to achieve that interest, and Defendants can do neither here. Moreover, Defendants' affirmative defenses—grounded in prudential standing and waiver doctrine—have either already been rejected by this Court or lack merit as a matter of law. Accordingly, this Court should grant Plaintiffs' motion for summary judgment and declare the Broadcast Ban unconstitutional insofar as it applies to lawfully obtained recordings.

## FACTS

### A.  The Public's Right of Access to Maryland Trial Court Recordings

Maryland court rules require all proceedings held before a trial court judge to be "recorded verbatim in their entirety." Md. Rule 16-503(a) (circuit courts); Md. Rule 16-502(a) (district courts). Many trial courts across the State, including the Circuit Courts for Baltimore City and Prince George's County, comply with this requirement by creating audio recordings of all judicial proceedings.[1] And some jurisdictions, like

---

[1]    *See* Md. Judiciary, Court Reporting Manual 16 (2021), https://perma.cc/2KRN-2VLW; *see also Directory of Appellate, Circuit, District, and Orphans' Courts*, Md. Courts, mdcourts.gov/courtsdirectory (last visited Apr. 4, 2022).

Baltimore City, also maintain video recordings of their proceedings.  *See, e.g.*, Ex. 4, Declaration of Baynard Woods ("Woods Decl.") ¶¶ 4–5.

In every jurisdiction, members of the public have a qualified right of access to the recordings.  The contours of that right are set forth in court rules adopted by the State's judiciary.  Those rules require trial courts to allow "any person" to view and listen to audio and video recordings at the courthouse, Md. Rule 16-504(i), and, as relevant here, to "make a copy" of the audio recording "available to any person upon written request," Md. Rule 16-504(h); *see also* Md. Rule 16-502(g)(1) (same requirement for district courts).[2]

Under the rules, trial courts retain authority to ensure that especially sensitive content will not be released to the public.  *See generally* Md. Rule 16-504(h)(1) ("Except (A) for proceedings closed pursuant to law, (B) as otherwise provided in this Rule, or (C) as ordered by the court, the authorized custodian of an audio recording shall make a copy of the audio recording . . . available to any person upon written request . . . ."). For example, if a judge finds that certain portions of a recording "should and lawfully may be shielded from public access and inspection, the court shall direct that appropriate safeguards be placed on that portion of the recording." Md. Rule 16-504(g); *see also* Md. Rule 16-504(h)(2) ("Redacted Portions of Recording").  Recordings may

---

[2]  Although the courts that maintain both audio and video recordings of their proceedings are not required to provide copies of video recordings to the public as they must do with audio recordings, *see* Md. Rule 16-504(h)(1), (j), nothing in the rules precludes them from doing so.

also be withheld from the public "as ordered by the court" in specific cases where it is warranted by law. *See* Md. Rule 16-504(h)(1)(C), (i)(1).

> ### B. Maryland's Ban on Broadcasting Recordings of Criminal Trial Proceedings

Despite mandating public access to court recordings, Maryland law imposes limits on what the public may do with those recordings. Specifically, it restricts the public's ability to disseminate the recordings. Section 1-201 of the Maryland Code of Criminal Procedure makes it unlawful to "broadcast any criminal matter, including a trial, hearing, motion or argument, that is held in trial court or before a grand jury." Md. Code, Crim. Proc. § 1-201(a)(1). Those who violate the statute may be held in contempt, *id.* § 1-201(c), and subjected to "a full range of sanctions, including incarceration," Defs.' Mem. Supp. Mot. to Dismiss 33, ECF No. 23-2 ("MTD").

As relevant here, Maryland officials construe § 1-201 to cover not only broadcasts of live court proceedings but also broadcasts of court *recordings* that the State itself has made available to the public. In 2016, for example, Baltimore court officials considered holding in contempt the producers of *Serial*, a popular investigative-reporting podcast, for playing excerpts of a 2000 murder trial on their show. *See* Justin Fenton, *Court Officials Considered Contempt for 'Serial' Producers for Airing Courtroom Audio*, Balt. Sun (Dec. 21, 2016), https://perma.cc/6NW6-447R. In 2019, a Baltimore City circuit judge sent a letter to HBO admonishing the network for using video footage of the same trial in a documentary. Ex. 2 at Carrion0217. And a month later, the same

judge sent a similar letter to a local journalist, warning her that it would be unlawful for her to include courtroom audio (from a different case) on her podcast.  Ex. 3 at Carrion0227–28.

### C.    Impact of the Broadcast Ban on Plaintiffs' Speech

Plaintiffs are journalists, lawyers, and community organizations who seek to publish and disseminate recordings of Maryland criminal proceedings as part of their reporting, advocacy, and community-education efforts.  They have refrained from doing so, however, because they fear being sanctioned under § 1-201.  Woods Decl. ¶ 8; Ex. 5, Declaration of Brandon Soderberg ("Soderberg Decl.") ¶ 6; Ex. 6, Declaration of Zach Zwagil ("OJB Decl.") ¶ 6; Ex. 7, Declaration of Matthew Zernhelt ("BALT Decl.") ¶ 6; Ex. 8, Declaration of Qiana Johnson ("Johnson Decl.") ¶ 8.

Plaintiffs Brandon Soderberg and Baynard Woods are Baltimore-based journalists who have worked on a book and a documentary film about the Baltimore Police Department's Gun Trace Task Force.  Woods Decl. ¶¶ 2–3; Soderberg Decl. ¶¶ 2–3.  In recent years, the Baltimore City Court Reporter's office has provided them with copies of several audio recordings, as well as one video recording, of local court proceedings.  *See* Woods Decl. ¶ 4; Soderberg Decl. ¶ 4.  Mr. Soderberg and Mr. Woods "intend to use these recordings in [their] documentary film, among other reporting projects."  Woods Decl. ¶ 6; Soderberg Decl. ¶ 4.

Plaintiffs Open Justice Baltimore (OJB) and Baltimore Action Legal Team (BALT) are organizations that support community-centered efforts to improve the

criminal justice system, including by enhancing its transparency.  OJB Decl. ¶ 2; BALT Decl. ¶ 2.   OJB and BALT have both obtained audio recordings of local court proceedings from the Baltimore City Court Reporter's office.  *See* OJB Decl. ¶ 3; BALT Decl. ¶ 3.   They intend to use audio recordings of Baltimore City Circuit Court proceedings in their efforts to educate the public about Baltimore's legal system.  OJB Decl. ¶¶ 2, 4; BALT Decl. ¶ 4.   In particular, OJB and BALT "plan[] to post the recordings online, play them at community events (including know-your-rights events for community members and legal training for volunteer lawyers), and share them on social media."  BALT Decl. ¶ 4; *see* OJB Decl. ¶ 4.

Plaintiff Qiana Johnson is a community organizer in Prince George's County and the founder of Plaintiff Life After Release, an organization that seeks to empower people and communities affected by the criminal justice system.  Johnson Decl. ¶ 2. Life After Release coordinates a court-watching program aimed at promoting accountability within Prince George's County's judicial system.  *Id.* ¶ 3.   The organization also supports people facing criminal charges by helping their family and community members remain informed and involved in the adjudicative process.  *Id.* Ms. Johnson and Life After Release have obtained audio recordings of local court proceedings from the Prince George's County Office of Court Reporters.  *Id.* ¶ 4.  Some of the recordings come from proceedings in which Ms. Johnson was invited to address the court on behalf of criminal defendants who asked her to advocate for them.  *Id.* ¶ 5. Ms. Johnson and Life After Release "plan to post the recordings . . . on websites and

play them at meetings in order to highlight the impact of [their] participatory-defense work and teach others how to become effective community advocates." *Id.* ¶ 6.

Each of the Plaintiffs lawfully obtained the recordings. Soderberg Decl. ¶ 4; Woods Decl. ¶¶ 4–5; OJB Decl. ¶ 3; BALT Decl. ¶ 3; Johnson Decl. ¶ 4. In requesting recordings from their local courthouses, Plaintiffs Woods, OJB, and Johnson signed forms that acknowledged the general prohibition found in Section 1-201, namely, that recordings may not be "broadcast." *See* Woods Decl. ¶ 4; OJB Decl. ¶ 3; Johnson Decl. ¶ 4. The forms did not include any language indicating that signing the forms constituted a waiver of constitutional rights. Woods Decl. ¶ 4; OJB Decl. ¶ 3; Johnson Decl. ¶ 4.

On May 2, 2019, Mr. Soderberg, Mr. Woods, OJB, and BALT (the Baltimore Plaintiffs) submitted letters to the administrative judge for Baltimore City at that time, former Defendant W. Michel Pierson, to notify him of their plans to disseminate the recordings in their possession. *See generally* Compl., Ex. A, ECF No. 1-1; Compl., Ex. B, ECF No. 1-2. In the letters, the Baltimore Plaintiffs asked if Judge Pierson knew of any harms that might result from the dissemination of the recordings, noting that they would consider his views before acting on their plans. The Baltimore Plaintiffs also sought clarity as to whether their intended uses of the recordings—such as sharing the recordings on social media—would constitute "broadcasting" under § 1-201. Court officials never responded to either letter. Soderberg Decl. ¶ 5; Woods Decl. ¶ 7; OJB Decl. ¶ 5; BALT Decl. ¶ 5.

On May 14, 2019, Ms. Johnson and Life After Release (the Prince George's County Plaintiffs) submitted a similar letter to the administrative judge for Prince George's County, Defendant Sheila R. Tillerson Adams.  *See generally* Compl., Ex. C, ECF No. 1-3.  Like Judge Pierson, Judge Adams never responded to the letter from the Prince George's County Plaintiffs.  Johnson Decl. ¶ 7.

Defendants' failure to respond to Plaintiffs' inquiries has left Plaintiffs in the dark as to whether (and, if so, how) they may disseminate the various court recordings in their possession.  More importantly, it has chilled their speech and deterred them from using the recordings in all of the ways that they otherwise would.  *See* Soderberg Decl. ¶ 6; Woods Decl. ¶ 8; OJB Decl. ¶ 6; BALT Decl. ¶ 6; Johnson Decl. ¶ 8.

## PROCEDURAL HISTORY

On May 28, 2019, Plaintiffs filed this action against Defendants in their official capacities as the administrative judges for Baltimore City and Prince George's County, respectively.[3]  In their complaint, Plaintiffs asserted that § 1-201 violated the First

---

[3]  Defendants are Hon. Audrey J. S. Carrión, who serves as the administrative judge for Baltimore County and Maryland's Eighth Judicial Circuit, and Hon. Sheila R. Tillerson Adams, who serves as the administrative judge for Prince George's County and Maryland's Seventh Judicial Circuit.  Plaintiffs originally named Hon. W. Michel Pierson as a defendant, but he was replaced by Carrión after he retired.  *See* Letter Order 2, ECF No. 46.  Plaintiffs also originally named the Baltimore City and Prince George's County court reporters in their official capacities as custodians of court recordings for those jurisdictions, but this Court held that they were not proper defendants, *see* Mem. Op. 14–16, ECF No. 30 ("MTD Op."), and Plaintiffs did not appeal that portion of the Court's ruling, *see infra* p. 9.

Hereinafter, Plaintiffs will at times refer to Defendants, who are represented by the Attorney General of Maryland, as the "State."

Amendment and was void for vagueness. Compl. ¶¶ 37–51. They sought a declaratory judgment that § 1-201 is unconstitutional insofar as it prohibits them from disseminating court recordings that they acquired through lawful means. *See id.* at pp. 22–23 (asking court to declare that § 1-201 is unconstitutional "as applied to lawfully obtained audio or video recordings," and that Plaintiffs may not be held in contempt or otherwise sanctioned for posting online, sharing on social media, playing at public events, or including in any film or podcast "any lawfully obtained audio or video recordings of criminal proceedings that occurred in open court").

Defendants moved to dismiss the complaint in July 2019, arguing that Plaintiffs lacked standing, failed to state a claim, and failed to name necessary parties. *See* ECF Nos. 21 & 23. This Court dismissed the complaint in January 2020. *See generally* MTD Op. The Court rejected Defendants' argument that Plaintiffs lacked standing and failed to name necessary parties, *id.* at 6–14, 16–19, but held that Plaintiffs failed to state a claim under either the First Amendment or the void-for-vagueness doctrine, *id.* at 19–33. With respect to the First Amendment claim, the Court held that the Broadcast Ban was a content-neutral regulation of time, place, and manner of speech that survived intermediate scrutiny. *Id.* at 26–30.

Plaintiffs appealed the dismissal of their First Amendment claim. ECF No. 32. On June 15, 2021, the Fourth Circuit vacated the dismissal of that claim and remanded the case for a determination as to whether the Broadcast Ban could satisfy strict scrutiny. *Soderberg*, 999 F.3d at 970. The court held that Maryland could not

9

constitutionally punish the broadcasting of lawfully obtained, official court recordings "absent a need to further a state interest of the highest order." *Id.* at 969 (quoting *Daily Mail*, 443 U.S. at 103); *see also id.* (equating the *Daily Mail* standard with strict scrutiny).

In September 2021, after the case was remanded to this Court, Defendants filed an answer to the complaint raising five affirmative defenses, ECF No. 56, and the Court issued a scheduling order that allowed the parties to proceed to discovery, ECF No. 57.[4]  Approximately one month later, Defendants amended their answer to add two affirmative defenses related to attorneys' fees.  ECF No. 62.  Shortly thereafter, on November 2, 2021, Plaintiffs moved to strike the other five affirmative defenses because they failed to provide Plaintiffs with sufficient notice of their factual bases. ECF No. 63.  The Court granted Plaintiffs' motion on February 8, 2022—a few days after the parties completed discovery—and instructed Defendants to file a second amended answer.  ECF No. 68.  Pursuant to the Court's order, Defendants filed a second amended answer on February 22, 2022.  Second Am. Answer, ECF No. 70 ("Answer").  Plaintiffs now move for summary judgment.

---

[4] After the Fourth Circuit remanded the case, the parties were ordered to submit supplemental briefing on the application of strict scrutiny.  *See* Letter Order, ECF No. 46 (setting briefing schedule on an amended motion to dismiss).  But shortly thereafter, this Court granted Defendants' unopposed request to amend the initial scheduling order to allow Defendants to file an answer in lieu of an amended motion to dismiss, given Defendants' anticipated need to rely on matters outside the complaint "to explain how and why the broadcast ban serves the State's interest."  ECF No. 54; *see* Order, ECF No. 55.

## LEGAL STANDARD

Summary judgment is proper if the evidence "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  But where, as here, the court is faced with cross-motions for summary judgment, it must review each motion separately and on its own merits "to determine whether either of the parties deserves judgment as a matter of law."  *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (internal quotation mark omitted).

## ARGUMENT

### I.    The Broadcast Ban Violates the First Amendment.

#### A.    Legal Standards

As the Fourth Circuit explained, because the Broadcast Ban is "properly assessed as a penal sanction for publishing information released to the public in official court records[,] it is subject to strict scrutiny."  *Soderberg,* 999 F.3d at 965 (citing *Cox Broad.,* 420 U.S. 469, and *Daily Mail*, 443 U.S. 97).  The "proper strict scrutiny standard" is a "rigorous review"—the State must show that the law is "narrowly tailored to a state interest of the highest order."  *Id.* at 970 n.4 (citing *Fla. Star v. B.J.F.*, 491 U.S. 524, 541 (1989)).  That is, "[t]o survive strict scrutiny," the State "must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the

asserted interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992).  Strict scrutiny is "the most demanding test known to constitutional law." *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)).

The burden of making such a showing rests squarely upon the State as the party seeking to uphold the law.  *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (strict scrutiny "requires *the Government* to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest" (emphasis added) (citation omitted)); *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (citing *Bennett* for the proposition that it is the government's burden to show that a regulation limiting speech "furthers a compelling governmental interest and is narrowly tailored to that end"); *see also, e.g.*, *Republican Party of Minn. v. White*, 536 U.S. 765, 774–75 (2002) (placing burden on party seeking to uphold rule restricting speech).  This burden is a "heavy" one, *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987), and "it is the rare case" in which a State is able to satisfy it, *Burson*, 504 U.S. at 211.

With respect to narrow tailoring, the State must demonstrate that "no 'less restrictive alternative' would serve its purpose." *Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016); *accord Frisby v. Schultz*, 487 U.S. 474, 485 (1988).  Specifically, with regard to alternatives, the State is required "to *prove* that it actually *tried* other methods to address the problem." *Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir. 2015) (emphases in original).  Indeed, even in the intermediate-scrutiny context, "it is not enough for [the government] simply to say that other approaches have not

worked." *Id.* (alteration in original) (quoting *McCullen v. Coakley*, 573 U.S. 464, 496 (2014)). "Instead, the government must '*show*[] that it seriously undertook to address the problem with less intrusive tools readily available to it,' and must '*demonstrate* that [such] alternative measures . . . would fail to achieve the government's interests, not simply that the chosen route is easier.'" *Id.* at 231–32 (alterations and emphases in original) (citation omitted) (quoting *McCullen*, 573 U.S. at 494–95).

In conjunction with that requirement, a regulation may neither be too broad nor too narrow. A rule is unconstitutionally overinclusive if it "unnecessarily circumscribes protected expression." *Cent. Radio*, 811 F.3d at 633 (quoting *White*, 546 U.S. at 775). It is also unconstitutionally underinclusive if it "leaves appreciable damage to the government's interest unprohibited." *Id.* (quoting *Reed,* 576 U.S. at 172). As explained further below, the Broadcast Ban fails for both reasons. It regulates substantially more speech than it needs to by prohibiting broadcasting in *all* cases, even where it would not imperil any state interest, while at the same time neglecting to limit the publication of the exact same content in other forms that equally implicate the State's concerns. Moreover, the State has less restrictive measures readily available to serve its interests, including making a case-by-case determination to close the courtroom or redact information from recordings provided to the public.

Finally, that Plaintiffs seek a declaration that the Broadcast Ban is *facially* invalid does not alter the foregoing inquiry. The Fourth Circuit made clear in this case that strict scrutiny applies to Plaintiffs' "facial, pre-enforcement challenge to the Broadcast

Ban." *Soderberg*, 999 F.3d at 966, 969–70.  Although this Court cited *United States v. Salerno*, 481 U.S. 739 (1987), to suggest in another case that a plaintiff asserting a facial challenge "must establish that no set of circumstances exist under which the [law] would be valid," *Nat'l Pub. Radio, Inc. v. Klavans*, No. 21-cv-2247, 2021 WL 4197661, at *7 n.8 (D. Md. Sept. 15, 2021) (quoting *Salerno*, 481 U.S. at 745), the *Salerno* principle does not alter the Court's review here.[5]  Indeed, *Salerno* itself distinguished First Amendment facial challenges.  *See* 481 U.S. at 745.  And strict scrutiny places the burden on the State (not the challenger) to demonstrate that its law is the least restrictive means of achieving a compelling government interest.  To satisfy that burden, it is insufficient for the State to describe a specific or hypothetical situation where a prohibition on broadcasting might be necessary to serve its interests.  As the Tenth Circuit has explained:

> *Salerno*'s language . . . is accurately understood not as setting forth a *test* for facial challenges, but rather as describing the *result* of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard.  In other words, where a statute fails the relevant constitutional test (such as strict scrutiny . . .), it can no longer be constitutionally applied to anyone—and thus there is "no set of circumstances" in which the statute

---

[5] The viability of the *Salerno* standard to any facial challenge is in question.  *See City of Chicago v. Morales*, 527 U.S. 41, 55–56 n.22 (1999) (referring to the *Salerno* standard as "dictum," and noting "[t]o the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation," and that it is "doubtful" it would be appropriate for a federal court to apply the *Salerno* standard for facial challenges in any case); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012) ("The idea that the Supreme Court applies the 'no set of circumstances' test to every facial challenge is simply a fiction, readily dispelled by a plethora of Supreme Court authority."); *Janklow v. Planned Parenthood*, 517 U.S. 1174, 1175 & n.1 (1996) (Stevens, J., memorandum respecting the denial of certiorari) (noting that the "no set of circumstances" formulation "has been properly ignored in subsequent cases," and collecting cases).

would be valid.  The relevant constitutional test . . . remains the proper inquiry.

*Doe*, 667 F.3d at 1127 (collecting cases); *see also Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016) (noting that facial challenges require applying the relevant constitutional test "without trying to dream up whether or not there exists some hypothetical situation in which . . . the statute might be valid"); *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 413 F.3d 1327, 1337–38 (Fed. Cir. 2005) (holding that where strict scrutiny applies, *Salerno* is "of limited relevance . . ., at most describing a conclusion that could result from the application of the strict scrutiny test").

This makes good sense.  An "[a]ction taken to remedy an evil will [only] be considered narrowly tailored if it targets and eliminates no more than the exact source of the evil it seeks to remedy." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 193 (4th Cir. 2013) (first alteration in original) (internal punctuation and citation omitted).  This cannot be squared with a requirement that a challenger prove that an oversized net does not catch some legitimate fish among the dross.  Accordingly, the Supreme Court and the Fourth Circuit have regularly applied heightened scrutiny to facially invalidate rules without mentioning *Salerno* or demanding a showing that there could be no circumstances where a rule might be justified. *See, e.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011); *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004).

15

This Court should find that the Broadcast Ban is facially invalid without regard to *Salerno* if the State does not prove that it survives strict scrutiny.  For the reasons that follow, the State cannot.

### B.     The Broadcast Ban fails strict scrutiny.

Plaintiffs are entitled to judgment as a matter of law on their First Amendment claim because Defendants cannot satisfy their burden of showing that the Broadcast Ban satisfies strict scrutiny—that is, that the Ban is necessary and narrowly tailored to protect a state interest of the highest order.  *See Soderberg*, 999 F.3d at 969, 970 n.4.

### 1.     The State has not substantiated that the Broadcast Ban serves any state interests of the highest order.

Defendants assert several state interests that they contend are furthered by Maryland's Broadcast Ban.  Specifically, they aver that the Ban is necessary to (1) ensure that the criminal trial process is fair, efficient, and effective; (2) protect public safety through the conviction of criminals; (3) maintain public trust in the judicial process by preventing the alteration and broadcasting of altered recordings of criminal proceedings; and (4) protect witnesses and other trial participants from threats, intimidation, and harassment.  *See* Ex. 9, Def. Carrión's Resp. to Pls.' Interrog. No. 4; Ex. 10, Def. Adams' Resp. to Pls.' Interrog. No. 4; *see also* Answer at 11.  But Defendants have provided little more than speculation to explain how a blanket ban on broadcasting already-public court recordings meaningfully furthers any of these interests.  *See Wash. Post v. McManus*, 944 F.3d 506, 522 (4th Cir. 2019) ("The Supreme Court has made clear

that, when free speech values are at stake, states must supply rationales that are 'far stronger than mere speculation about serious harms.'" (quoting *Bartnicki v. Vopper*, 532 U.S. 514, 531 (2001))); *see also Ross v. Early*, 746 F.3d 546, 556 (4th Cir. 2014) (holding that even under intermediate scrutiny, "it is not enough for the [State] to identify an interest that is significant in the abstract," and it must "make some evidentiary showing that the recited harms are real, not merely conjectural, and that the [law] alleviates these harms in a direct and material way" (internal quotation marks omitted)).   Indeed, Defendants have failed to provide any evidence as to how their proposed state interests of the highest order have been, or will be, furthered by the Broadcast Ban.

With respect to the State's asserted interest in ensuring fair criminal trials, the State has not advanced any evidence showing that criminal trials become less fair or more prejudicial to defendants when broadcast is permitted.   The notion that public scrutiny of the judicial process would *undermine*—rather than enhance—the fairness of criminal trials inverts the very constitutional interests that *Cox Broadcasting*, *Daily Mail*, and their progeny aim to protect.   As the Supreme Court has "repeatedly recognized, one of the important means of assuring a fair trial is that the process be open to neutral observers."  *Press-Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 7 (1986).   Indeed,

> [a] responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field.   Its function in this regard is documented by an impressive record of service over several centuries.   The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the

police, prosecutors, and judicial processes to extensive public scrutiny and criticism.

*Sheppard v. Maxwell,* 384 U.S. 333, 350 (1966).  That is precisely Plaintiffs' intent.  The State has not advanced a single piece of evidence to suggest that *any* particular criminal case, much less criminal cases generally, would be rendered unfair by what Plaintiffs seek to do and the Broadcast Ban forbids: truthfully publish lawfully obtained official court recordings of proceedings that are already in the public record.  Even if the State were to present evidence that publication would have a deleterious effect in certain proceedings, it could not support a generalized fair-trial concern weighty enough to justify a blanket ban on the broadcast of *all* criminal proceedings.  *See infra* Part I.B.2; *see also, e.g., Chandler v. Florida*, 449 U.S. 560, 575 (1981) ("[T]he risk of [juror] prejudice does not warrant an absolute constitutional ban on all broadcast coverage.").

The State also suggests, also without evidence, that the Broadcast Ban helps to protect public safety by facilitating the conviction of criminals.  *See* Def. Carrión's Resp. to Pls.' Interrog. No. 4 (asserting state interest in "[p]rotecting public safety through the conviction of criminals"); Def. Adams' Resp. to Pls.' Interrog. No. 4 (same).  Nothing in the record and nothing provided in discovery would support the idea that guilty criminals are more often convicted where later broadcast of recordings of proceedings is prohibited.

This interest may be interpreted as an alternate framing of the State's asserted interest in "protecting witnesses" (and thereby ensuring their cooperation in criminal

18

trials).   Answer at 11; *see* Def. Carrión's Resp. to Pls.' Interrog. No. 4; Def. Adams' Resp. to Pls.' Interrog. No. 4.   But evidence produced by the State about witness reluctance to testify—chiefly in the form of testimony of its two proffered expert witnesses—is equivocal at best.

Both witnesses acknowledged that they had neither produced nor reviewed any empirical evidence about the effects on witness cooperation of broadcasting recordings of court proceedings.   *See* Ex. 11, Deposition of Anne Colt Leitess ("Leitess Dep.") 77:9-13; Ex. 12, Deposition of Scott D. Shellenberger ("Shellenberger Dep.") 37:18– 38:4.   The experts acknowledged that, in their experience, witnesses are generally reluctant to testify because they know their testimony will be heard in a court proceeding that is open to the public, *see* Shellenberger Dep. 42:4-18, 47:4–49:5; *cf.* Leitess Dep. 75:5-22, 78:8-17, and because their testimony is recorded and available to the public, *see generally* Md. Rule 16-504(h); Md. Rule 16-502(g)(1).   But the expert witnesses had no specific knowledge about the Broadcast Ban's impact on witnesses' reluctance to testify.   Witness Scott D. Shellenberger, the State's Attorney for Baltimore County with over 20 years of experience as a prosecutor, conceded that he has never mentioned the Broadcast Ban in conversations with witnesses.   Shellenberger Dep. 15:5-7, 16:14-17, 43:17-20, 45:9-13, 52:9-11.   Similarly, witness Anne Colt Leitess, the State's Attorney for Anne Arundel County with over 30 years of experience as a prosecutor, conceded that she has never spoken to any witness who told her that they were specifically concerned about the rebroadcasting of audio recordings.   Leitess Dep.

18:1–20:2, 83:6-12, 94:2-10, 111:15-21.  Her opinion on this point was limited to stating that witnesses found it "reassuring" that their testimony is "not going to be on TV or the like." *Id.* at 83:16-17; *see also id.* at 97:14-18 ("Q. Do you have any specific knowledge that any specific witness would have violated a subpoena and not come to court but for the broadcast ban's prohibition on broadcasting audio recordings?" A. No.").

Plaintiffs acknowledge that witnesses who testify in criminal cases are sometimes subject to threats, intimidation, and harassment.  But the State has offered no evidence to establish that witnesses would be more likely to be subject to threats, intimidation, or harassment if the Broadcast Ban were lifted.  The State produced no studies or other evidence suggesting that broadcasting lawfully obtained recordings of court proceedings has *any* effect on witness safety, and neither expert could offer *any* specific instances where the broadcasting of such recordings led to witness intimidation.  Indeed, the connection between broadcasting and witness safety is little more than conjecture.

Moreover, the State's concerns cannot be squared with the longstanding practices of numerous other jurisdictions.  Many state and federal trial courts make recordings of criminal proceedings available to the public without imposing any restrictions on the subsequent dissemination of those recordings.[6]  And many states

---

[6]  For example, members of the public may obtain recordings from almost any (public) criminal proceeding held in the primary state trial courts of Alaska, Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, North Dakota, Utah, Vermont, and Wisconsin.  *See* Ex. 13 (providing a non-exhaustive list of state and local

similarly allow members of the press or public to make their own recordings of criminal trial court proceedings (subject to certain limitations).[7]  The State has presented no evidence that any of these courts have suffered any of the negative outcomes it set forth from allowing those recordings to be freely shared.  It is unlikely that Maryland—which appears to be the only jurisdiction to ban the broadcast of *publicly available* court recordings—has a unique interest in shielding its public recordings from broader scrutiny or exposure.

Finally, there is simply no connection between the Broadcast Ban and the State's interest in prohibiting the broadcasting of altered recordings.  The Broadcast Ban is not limited to prohibiting the publication of altered recordings—it bans, and Plaintiffs seek to publish, *truthful* recordings.  If the State wishes to specifically prevent the distribution of altered recordings, then it should enact rules banning *that* practice.

---

jurisdictions that allow the public to access such recordings).  Dozens of federal district courts likewise have made audio recordings of all of their proceedings (including criminal proceedings) available to the public through PACER.  *See, e.g.*, *Digital Audio Recording Project*, Admin. Office U.S. Courts, https://perma.cc/9ZSV-P4JR (last visited Mar. 20, 2020).

[7] *See, e.g.*, Ariz. Sup. Ct. R. 122(h); Conn. R. Super. Ct., Gen. Provisions, § 1-11C(a); Fla. R. Jud. Admin. 2.450(a); Mass. Sup. Jud. Ct. R. 1:19(2); Mich. Sup. Ct. Admin. Order 1989-1(2)(a)(i); Miss. R. for Elec. & Photographic Coverage of Jud. Proceedings 3; N.H. R. Crim. P. 46(a); N.M. Sup. Ct. R. 23-107; N.C. R. Super. & Dist. Cts. 15(b); Ohio R. of Superintendence for Cts. 12(A); R.I. R. Sup. Ct., art. vii; S.C. R. App. Ct. 605(f)(1)(i); Tenn. Sup. Ct. R. 30(A)(1); Utah Jud. Admin. Code, Rule 4-401.01(2); Vt. R. Crim. P. 53; Wis. Sup. Ct. R., ch. 61.

### 2. The Broadcast Ban is not narrowly tailored to protect any of the interests cited by the State.

Even if the State could substantiate that its asserted interests are furthered by the Broadcast Ban, it cannot satisfy its burden to prove that the Broadcast Ban is "narrowly tailored" to meet those interests. *Soderberg*, 999 F.3d at 970 n.4 (quoting *Fla. Star*, 491 U.S. at 541). Rather, the Broadcast Ban overreaches by "infringing on speech that does not pose the danger that has prompted regulation." *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 265 (1986). It also fails to prevent other potentially deleterious conduct, thereby "leaving appreciable damage to the government's interest unprohibited." *Am. Ass'n of Pol. Consultants, Inc. v. FCC*, 923 F.3d 159, 167 (4th Cir. 2019) (internal quotation mark omitted). Either of these problems standing alone is enough to cause the Broadcast Ban to fail strict scrutiny review. *See, e.g.*, *Cent. Radio*, 811 F.3d at 633.

First and foremost, the Broadcast Ban is "unconstitutionally overinclusive" because it unnecessarily burdens more protected expressive activity than required to serve the State's interests. *Id.* By its own terms, the Broadcast Ban applies to recordings from "any" criminal proceeding—regardless of when the proceeding occurred, who participated, and what transpired. The statute applies equally to pending cases and cases that ended years ago; to high-profile matters and obscure ones; to lengthy jury trials with numerous witnesses and brief status conferences with no witnesses and no evidence presented. The statute also applies equally to audio and video recordings. In short, the statute draws no distinction between the types of recordings whose

dissemination might implicate Defendants' stated interests and those that surely will not. *Cf. In re Murphy-Brown*, 907 F.3d 788, 799–800 (4th Cir. 2018) (holding that a "gag order was not narrowly tailored" to ensure trial fairness where it "applied blanket restrictions to more than twenty cases that will be tried over a period of years" and "assumed all covered individuals were identically situated vis-à-vis pending and future litigation").

Even if the Broadcast Ban were to serve a state interest in a particular case—say, by convincing a reluctant witness to testify or reducing the chance a witness would be harmed—it applies equally in cases where these issues do not arise. And, as explained above, that a given regulation may serve its purpose in specific or hypothetical circumstances is insufficient to satisfy strict scrutiny. *See supra* pp. 16–17. Defendants' own proffered expert witnesses acknowledge that the concerns cited by the State are not present in every case. *See, e.g.*, Leitess Dep. 143:14-22 (Q. . . . . [I]s it fair to say that you agree that there are certain cases where audio broadcasting specifically would not . . . present a specific risk . . . . to witnesses? A. Yes."); *see also* Shellenberger Dep. 71:21–72:4 (acknowledging that risks can "depend[] on the facts of the case" and "who the defendant and . . . the defendant's friends and relatives are"). For example, some cases have only law enforcement officers as witnesses, who Defendants' proffered experts acknowledge have not generally cited concerns about audio broadcasting. *See* Shellenberger Dep. 46:7-12; Leitess Dep. 94:11–96:3, 140:11–141:11. Some of these cases present issues of significant public concern, including the conduct of public

23

officials.  *See, e.g.*, Justin Fenton, *Records: Baltimore Police Officer Charged with DUI After Being Found Lying 'in Vomit.' His Off-Duty Gun Went Missing*, Balt. Sun (Oct. 14, 2020), https://perma.cc/CRQ2-3EBT.  In these cases, the Broadcast Ban inhibits public discussion by preventing the public airing of lawfully obtained recordings of court proceedings without serving any important state interest.  This is the opposite of a narrowly tailored rule.

At the same time that the Broadcast Ban is overinclusive, it is also too *narrow* to serve Defendants' stated goals.  *See Cent. Radio*, 811 F.3d at 633 ("A regulation . . . is fatally underinclusive if it 'leaves appreciable damage to the government's interest unprohibited'" (alterations omitted) (quoting *Reed*, 576 U.S. at 172)); *see also First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 793 (1978) (noting that the State's proffered purpose was "belied . . . by the provisions of the statute, which [were] both underinclusive and overinclusive"); *Wash. Post*, 944 F.3d at 521 ("[W]hile the Act strikes too narrowly in some respects, it also strikes too broadly in others.").  Even under Defendants' (erroneous) view that the broadcast of any recording of a criminal trial proceeding poses a threat to witness cooperation, trial fairness, and the like, Defendants cannot show that a blanket ban on disseminating court recordings meaningfully addresses those threats.

To start, the statute does nothing to stop people from obtaining copies of court recordings or from reporting on what transpired during pending court proceedings, including names, addresses, and photographs of witnesses and the verbatim content of

their testimony.  Defendants themselves have conceded that people remain free to share "all of the *information* in these recordings through reports, transcripts, [or] summaries." Defs.' Reply Supp. Mot. to Dismiss 1–2, ECF No. 29 ("MTD Reply"); *cf.* Shellenberger Dep. 49:18–51:10, 60:6–62:10; Leitess Dep. 57:7-21, 81:18–83:5, 123:1-6.  The Ban cannot be narrowly tailored if it allows the exact same content to be disseminated through means other than rebroadcasting audio court recordings.  *Cf. Daily Mail*, 443 U.S. at 104–05 (holding that a statute criminalizing the publication of juvenile offenders' names "does not satisfy constitutional requirements" because it "does not restrict the electronic media or any form of publication, except 'newspapers,' from printing the names").  Moreover, the Broadcast Ban does not prevent any person or media outlet from broadcasting material through "reenactments," MTD Reply at 1–2, including using actors adopting the personae of witnesses, to reproduce the exact content of the recordings, *see* Leitess Dep. 57:18-21; Shellenberger Dep. 60:15–61:3.  A ban on broadcasting court recordings cannot be narrowly tailored if it permits people to broadcast material, including "reenactments," featuring the exact same information expressed using the exact same words.

Indeed, the testimony of Defendants' proffered experts demonstrates just how misaligned the Broadcast Ban is to address the interest on which the State appears to rely most heavily in this case.  The State's interest in witness cooperation is principally affected by witnesses' fear of potential retaliation and criminal defendants knowing who they are.  *See, e.g.*, Shellenberger Dep. 47:9-12.  The ban on broadcasting audio

recordings of witness testimony does little to materially advance the State's interest in either alleviating the specific fears cited by Defendants or encouraging witnesses to come to court and testify. Witnesses' identities and testimony remain a matter of public knowledge, as the public may attend court proceedings, obtain recordings of court proceedings, and report on court proceedings. The State has not shown that the ability to broadcast, distinct from the ability to publish witnesses' names or testimony, performs any additional or distinct role in dissuading witnesses from testifying or in putting them at risk. In fact, Defendants' proffered expert witnesses acknowledged that witnesses in criminal cases have not raised the prospect of audio broadcasting as an area of concern. *See* Leitess Dep. 111:15-21; Shellenberger Dep. 45:9-13; *see also Nat'l Pub. Radio*, 2021 WL 4197661, at *6 ("[S]ince well before the advent of broadcast media, witnesses who cooperate with the government have risked intimidation and retaliation by a criminal defendant's associates.").

The Broadcast Ban is also underinclusive because it only applies to "criminal" proceedings held in "trial court." Md. Code, Crim. Proc. § 1-201(a)(1). The statute does nothing to prevent the broadcast of criminal appellate proceedings, which may involve references to the same subject matter, litigants, and witnesses as criminal trial court proceedings; nor does it prevent the broadcasting of civil proceedings, which may also involve the same subject matter, litigants, and witnesses. The State offers no explanation for why the broadcast of a trial court hearing on a purely legal issue in a criminal case (which the Broadcast Ban prohibits) would prejudice the accused any

26

more than an appellate argument on the same issue (which the Broadcast Ban permits). The fact that appellate arguments typically occur after a verdict has been rendered hardly eliminates the risk of prejudice: after all, the most common remedy sought in criminal appeals is a *new trial*. Nor is it clear why the broadcast of a criminal trial court proceeding would necessarily threaten witness cooperation more than the broadcast of a proceeding in a civil habeas corpus case. *See Grandison v. State*, 38 A.3d 352, 365 (Md. 2012) (noting that "[p]ostconviction relief" is "considered to be civil in nature" (citation omitted)); *see, e.g., Gray v. State*, 857 A.2d 1176 (Md. Ct. Spec. App. 2004) (describing postconviction relief hearing featuring multiple witnesses); *Williams v. State*, No. 1415, 2021 WL 6057143 (Md. Ct. Spec. App. Dec. 20, 2021) (same).

Because the Broadcast Ban is both over- and under-inclusive, Defendants cannot meet their burden of showing that no less restrictive alternative would serve their purposes. *See Cent. Radio*, 811 F.3d at 633. Indeed, although it is up to "the government to prove that no 'less restrictive alternative' would serve its purpose," *id.* (quoting *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000)), Plaintiffs can identify an obvious less-restrictive measure available to the State. The same court rule that gives the public a right of access to court recordings also authorizes judges to redact sensitive portions of those recordings and—if necessary—withhold entire recordings in individual cases. *See supra* pp. 3–4 (discussing Md. Rule 16-504). A case-by-case determination of when broadcasting criminal court proceedings may be prohibited is less restrictive to free

expression and serves the State's purposes better than the Broadcast Ban.  The blanket Broadcast Ban cannot be considered narrowly tailored for purposes of strict scrutiny.

Moreover, narrow tailoring requires the State to "*prove* that it actually *tried* other methods" by presenting evidence that it "'seriously undertook to address the problem with less intrusive tools readily available to it,'" and to "'*demonstrate* that [such] alternative methods . . . would fail to achieve the government's interests."  *Reynolds*, 779 F.3d at 231–32 (alterations and emphases in original) (quoting *McCullen*, 573 U.S. at 494–95). Here, the State has presented no such evidence, and it does not appear that they have made any serious attempts to achieve the same goals using less restrictive tools, including the one already codified in law.  Indeed, the State's proffered experts— experienced Maryland State's Attorneys—admit that they rarely, if ever, attempt to use existing law to exclude specific cases or portions of cases from public scrutiny.  *See* Shellenberger Dep. 73:9-17 ("Q. So you could move to close the courtroom?  A.  You could.  It's rarely done, but you could.  Q. Could you move to shield certain testimony from public access?  A. You could.  Q. Have you ever done that?  A. Not that I recall."); Leitess Dep. 93:7–94:10; 120:21–121:9 (similar).

Finally, the fact that numerous other jurisdictions around the country make court recordings publicly available—without blanket restrictions on how the public may use them—further demonstrates that the Broadcast Ban is not sufficiently tailored to the government's interests.  *See supra* pp. 20–21 & note 6.  The Supreme Court has cited alternative measures used by different states in similar cases to conclude that rules were

not narrowly tailored. *See Daily Mail*, 443 U.S. at 105 ("[A]ll 50 states have statutes that provide in some way for confidentiality, but only 5, including West Virginia, impose criminal penalties on nonparties for publication of the identity of the juvenile. Although every state has asserted a similar interest, all but a handful have found other ways of accomplishing the objective." (footnote omitted)); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 841 (1968) ("While not dispositive, we note that more than 40 States having similar commissions have not found it necessary to enforce confidentiality by use of criminal sanctions against nonparticipants.").

In sum, Maryland's blanket ban on broadcasting recordings—in all cases, for all proceedings, in perpetuity—falls well short of the narrow-tailoring requirement. As such, it fails the second prong of the strict scrutiny analysis.

## II.   None of Defendants' Other Affirmative Defenses Are Availing.

In addition to arguing that the Broadcast Ban is narrowly tailored to state interests of the highest order, Defendants assert two other affirmative defenses related to the merits of this case. *See* Answer at 11. For the reasons explained below, these affirmative defenses lack merit.

### A.   There is no basis for applying the prudential standing doctrine.

Defendants urge the court to decline to exercise jurisdiction under the prudential standing doctrine based on federalism concerns. *See id.* Specifically, Defendants contend that "Plaintiffs' claims are more properly raised in state court as a defense to

any contempt proceeding that may be brought against Plaintiffs in the event they violate the broadcast ban." *Id.* But this Court has already rejected that argument at the motion-to-dismiss stage. In moving to dismiss the complaint in 2019, Defendants relied on the same federalism concerns that they invoke now to support their prudential standing argument. *See* MTD at 13–14. After noting these concerns were more appropriately characterized as questions about whether the Court "should abstain from exercising its jurisdiction under the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971)," this Court held that "Defendants' concerns [were] futile" because there were no ongoing proceedings as by required by *Younger*. MTD Op. at 12–13. That remains true today. Thus, Plaintiffs remain "free to pursue federal declaratory relief" in this Court. *Id.* at 14.

**B.      Plaintiffs' claims are not barred by waiver.**

Defendants also contend that "Plaintiffs' claims are barred by waiver because, as a condition of receiving copies of official recordings of Maryland criminal trial proceedings, they agreed not to duplicate, broadcast, or otherwise distribute such recordings, and agreed to comply with the requirements of Maryland law." Answer at 11. Even if Defendants had evidence to support this contention for each of the Plaintiffs (which they do not), their waiver defense fails as a matter of law.

The essence of Defendants' waiver argument appears to be that because some of the Plaintiffs signed forms acknowledging the existence of the Broadcast Ban at the time they obtained recordings, they are forever prevented from challenging the Ban,

even if it violates their constitutional rights.  That cannot be the case.  The facts, waiver

law, and public policy establish that this argument carries no weight.

As an initial matter, not all Plaintiffs signed such a form.  Accordingly, even if

Defendants' argument were availing as to certain Plaintiffs, those who did not sign the

form would be able to proceed with their facial challenge.  *Cf. Watt v. Energy Action Educ.*

*Found.*, 454 U.S. 151, 160 (1981) ("Because we find California has standing, we do not

consider the standing of other plaintiffs.").  And the other Plaintiffs could overcome

the waiver argument by requesting from the courts the same recordings they previously

obtained and refusing to sign any form, teeing up a facial challenge.  The law does not

require such needless formalities.

In any event, the law of waiver simply does not apply here.  As established, the

case law derives from circumstances where an entity enters into a contract with the

government that includes the explicit waiver of constitutional rights, such that it

constitutes "an intentional relinquishment or abandonment of a known right or

privilege."  *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 186 (1972) (quoting *Johnson v.*

*Zerbst*, 304 U.S. 458, 464 (1938)).  The Supreme Court has held that "a waiver of

constitutional rights in any context must, at the very *least*, be clear."  *Fuentes v. Shevin*,

407 U.S. 67, 95 (1972) (emphasis in original).  This Court "need not concern [itself]

with the involuntariness or unintelligence of a waiver when the contractual language

relied upon does not, on its face, even amount to a waiver."  *Id.*; *see also Curtis Publ'g Co.*

*v. Butts*, 388 U.S. 130, 145 (1967) ("[W]e are unwilling to find waiver in circumstances which fall short of being clear and compelling.").

Here, it is undisputed that Maryland law gives Plaintiffs the right to obtain copies of recordings. The forms that Defendants appear to argue constitute waiver only include an agreement and acknowledgment that Maryland law prohibits broadcasting, with no language about waiver of constitutional rights or relinquishment of the ability to challenge that law. *See* Ex. 14 at Adams0184. That does not present "clear and compelling" evidence that Plaintiffs knowingly waived their First Amendment rights, and for good reason. If acknowledgment of the existence of a law constituted waiver of the right to challenge that law, the government could effectively insulate itself from any assertion of constitutional rights in its provision of services by requiring recipients to sign forms acknowledging, for example, the presence of speech-infringing or discriminatory rules. No case law supports such a problematic principle.

Moreover, even if it were found that the forms provide "clear and compelling" evidence that Plaintiffs waived their First Amendment rights, as the Fourth Circuit explained in *Overbey v. Mayor of Baltimore*, 930 F.3d 215 (4th Cir. 2019), the waiver would only be enforceable if (1) "it was made knowingly and voluntarily," and (2) "under the circumstances, the interest in enforcing the waiver is not outweighed by a relevant public policy that would be harmed by enforcement." *Id.* at 223.

Here, the ambiguous language on the forms shows that any waiver was not made knowingly and voluntarily. *See, e.g.*, Ex. 14 at Adams0184. But even if it were,

enforcement would harm the important public policy surrounding the public's role in "guarantee[ing] the fairness of trials" and "bring[ing] to bear the beneficial effects of public scrutiny upon the administration of justice." *Cox Broad.*, 420 U.S. at 492. Plaintiffs intend to use the recordings for precisely the public scrutiny contemplated in *Cox Broadcasting*—in their "reporting projects," Soderberg Decl. ¶ 4; Woods Decl. ¶ 6; in "their efforts to educate the public[ and] increase transparency within Baltimore's legal system," BALT Decl. ¶ 4; *see* OJB Decl. ¶¶ 2, 4; and in their projects to "highlight the impact of [their] participatory-defense work and teach others how to become effective community advocates," Johnson Decl. ¶ 6. This strongly serves the core First Amendment interest in "uninhibited, robust, and wide-open" public discourse, which, as in *Overbey*, decisively outweighs the government's minimal interest. *See* 930 F.3d at 223–24 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Furthermore, enforcement of any waiver would significantly undercut the crucial public policy interest in upholding "[t]he First Amendment . . . as a bulwark against" censorship. *See id.* at 224.

For the reasons explained in Part I, the government's countervailing "interest in enforcing [any] waiver" is weak, *id.* at 223, given the poor fit between the Broadcast Ban and the State's interests. Accordingly, even if the unclear language in the forms constituted a knowing waiver of constitutional rights by some of the Plaintiffs, the strong First Amendment public policy interests outweigh any interest in enforcing any waiver. *See id.* ("[T]he second prong is decisive as a matter of law.").

33

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted.

## REQUEST FOR HEARING

Pursuant to Local Rule 105.6 and Federal Rule of Civil Procedure 57, Plaintiffs respectfully request a hearing on their Motion for Summary Judgment and request for declaratory relief.

Dated:  April 6, 2022                                    Respectfully submitted,

/s/ Shelby Calambokidis

ADAM HOLOFCENER (No. 19579)          SHELBY CALAMBOKIDIS* (No. 816008)
Maryland Volunteer Lawyers for the Arts     SETH WAYNE* (No. 816003)
120 W. North Ave., Suite 305A                Institute for Constitutional Advocacy
Baltimore, MD 21201                              and Protection
Tel.:  410-752-1633                          Georgetown University Law Center
adam@mdvla.org                               600 New Jersey Avenue NW
                                             Washington, DC 20001
                                             Tel.:  202-661-6599
                                             Fax:  202-661-6730
                                             sc2053@georgetown.edu
                                             sw1098@georgetown.edu
                                             * Admitted pro hac vice