IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BRANDON SODERBERG, et al., | * | |
| *Plaintiffs*, | * | |
| v. | * | No. 19-cv-01559-RDB |
| | * | |
| AUDREY J.S. CARRION, et al., | * | |
| *Defendants*. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

BRIAN E. FROSH
Attorney General of Maryland

ROBERT A. SCOTT
Federal Bar No. 24613
ANN M. SHERIDAN
Federal Bar No. 11137
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
asheridan@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

Attorneys for Defendants

May 6, 2022

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 4

Maryland's Place in the Lengthy National Debate Governing Electronic Media in the Courtroom ............................................................................. 4

The National Debate.................................................................................. 4

Enactment of Crim. Proc. § 1-201............................................................ 7

Concerns for Integrity of Criminal Trials Persist....................................... 11

Plaintiffs Brandon Soderberg and Baynard Woods Obtain Copies of Audio and Video Recordings of Criminal Trial Proceedings From Undisclosed Sources. ..................................................................................................... 13

Plaintiff Open Justice Baltimore Obtains Copies of Audio Recordings of Criminal Trial Proceedings Conditioned Upon the Prohibition Against Broadcasting or Making Copies of the Recordings. ............................................ 14

Plaintiffs Qiana Johnson and Life After Release Obtain Copies of Audio Recordings of Criminal Trial Proceedings Conditioned Upon the Prohibition Against Broadcasting or Making Copies of the Recordings. ............................... 14

Plaintiff Baltimore Action Legal Team Plans to Request Copies of Official Recordings of Criminal Trial Proceedings from the Baltimore City Court Reporter's Office in Future. ................................................................................ 15

ARGUMENT............................................................................................................ 16

I.     APPLICABLE LEGAL STANDARDS ....................................................................... 16

II.    PROTECTION OF THE FAIRNESS AND INTEGRITY OF CRIMINAL TRIALS IS A STATE INTEREST OF THE HIGHEST ORDER................................................................ 18

III.   SECTION 1-201 OF THE CRIMINAL PROCEDURE ARTICLE IS NARROWLY TAILORED TO PROMOTE THE STATE'S INTERESTS IN PROTECTING THE INTEGRITY AND FAIRNESS OF CRIMINAL TRIALS. ................................................. 22

IV.    THE INTERESTS AT STAKE IN COX BROADCASTING  AND DAILY MAIL ARE DISTINCT FROM THE INTERESTS AT STAKE IN THIS CASE. ..................................... 26

CONCLUSION ............................................................................................................. 30

**INTRODUCTION**

This case does not involve a typical First Amendment challenge to a state law regulating speech.  It involves a challenge to Maryland's decades-long statutory and judicial scheme governing public access to Maryland's criminal trial proceedings under § 1-201 of the Criminal Procedure Article of the Maryland Code and Title 16 of the Maryland Rules.  The statute prohibits all individuals from recording and/or broadcasting live criminal trial proceedings.  Plaintiffs do not challenge that aspect of the statute.  The statute and rules also work in concert to permit the public to obtain copies of official court recordings of criminal trial proceedings on the condition that those recordings not be copied, broadcast, or disseminated through electronic or other means.  Violations of the condition are punishable through criminal contempt proceedings.  It is this latter part of Maryland's procedural structure that plaintiffs seek to invalidate through this facial, pre-enforcement challenge.

In particular, plaintiffs seek a declaration that Section 1-201 of the Criminal Procedure Article of the Maryland Code is unconstitutional as applied to "lawfully obtained" audio or video recordings.  ECF No. 71-17.  They further seek a declaration that they "may not be held in contempt (or otherwise subject to state sanction) for broadcasting or distributing" such recordings "including (a) posting such recordings online; (b) including such recordings in any films; (c) playing such recordings at public events; (d) sharing such recordings over social media; and/or (e) including such recordings on podcasts."  ECF No. 71-17.  The sweeping relief plaintiffs seek will interfere with

Maryland courts' ability to regulate public access to official recordings of criminal trial proceedings in a manner that balances the competing interests served by Maryland's statute and rules. Maryland courts will be required to choose between barring all public access to copies of recordings of criminal trial proceedings, and thereby meet the State's legitimate objectives, or permitting the public to obtain copies of such recordings with no limitations as to how they may use them, and thereby abandon the State's legitimate objectives. Although plaintiffs purport to rely upon *Cox Broadcasting*[1] and its progeny, such a result would constitute an extension of those cases not contemplated by the Supreme Court or the Courts of Appeals interpreting those cases.

In May 2019, the six plaintiffs filed this action for declaratory relief contending that Maryland's statute and rules are void for vagueness and that the prohibition on broadcasting violates the First Amendment. Compl. ¶¶ 45, 51. In January 2020, the Court granted defendants' motion to dismiss the complaint under Rule 12(b)(6). The Court agreed with defendants that Maryland's scheme should be analyzed as a neutral time, place, and manner regulation of speech similar to Rule 53 of the Federal Rules of Criminal Procedure. ECF No. 30 at 25. The Court therefore applied an intermediate scrutiny standard and determined that Maryland's restrictions passed constitutional muster because they furthered substantial government interests and left open ample alternative channels of communication. ECF No. 30 at 27-28. Plaintiffs appealed the Court's ruling.

---

[1] *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975).

Following briefing and argument, the Fourth Circuit Court of Appeals determined that the statute should be analyzed as a penal sanction for publishing information released to the public in official court records under *Cox Broadcasting*, 420 U.S. 469, *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979), and their progeny.  ECF No. 74 at 3.  The Court of Appeals vacated the dismissal granted by this Court and remanded the case for consideration of whether Maryland's law is "narrowly tailored to [further] a state interest of the highest order."  ECF No. 74 at 15 n.4.  The parties' cross-motions for summary judgment are now before the Court.

Significantly, when the Court of Appeals analyzed the plaintiffs' challenge under the *Cox Broadcasting* line of cases, it did not hold that the dissemination of lawfully obtained information may never be prohibited.  Instead, it remanded the case to this Court for a determination of whether Maryland's scheme is narrowly tailored to further an interest of the highest order.  In doing so, the Court of Appeals provided no guidance as to how this Court should resolve the competing Constitutional principles of equal magnitude presented by this case: (1) the State's authority to administer justice through its courts embedded in the federalist structure of our system of government; (2) the Sixth Amendment rights of every accused to a fair trial; and (3) the First Amendment rights implicated by access to the State's criminal trial proceedings.

The First Amendment precedents upon which plaintiffs rely provide little guidance for how the Court should analyze the unique circumstances presented by this case.  Instead,

this case requires an examination and harmonization of the *Estes v. Texas*[2] line of cases involving electronic media coverage in the courtroom with the *Cox Broadcasting* line of cases upon which the Court of Appeals relied.  When the relevant precedents are applied, plaintiffs' challenge fails because, viewed through the proper lens, Maryland's statute and rules, working collectively, are narrowly tailored to promote and balance competing interests of the highest order.

## STATEMENT OF FACTS

### Maryland's Place in the Lengthy National Debate Governing Electronic Media in the Courtroom

#### The National Debate

In a debate that has evolved with evolving technologies, judges and lawyers have expressed concerns over the impact of news media coverage on the administration of justice in criminal trial proceedings at least as far back as the early 20th Century.  *See Chandler v. Florida*, 449 U.S. 560, 562-66 (1981) (setting forth history of debate).  In 1937, the American Bar Association ("ABA") House of Delegates adopted Judicial Canon 35, declaring that all photographic and broadcast coverage of courtroom proceedings should be prohibited.  *Id.* at 562-63.  In 1952, the ABA House of Delegates amended Canon 35 to add a prohibition of television coverage; in 1972, it reaffirmed those proscriptions. *Id.* at 563.

---

[2] *Estes v. Texas*, 381 U.S. 532 (1965).

In 1965, the Supreme Court addressed a criminal defendant's challenge to television coverage of his criminal trial proceedings in the case of *Estes v. Texas*, 381 U.S. 532.  The State of Texas had adopted a rule leaving the question of whether criminal proceedings could be broadcast to the discretion of the trial judge.  *Id.* at 535.  Under the Texas rule, a trial judge had permitted live radio and television coverage and news photography of pretrial proceedings, and extensive live telecasting of the actual trial, of a criminal case that had garnered extensive national attention.  *Id.* at 536-37.  The pretrial proceedings included at least 12 cameramen and obtrusive equipment that had led to considerable disruption, but, by the time of the trial, filming was restricted to a booth that had been constructed at the back of the courtroom to blend with the permanent structure of the room.  *Id.*  In a plurality opinion, the Court nevertheless determined that the broadcasting of the trial had deprived the defendant of his Fourteenth Amendment right to a fair trial and reversed his conviction.  *Id.* at 534-35.

The Court began its analysis by noting that the Sixth Amendment embodies a right of the accused to a public trial because "[h]istory had proven that secret tribunals were effective instruments of oppression."  *Id.* at 538-39.  The Court further observed that a free press provides an important function in a democratic society, protected by the First Amendment, to "awaken public interest in governmental affairs," expose corruption in government, and "inform[] the citizenry of public events and occurrences, including court proceedings."  *Id.* at 539.  The Court finally observed that neither the First nor the Sixth Amendments "speaks of an unlimited right of access to the courtroom on the part of the broadcasting media," and that the important societal interest in freedom of the press is

"subject to the maintenance of absolute fairness in the judicial process." *Id.* Ultimately, it determined that the broadcasting of the proceedings had deprived the defendant of a fair trial.

Significantly, the Court did not require the defendant to demonstrate prejudice. The Court noted that television, "by its very nature, reache[s] into a variety of areas in which it may cause prejudice to an accused," but one might not be able to "put his finger on its specific mischief and prove with particularity wherein he was prejudiced." *Id.* at 544. The Court recognized that the numerous ways broadcasting may cause actual unfairness may be "so subtle as to defy detection by the accused or control by the judge." *Id.* at 545.

In 1978, the ABA Committee on Fair Trial-Free Press proposed revised standards that would permit courtroom coverage by electronic media under conditions to be established by local rule under the control of the trial judge, but "only if such coverage was carried out unobtrusively and without affecting the conduct of the trial." *Id.* at 563-64. In 1979, the ABA House of Delegates rejected the proposed revisions. *Id.* at 564. Meanwhile, based on its own study of the matter, the Conference of State Chief Justices, by a vote of 44 to 1, approved a resolution to allow the highest court of each state to promulgate standards and guidelines regulating radio, television, and other photographic coverage of court proceedings. *Id.*

In 1981, the Supreme Court had the opportunity to revisit its decision in *Estes*. In *Chandler v. Florida*, the Court considered a constitutional challenge to Florida's newly adopted court rules permitting electronic coverage of trials over the objection of the accused and declined to adopt a *per se* rule banning such coverage. 449 U.S. 560, 582-83

6

(1981).  In so holding, the Court acknowledged that "[d]angers lurked" in Florida's procedural experimentation to permit electronic media coverage of Florida's criminal trials.  *Id.* at 582.  The Court recognized that extended media coverage of a trial "may adversely affect the conduct of the participants and the fairness of the trial yet leave no evidence of how the conduct or the trial's fairness was affected."  *Id.* at 577.  Ultimately, however, the Court reasoned that it was "not empowered by the Constitution to oversee or harness state procedural experimentation" unless the state action "infringes fundamental guarantees."  *Id.*  Because the Court had no "supervisory authority over state courts," it held that "the Constitution does not prohibit a state from experimenting" with electronic media coverage.  *Id.* at 582-83.

### Enactment of Crim. Proc. § 1-201

In November 1980, the Court of Appeals of Maryland issued a "Rules Order" suspending certain judicial ethics rules for 18 months to allow for a pilot program to "experiment" with "extended media coverage" of trial proceedings.  7 Md. Reg. 2252-55 (November 28, 1980), attached hereto as Exhibit 1.  Two of the seven judges declined to sign the order and a third filed a written dissent expressing concerns about the potential impact on witnesses and the resulting "adverse effect on the administration of justice."  *Id.* at 2253.  In accordance with the order, the Court adopted Rule 1209 which required written consent of all parties to any proceeding where extended media coverage was permitted and that such coverage "be conducted so as not to interfere with the right of any person to a fair and impartial trial[] and . . . the dignity and decorum which must attend the proceedings."  Md. Rule 1209 (1983 Supp.), attached hereto as Exhibit 2.

Although the Supreme Court, in issuing its *Chandler* decision, had permitted the states to experiment with electronic media coverage of their respective court proceedings, Maryland's General Assembly, in its 1981 legislative session, decided that the risk to trial fairness and integrity from broadcasting was too great and enacted what is now § 1-201 of the Criminal Procedure Article, Annotated Code of Maryland.[3]   Section 1-201 commands that, with certain exceptions, "a person may not record or broadcast any criminal matter, including a trial, hearing, motion, or argument, that is held in trial court or before a grand jury" and any person who violates this provision "may be held in contempt of court."   Md. Code Ann., Crim. Proc. § 1-201 (c).[4]  The statute does not prohibit any person from describing, transcribing, or reenacting any portion of a criminal trial.  It bans only the transmission of participants' images and voices from inside the courtroom.

Beginning in the late 1990s, Maryland courts transitioned from the traditional court reporter-only system to audio recording of trial-court proceedings.  *See* Md. Rules 16-502, 16-503.[5]  In 1997, Maryland's statewide trial court of limited jurisdiction, known as the

---

[3] The statute was originally codified as Article 27, § 467B of the Maryland Code. 1981 Md. Laws ch. 748, at 2782.  The General Assembly then modified the text of § 1-201 "without substantive change" as part of a 2001 recodification of the Code.  2001 Md. Laws ch. 10, at 85-86.

[4] Unsuccessful bills seeking to amend the statute were introduced in the 2006-09, 2016-17, and 2019-20 legislative sessions.   Md. Fisc. Note, 2020 Sess. H.B. 1376.http://mgaleg.maryland.gov/2020RS/fnotes/bil_0006/hb1376.pdf   (last   visited September 3, 2021).

[5] Acting under its constitutional authority to adopt "rules and regulations concerning the practice and procedure in and the administration of" the courts, Md. Const. art. IV, § 18, the Court of Appeals of Maryland has promulgated 20 titles of rules.  Title 16 of the Maryland Rules regulates court administration.

District Court, moved to an all-audio system, and permitted parties to proceedings to gain access to recordings.  Md. Rule 16-504 (Michie 1998) (amending and re-codifying Md. Dist. Ct. Rule 1224 (Michie 1996), which had provided for court reporters in the District Court).

At that time, Maryland's trial courts of general jurisdiction, known as circuit courts, could authorize recordings of proceedings, in which case parties and stenographers would be afforded access to the recordings, Md. Rule 16-406 (Michie 1998), but proceedings were still recorded verbatim by court reporters, Md. Rule 16-404(d) (Michie 1998).  The rule providing access to recordings was then rewritten in 2005 to provide copies of audio recordings to "any person upon written requests and the payment of reasonable costs, unless payment is waived by the court."  Md. Rule 16-406 (Lexis 2006).  Then, in 2016, the rules were rearranged and reworked.  Under this revision, each circuit court, like the District Court, could record proceedings and make the recordings available to the public. Md. Rule 16-503.

Due to the 2016 revision, an entire chapter of Rules now regulates the "recording of proceedings," Md. Rules tit. 16, ch. 500, and another chapter regulates "extended coverage" of court proceedings, such as real-time broadcasting for civil cases, Md. Rules tit. 16, ch. 600.  The recordings of proceedings are "under the control of the court" and access to the official recording itself is limited.  Md. Rule 16-504(a).  A member of the public, however, may obtain copies of most court audio recordings or listen to and view video recordings at the courthouse.  Md. Rules 16-504(h), (i).  Copies of video recordings are provided only to judges, judicial and attorney ethics investigators, parties and their

attorneys, or transcriptionists.  Md. Rule 16-504(i).  Any person receiving a copy of a video recording under Md. Rule 16-504(j)(1) is prohibited from making or causing to be made any additional copy of the recording, and, subject to certain exceptions, from giving or electronically transmitting the recording to another.  Md. Rule 16-504(j)(2).  And no copies of recordings are provided when a proceeding is "closed pursuant to law;" another rule provides for sealing or shielding, or "as ordered by the court."  Rule 16-504(h)(1).

When placing an order for a recording of a criminal trial proceeding, requesters must use standard order forms provided by the circuit courts that clearly set forth the prohibition on broadcasting and condition release of the recording on agreement with those terms. Prince George's County's forms (paper and online) include the following acknowledgement:

> By my signature I acknowledge that Maryland Criminal Procedure Article § 1-201 provides that a person may not broadcast any proceedings in a criminal matter and agree that I will not broadcast, copy, transfer, or otherwise electronically transmit to any person any recording of any criminal proceeding and that any willful violation may be punishable as contempt.

*See* Declaration of Phyllis Hernandez, attached hereto as Exhibit 3.  And each copy distributed to a member of the public is affixed with a label that clearly warns that any and all duplication and/or broadcast is strictly prohibited.  *Id.*

Baltimore City's form includes the following acknowledgement:

> By my signature, I acknowledge that Maryland Criminal Procedure Article 1-201 provides that a person may not broadcast any proceeding in a criminal matter, and I agree that this recording will not be broadcast or copied.

*See* Declaration of Patricia Trikeriotis, attached hereto as Exhibit 4.  And each copy distributed to a member of the public is affixed with a label indicating that the recording

10

"is to be used only for purposes permitted" by Maryland Rule 16-504 and Maryland Criminal Procedure Article § 1-201, that it is not to be used for transcription purposes or media broadcast, and that unauthorized use can result in penalties for contempt of court. *Id.*[6]

### Concerns for Integrity of Criminal Trials Persist

Since the passage of Crim. Law § 1-201, concerns about the potential for broadcasting to negatively impact criminal trials have persisted.  In 2008, after study and public hearings, the Maryland Judicial Conference Committee to Study Extended Media Coverage in Maryland determined that "the adverse impacts on the criminal justice process are real" and concluded unanimously that the current statutory prohibition on recording and broadcasting criminal trial courts should remain in effect.[7]  In support of this motion and response, defendants submit the declarations of two State's Attorneys documenting the continued need for Maryland's ban on the broadcasting of criminal trials.  *See* Declarations of Anne Colt Leitess and Scott D. Shellenberger, attached as Exhibits 5 and 6 respectively.

Anne Colt Leitess, State's Attorney for Anne Arundel County, Maryland, and a prosecutor with 33 years of experience, attests that the top challenge facing prosecutors is convincing victims and witnesses to violent crimes to appear in court and testify.  Leitess

---

[6] Each of the circuit courts use some version of this form.  Since the administrative judges for the Circuit Court for Baltimore City and the Circuit Court for Prince George's County are the defendants in this case, defendants are using samples from their courts in support of this motion and response.

[7] https://www.courts.state.md.us/sites/default/files/import/publications/pdfs/mediac overagereport08.pdf.

Decl. ¶¶ 2, 3.  Ms. Leitess routinely hears witnesses voice their concerns that the trial will be broadcast and that anyone will be able to see and hear them testify. *Id.* ¶ 6. They fear returning to their communities and being labeled snitches.  *Id.* ¶ 6. This fear is most greatly felt in cities such as Annapolis and Baltimore where witness intimidation is common and cooperation in homicide investigations is largely non-existent. *Id.* ¶ 6.

One of the most effective tools Ms. Leitess has at her disposal to secure witness cooperation is her ability to reassure them that there will be no cameras in the courtroom and that no one will be able to record their face or voice while they testify and play it on television or over the internet.  *Id.* ¶ 8.  Recording (other than by court personnel) and photography is forbidden in all Maryland courts and signs are posted on the courtroom doors, at the entrance to the courthouse, and stated by the judge during the case.  *Id.* ¶ 8. This simple fact helps Ms. Leitess to persuade witnesses to come to court to testify.  *Id.* ¶ 8.

Similarly, Scott D. Shellenberger, State's Attorney for Baltimore County, Maryland, with prosecutorial experience extending as far back as 1985, attests that over the last 35 years he has observed an increased reluctance of victims and witnesses to come to court to testify.  Shellenberger Decl. ¶ 5.  Prosecutors spend a great deal of time and energy trying to get witnesses to come to court and testify.  *Id.* ¶ 5.  Much of witnesses' reluctance is due to concerns for safety and possible retaliation for testifying against a criminal defendant.  *Id.* ¶ 6.  Both Mr. Shellenberger and Ms. Leitess attest that it is sometimes necessary to procure witness testimony by taking the witness into custody and bringing the witness involuntarily to court.   *Id.* ¶ 6; Leitess Decl. ¶ 5.   Based on his

extensive experience, Mr. Shellenberger believes that permitting the broadcasting of witness testimony over various media outlets or the internet will greatly increase witness reluctance thereby hampering prosecutors' ability to secure convictions and negatively impacting public safety.  *Id.* ¶¶ 7-8.

### Plaintiffs Brandon Soderberg and Baynard Woods Obtain Copies of Audio and Video Recordings of Criminal Trial Proceedings From Undisclosed Sources.

Plaintiffs Brandon Soderberg and Baynard Woods are authors who recently published a book on corruption in Baltimore City's Gun Trace Task Force.  ECF Nos. 71-6 ¶¶ 1-3 and 71-7 ¶¶ 1-3.  They also are engaged in a documentary film project on the same subject.  ECF Nos. 71-6 ¶ 3 and 71-7 ¶ 3.  Over several years, Mr. Soderberg and Mr. Woods have received copies of audio recordings, as well as one video recording of Baltimore City Circuit Court criminal proceedings, from the Baltimore City Court Reporter's Office.  ECF Nos. 71-6 ¶ 4 and 71-7 ¶ 4.  Mr. Woods acknowledges that, to receive the recordings, he had to sign a paper stating that broadcasting the recordings could result in contempt charges.  ECF No. 71-6 ¶ 4.  They assert they also have "lawfully obtained" copies of two additional video recordings of Baltimore City Circuit Court criminal proceedings,[8] ECF Nos. 71-6 ¶ 4 and 71-7 ¶ 4, but they have refused to disclose

---

[8] It might be true that Mr. Soderberg and Mr. Woods broke no laws to obtain a video recording, but that does not mean that no laws were broken in that exchange.  Maryland Rule 16-504(j)(1) provides that only certain judiciary officials, Bar Counsel, and the parties to a case may secure a copy of a video recording, but such persons are prohibited from making further copies or giving or electronically transmitting the recording to any other person, Md. Rule 16-504(j)(2).  And any willful violation of this rule is punishable as contempt.  Md. Rule 16-504(j)(3).  Upon written request, members of the public are permitted to go to the courthouse and view a video recording, but they are prohibited from

the source of those video recordings, *see* Soderberg Response to Interrogatory No. 8, attached hereto as Exhibit 7, and Woods Response to Interrogatory No. 8, attached hereto as Exhibit 8.

> **Plaintiff Open Justice Baltimore Obtains Copies of Audio Recordings of Criminal Trial Proceedings Conditioned Upon the Prohibition Against Broadcasting or Making Copies of the Recordings.**

In May 2019, Zach Zwagil, a data analyst for plaintiff Open Justice Baltimore ("OJB"), obtained from the Baltimore City Court Reporter's Office an audio recording of a Baltimore City Circuit Court criminal proceeding.  In exchange for the recording, Mr. Zwagil "signed a request for that stated [he] was prohibited from broadcasting or making a copy of the recording."  ECF No. 71-8 ¶ 3.  OJB intends to share this recording on OJB's website and possibly on social media in violation of the terms of release signed by Mr. Zwagil.  ECF No. 71-8 ¶ 4.  Plaintiffs seek to be insulated from any repercussions stemming from the violation of the court's conditional release of the recording.

> **Plaintiffs Qiana Johnson and Life After Release Obtain Copies of Audio Recordings of Criminal Trial Proceedings Conditioned Upon the Prohibition Against Broadcasting or Making Copies of the Recordings.**

Plaintiff Qiana Johnson, founder of Life After Release ("LAR"), coordinates a local court-watching program aimed at increasing accountability and promoting positive change within Prince George's County's judicial system.  ECF No. 71-10 ¶¶ 2-3.  On behalf of herself and LAR, Ms. Johnson has obtained audio recordings of criminal proceedings in Prince George's County from the Prince George's County Office of Court Reporters.  ECF

---

copying the video recording, and may be subject to contempt if they violate the rule.  Md. Rule 16-504(i).

No. 71-10 ¶ 4.  In her declaration submitted in support of plaintiffs' summary judgment motion, Ms. Johnson acknowledges that, in requesting at least one of these recordings, she signed a form acknowledging that duplication and broadcast of the recording was prohibited.  ECF No. 71-10 ¶ 4; *see also* ECF No. 71-14.  Despite the acknowledgement of Maryland's prohibition against duplication and broadcasting of the recordings, Ms. Johnson and LAR plan to post the recordings on websites to highlight the impact of their participatory-defense work and teach others how to become effective community advocates.  ECF No. 71-10 ¶ 6.

### Plaintiff Baltimore Legal Action Team Plans to Request Copies of Official Recordings of Criminal Trial Proceedings from the Baltimore City Court Reporter's Office in Future.

Plaintiff Baltimore Legal Action Team ("BALT") is a coalition of lawyers who provide legal support to Baltimore communities seeking to exercise their civil liberties and protest injustices rooted in structural racism and economic inequalities.  ECF No. 71-9 ¶ 2. BALT also supports community-centered efforts aimed at addressing racial inequities in the criminal legal system and increasing transparency about how that system works in Baltimore.  ECF No. 71-9 ¶ 2.   BALT, with the help of a local lawyer, obtained a copy of a recording of a criminal trial proceeding, but they lost the copy after the filing of this lawsuit.  ECF No. 71-9 ¶ 3.  If successful in this lawsuit, BALT intends to request additional recordings from the Baltimore City Court Reporter's Office and post the recordings online and share them on social media.  ECF No. 71-9 ¶ 4.

**ARGUMENT**

## I.   APPLICABLE LEGAL STANDARDS

Plaintiffs mount a pre-enforcement, facial challenge to Maryland's law banning broadcasting of criminal trial proceedings.   To succeed in a typical facial challenge, plaintiffs would have to establish that there is "no set of circumstances" under which the law would be valid, or that the statute lacks any "plainly legitimate sweep."   *United States v. Stevens*, 559 U.S. 460, 472 (2010) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987), and *Washington v. Glucksberg*, 521 U.S. 702, 740 n. 7 (1997)).   In the First Amendment context, the Supreme Court recognizes a "'second type of facial challenge' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"   *Id.* (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n. 6 (2008)).

The overbreadth doctrine seeks to "balance between competing social costs." *United States v. Williams*, 553 U.S. 285, 292 (2008).   The doctrine balances the "harmful effects" of "invalidating a law that in some of its applications is perfectly constitutional" against the possibility that "the threat of enforcement of an overbroad law [might] deter[] people from engaging in constitutionally protected speech."   *Id.*   To maintain the appropriate balance, the Supreme Court has "'vigorously enforced the requirement that a statute's overbreadth be substantial, not only in the absolute sense, but also relative to the statute's plainly legitimate sweep.'"   *Id.* (emphasis in original).   The overbreadth claimant bears the burden of demonstrating that substantial overbreadth exists.   They must

demonstrate "'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.'"  *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).  "The 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'"  *Williams*, 553 U.S. at 303 (quoting *Taxpayers for Vincent*, 466 U.S. at 800).

Under Federal Rule of Civil Procedure 56, a district court "shall grant summary judgment" if the record, including the pleadings, affidavits, and depositions, "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56 mandates the entry of summary judgment where, after adequate time for discovery, the non-moving party fails to come forth with proof sufficient to establish an essential element of his claim upon which he will bear the burden of proof at trial.  *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014); *Cray Communications v. Novatel*, 33 F.3d 390, 393 (4th Cir. 1994).

In order to survive a properly supported motion for summary judgment, the non-moving party must present evidence from which a reasonable fact finder could return a verdict in his favor.  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). The mere existence of some disputed fact does not require denial of the motion.  *Thompson Everett, Inc. v. Nat'l Cable*, 57 F.3d 1317, 1322 (4th Cir. 1995).  Rather, the disputed facts must be material to an issue necessary for resolution of the case and the quality and quantity

17

of the evidence offered to create a question of fact must be adequate to support a verdict. *Id.*; *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013).

## II.   PROTECTION OF THE FAIRNESS AND INTEGRITY OF CRIMINAL TRIALS IS A STATE INTEREST OF THE HIGHEST ORDER.

It cannot seriously be disputed that the fairness and integrity of criminal trials is a "state interest of the highest order."  Indeed, it is the bedrock of a just government.  *See Estes*, 381 U.S. at 557-59 (tracing development of Anglo-American criminal trial "from a ritual practically devoid of rational justification to a fact-finding process, the acknowledged purpose of which is to provide a fair and reliable determination of guilt") ("[T]he criminal trial under our Constitution has a clearly defined purpose, to provide a fair and reliable determination of guilt, and no procedure or occurrence which seriously threatens to divert it from that purpose can be tolerated.") (Warren, J. concurring); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 551 (1976) ("A fair trial in a fair tribunal is a basic requirement of due process.")   It is an interest embedded in the Sixth Amendment.  *Estes*, 381 U.S. at 539-40.

Section 1-201 protects the fairness and integrity of Maryland's criminal trials by guarding against the harm to the trial process that would result from the distraction of jurors and intimidation of witnesses, if they knew that their participation in criminal trials might be televised on the nightly news, *see id.* at 545-547, or disseminated worldwide via the internet and "available in perpetuity for unlimited viewing, further dissemination, and easy manipulation," *Mirlis v. Greer*, 952 F.3d 51, 56 (2nd Cir. 2020).  Awareness that a proceeding may be broadcast might affect witness testimony, demoralizing and frightening

some while causing others to overdramatize.  *Estes*, 381 U.S. 547.  Such awareness may also "render witnesses reluctant to appear and thereby impede the trial as well as the discovery of truth."  *Id.*  Such dangers are not merely hypothetical. State's Attorneys Leitess and Shellenberger have provided declarations that illustrate the real difficulties of procuring witness cooperation in criminal matters, particularly cases involving violent crime, and the potential dangers to the integrity of the trial process and public safety of widely disseminating recordings of criminal trial proceedings.

Both prosecutors have attested to the fact that Maryland prosecutors already spend substantial precious time and resources attempting to procure witness cooperation in criminal cases.  Leitess Decl. ¶¶ 4-7, Shellenberger Decl. ¶¶ 5-8.  State's Attorney Leitess calls procuring witness cooperation "[t]he top challenge" that prosecutors face.  Leitess Decl. ¶ 4.  She has provided compelling examples of cases involving real dangers to cooperating witnesses.  Leitess Decl. ¶¶ 11-16.  Based on her many years of experience, she opines that invalidation of Maryland's broadcast ban will have a chilling effect on witness cooperation and thereby affect public safety and the administration of justice. Leitess Decl. ¶ 18.  State's Attorney Shellenberger similarly opines that "if victims and witnesses learn that their recorded testimony could be broadcast over various media outlets, or posted on the internet, their reluctance to testify will greatly increase."  Shellenberger Decl. ¶ 7.  He further opines that invalidation of the broadcast ban will hamper prosecutors' ability to obtain criminal convictions and will have a negative impact on public safety. Shellenberger Decl. ¶ 8.

19

Plaintiffs dismiss Ms. Leitess's and Mr. Shellenberger's opinions because they are not based on hard data, but Maryland has had no reason to collect data on the potential effects of invalidating a broadcast ban that has been in place, without incident, for over 40 years.  And such data may be exceedingly difficult to capture even though the danger is very real.  *See Chandler*, 449 U.S. at 577 (observing that broadcasting a trial "may adversely affect the conduct of the participants and the fairness of the trial, yet leave no evidence of how the conduct or the trial's fairness was affected");  *Estes*, at 545 (observing that numerous ways broadcasting may cause actual unfairness may be "so subtle as to defy detection by the accused or control by the judge").

Such dangers have not diminished since *Estes*.  Indeed, as recently as 2010, the Supreme Court has cited the potential chilling effect on witnesses as a reason to grant a stay of the broadcast of a federal trial.[9]  *Hollingsworth v. Perry*, 558 U.S. 183, 195 (2010). In a per curiam decision, the Court held that the broadcast's potential chilling effect on witnesses was sufficient to establish the likelihood of irreparable harm required to justify the issuance of a preliminary injunction.  *Id.*  Significantly, the Court's concerns were not diminished by the fact that some of the witnesses were compensated experts.  *Id.* Additionally, the Court cited potential harm to *future* proceedings.  *Id.* at 196.

Maryland courts also have a compelling interest in the integrity of their official records and "an institutional interest in procedures designed to increase the accuracy of the

---

[9] The case involved a bench trial challenging California's Proposition 8, which amended California's State Constitution to provide that only marriage between a man and woman is valid or recognized in California.

essential truth-seeking function of the trial." *United States v. Hastings*, 695 F.2d 1278, 1283 (11th Cir. 1983) (citing *Estes*, 381 U.S. 544-51).  The advent of the internet and social media presents additional broadcasting dangers not contemplated in *Estes* and *Chandler*. Now, anyone can post a recording on the internet, which then becomes fair game for further distribution, and even alteration.  *See* Nina I. Brown, *Deepfakes and the Weaponization of Disinformation*, 23 VA. J. L. & TECH. 1 (2020);  Holly Kathleen Hall, *Deepfake Videos: When Seeing Isn't Believing*, 27 CATH. U. J. L. & TECH. 51 (2018).  As one commentator recently noted, deepfake[10] "technology is evolving at such an alarming rate that it is increasingly difficult to distinguish deepfakes from authentic videos."  Brown, *Deepfakes*, 23 VA. J. L. & TECH. at 2.  Several deepfake programs are freely available to anyone with a computer; deepfakes are easy to make and resemble actual video footage.  *Id.* at 5-6. Moreover, "[e]xperts predict that a competent detection tool will not be available for years, if not decades."  *Id.* at 2.  And, "once created, deepfakes are easy to disseminate and difficult to eradicate."  *Id.* at 15.  The harms Maryland's law seeks to limit are real harms that impact state interests of the highest order.

---

[10] In her law review article, Ms. Hall explains that a new software tool was released to the public in 2018 allowing the creation of "videos of people speaking words they have never articulated and/or performing tasks they never did."  Hall, *Deepfake Videos*, 27 CATH. U. J. L. & TECH. at 52.  Such creations are commonly referred to as "deepfakes." *Id.*  Audio-editing software also is readily available free on the internet.  *See, e.g.*, https://www.audacityteam.org/.

III.   **SECTION 1-201 OF THE CRIMINAL PROCEDURE ARTICLE IS NARROWLY TAILORED TO PROMOTE THE STATE'S INTERESTS IN PROTECTING THE INTEGRITY AND FAIRNESS OF CRIMINAL TRIALS.**

Plaintiffs do not challenge Section 1-201 standing alone.  They apparently concede that the right of the press and public to court access stops at the courthouse door, and, therefore, Maryland courts are not required to record proceedings or provide copies of official recordings to the public.   *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 609 (1978) (rejecting broadcaster's claim that right of access includes the right to copy and publish exhibits and materials displayed in open court).  Instead, they challenge the interplay between the statute and rules that permits a restricted release of official recordings.  Plaintiffs' challenge fails because Section 1-201 and the Title 16 Maryland Rules operate together to create a process for access to official court recordings that is narrowly tailored to provide the broadest possible access to criminal trial proceedings while also preventing the deleterious effect to the trial process that is bound to develop if there were no restraints on the use of recordings.  The statute and rules act in concert to thread a needle.

Section 1-201 of the Criminal Procedure Article prohibits individuals from recording or broadcasting any criminal matter held in the trial court or before a grand jury. Id. § 1-201(a)(1).  The prohibition is limited to criminal trials where Sixth Amendment interests are guaranteed; it does not extend to civil trials.  *Id.*  The prohibition also is limited to proceedings in the trial court or before a grand jury where the state's interest in protecting witnesses, jurors, and other lay participants is most acute.  It does not extend to appellate proceedings where the record is static and only legal argument is presented.  *Id.*  The

22

prohibition places no restrictions on the dissemination of descriptions of what occurred at trial; it prevents only the dissemination of voiceprints and images of the participants of trial. *Id.* The media or other persons viewing the trial are free to describe what happened at trial, perform reenactments of trial, or publish transcripts of trial. *Id.* Consequently, the restriction does not inhibit public discussion; it permits robust discussion, through publication of transcripts, reenactments, etc.

The statutory restriction acts in tandem with Maryland court rules governing the recording of court proceedings. By rule, all Maryland court proceedings are required to be recorded verbatim in their entirety by court personnel. Md. Rule 16-503(a). The proceedings may be recorded by any reliable method or combination of methods approved by the County Administrative Judge who shall determine which method shall be used to prepare a transcript. *Id.* 16-503(b). Only duly authorized employees of the circuit court may have access to or possession of an official electronic recording. *Id.* 16-504(a)(2). But, the authorized custodian shall make a copy of the audio recording, or, if practicable, the audio portion of an audio-video recording, available to any person upon written request. *Id.* 16-504(h)(1). To obtain a copy, all requesting individuals are required to sign a form acknowledging that broadcasting or copying the recording is prohibited by statute and agreeing to the restriction. *See* Exs. 3 and 4. And each recording is affixed with a label providing that the recording is only to be used for purposes permitted by Rule 16-504 and Crim. Proc. § 1-201, that the recording may not be used for media broadcast, and that unauthorized use can result in penalties for contempt of court. *Id.* Consistent with those warnings, the statute places enforcement of the restrictions squarely on the very courts

23

charged with administering criminal trials, maintaining the official record, and distributing copies of official recordings to the public. *See id.* § 1-201(c) (providing that person who violates the statute may be held in contempt of court).

The release of recordings to individuals permitted under the Maryland Rules, subject to the broadcast restriction of § 1-201, expands the public's access to court proceedings while providing narrowly tailored prevention of the particular harms posed by broadcasting: the widespread dissemination of criminal trial participants' voiceprints and video images "in perpetuity for unlimited viewing, further dissemination, and easy manipulation." *Mirlis*, 952 F.3d at 56. Contrary to plaintiffs' assertion, the restriction on use is not too narrow to safeguard Maryland's interests in protecting criminal trial participants and preventing witness intimidation. Although the restriction does not prevent all forms of witness or juror intimidation, it does prevent a certain type of intimidation that may be perpetrated on a large scale through internet trolling. It also will prevent the alteration of the courts' official recordings for nefarious purposes.

Plaintiffs' suggestion that Maryland could enact rules banning the alteration of its official recordings, ECF No. 71-1 at 28, is untenable because, once a recording is posted on a public website or social media platform, it is no longer within the control of the original poster. Indeed, each of the plaintiffs was asked to describe steps they have taken or will take to protect recordings from alteration or manipulation following their dissemination, publication, or broadcasting of such recordings, and each had no information responsive to those particular interrogatories. Exs. 7, 8, 9, 10, 11, 12 (Plaintiffs' Answers to Interrogatory Nos. 11 and 12). Consequently, plaintiffs'

representations, that they wish only to use accurate recordings for their educational and advocacy purposes, cannot protect Maryland's interests.

One recent commentator has described the futility of attempts to regulate video and audio manipulation, through criminal and civil laws prohibiting such conduct:

> [T]hose sophisticated enough to engage in online criminal activity often have the ability to remain anonymous. This is borne out by current deepfake pioneers. The first person to publicly release deepfake code (a Reddit contributor named Deepfakes) operates anonymously. So too does a second Reddit user who used Deepfakes code to create FakeApp. This cloak of anonymity dramatically reduces the ability of laws to regulate or deter deepfake abuses. If perpetrators can avoid detection and, thus, sanctions, the law is of minimal consequence. To have a realized impact, the law would need an enforcement mechanism — some way to identify and target those responsible for the deepfake in question's creation or distribution.

Brown, *Deepfakes*, 23 VA. J. L. & TECH. at 38. Moreover, even if identification of the perpetrators was possible, they could be located outside the jurisdictional reach of any such prohibition because "the perpetrators can originate outside of the U[nited] S[tates]." *Id.* at 39. "[T]he fact that these [crimes] can originate in a country other than that of the victim(s) creates a jurisdictional barrier to accountability that allows perpetrators to further discount the chances of getting sanctioned." *Id.* (citations and internal quotation marks omitted).

Maryland law avoids the problems that would plague prohibitions on altering official court recordings. By conditioning release of copies of official recordings on compliance with the broadcast restriction and making violation of the restriction punishable by contempt proceedings, Maryland law ensures that its restriction is enforceable. Consistent with the principles announced in *Cox Broadcasting*, Maryland's law seeks to sanction only persons who are "the source of [the] release." *Florida Star v. B.J.F.*, 491

25

U.S. 524, 535 (1989) (citing *Cox Broadcasting*, 420 U.S. at 495).  This case thereby falls within the "limited set of cases . . . where, despite the accessibility of the public to certain information, a meaningful public interest is served by restricting its further release by other entities."  *Id.* (discussing *Daily Mail*, 443 U.S. at 103).

## IV.   THE INTERESTS AT STAKE IN *COX BROADCASTING* AND *DAILY MAIL* ARE DISTINCT FROM THE INTERESTS AT STAKE IN THIS CASE.

Applying the factors identified in *Cox Broadcasting* and *Daily Mail* further demonstrates that those cases do not support plaintiffs' position.  Although Supreme Court precedent disfavors punishment of truthful publication of publicly available information, *Cox Broadcasting*, 420 U.S. at 495-96, there is no blanket prohibition on such restrictions. Instead, the Supreme Court and Courts of Appeals have resolved each "ongoing conflict between privacy and the First Amendment 'only as it arose in a discrete factual context.'" *Ostergren v. Cuccinelli*, 615 F.3d 263, 276 (4th Cir. 2010) (quoting *Florida Star*, 491 U.S. at 530).  Indeed, the Court of Appeals remanded this case to this Court for just such analysis, and the parties developed a factual record to enable to the Court to do so.

The Supreme Court has articulated three considerations that the *Cox Broadcasting* progeny have utilized to assist in the analysis when the conflict is one between privacy interests and the First Amendment:  (1) to the extent sensitive information is in the government's custody, the government often may protect such information by "less drastic means" than punishing the publication of truthful information; (2) punishing the press for publication of information that already is publicly available is unlikely to advance the State's interest in the protection of privacy; and (3) such restrictions on publication may

cause "timidity and self-censorship" by the press.  *Ostergren*, 615 F.3d at 275 (quoting *Florida Star*, 491 U.S. at 534-36).  The application of these factors favors denial of plaintiffs' request for declaratory relief because the protection of privacy is not the central State interest at stake in this case.  *See id.* at 281 (observing that cases involving State interests that diverge from the narrow privacy interests considered in *Cox Broadcasting* and *Florida Star* require "a more nuanced analysis").

As to the first factor, although it is true the State could prevent the release of criminal trial recordings entirely, that method would be a greater restriction on First Amendment interests than the method selected by the State.  The limited release of recordings to individuals permitted under § 1-201 and the Maryland Rules facilitates the public's access to court proceedings in a way that withholding recordings would not.  Particularly in light of recent court occupancy restrictions necessitated by ever-changing pandemic conditions, the State's method expands the size of the public courtroom giving media outlets access to the sights and sounds of the trial without having to send a journalist in person.  Although the State could limit *in abstentia* access to written transcripts, that method would increase costs to the media for the production of transcripts and prevent the journalist from making first-hand observations of participants' demeanor, speech quality and cadences, and bodily gestures—the very details that enable nuanced reporting.

As to the second factor, if the only matter at issue were the kind of narrow privacy interest at issue in *Cox Broadcasting* and *Florida Star*, then Maryland's release of its official recordings would seem to be foreclosed by those precedents.  *See Ostergren*, 614 F.3d at 281-82 (observing that *Cox Broadcasting* and *Florida Star* both involved very

narrow conceptions of privacy—the protection of people from disclosure of embarrassing private facts—that is lost when such facts have been disclosed).  Once released to the public, such information ceases to be private.  *Id.* at 282 ("Because this conception of privacy presupposes secrecy, personal matters that have been publicly disclosed can no longer be considered private.").  But privacy is not the central interest at play here.  The central interest—protecting the integrity and fairness of criminal trials—is not lost through the State's chosen method:  restricted release of official recordings of criminal trial proceedings coupled with a ban on broadcasting the trial-level proceedings.  As the Supreme Court has observed, "the very awareness . . . of the coverage and the contemplated broadcast may adversely affect the conduct of the participants and the fairness of the trial," but elude any potential remedy because it would "leave no evidence of how the conduct or the trial's fairness was affected."  *Chandler*, 449 U.S. at 577.  The State's chosen method avoids the potentially pernicious effects of broad dissemination (perhaps into perpetuity) of voiceprints and images of the participants of a criminal trial.

As to the third factor, the statute and rules do not invite timidity and self-censorship because the law is quite clear what is not permitted: broadcasting the voiceprints and images from the criminal court proceedings.  Unlike the situation where the government, either purposefully or inadvertently, has released information that it then seeks to make confidential by sanctioning publication, the broadcasting ban does not "'force upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication.'"  *Ostergren*, 615 F.3d at 275 (quoting *Florida Star*, 491 U.S. at 536).  Instead, the undisputed facts

28

demonstrate that Maryland courts make clear that copies of official recordings are to be used for personal use only and are not to be duplicated or broadcast.  Yet, despite those clear parameters, and plaintiffs' agreement to abide by them, they seek to invalidate Maryland's entire process for providing restricted access to official recordings.  That is not a result consistent with the requirements of *Cox Broadcasting* and *Daily Mail*.

This is not a case where a state has inadvertently released confidential information that it then seeks to protect through sanctions.  *Daily Mail*, 443 U.S. at 97 (preventing criminal indictment of newspapers who published name of juvenile defendant learned from witnesses, police, and local prosecutor).  Nor is it a case where a state engages in the very type of publication it prohibits the public from engaging in.  *Ostergren*, 615 F.3d at 286 (state could not prohibit the republishing of land records that included social security numbers when those same records were publicly available on court website).  Instead, this case involves a challenge to a decades-long procedure for the release of official court recordings on the condition that such recordings not be duplicated, broadcast, or further disseminated.  Invalidation of that process is not required by *Cox Broadcasting* and its progeny.  Plaintiffs' request for relief should be denied.[11]

---

[11] Defendants do not assert their affirmative defense of waiver against plaintiffs' facial challenge but reserve their right to raise waiver in the event plaintiffs make an as-applied challenge in future.

**CONCLUSION**

For all of the foregoing reasons, the Court should deny plaintiffs' motion for summary judgment and grant defendants' cross-motion for summary judgment.

BRIAN E. FROSH
Attorney General of Maryland

/s/ Robert A. Scott
_____
ROBERT A. SCOTT
Federal Bar No. 24613
ANN M. SHERIDAN
Federal Bar No. 11137
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
asheridan@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

May 6, 2022                               Attorneys for Defendants