UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**BRANDON SODERBERG**, *et al.*,

    *Plaintiffs*,

**v.**

**HON. AUDREY J. S. CARRIÓN, *et al.*,**

    *Defendants.*

Case No. 1:19-cv-01559-RDB

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

ADAM HOLOFCENER (No. 19579)
Maryland Volunteer Lawyers for
   the Arts
120 W. North Ave., Suite 305A
Baltimore, MD 21201
Tel.:  410-752-1633
adam@mdvla.org

SHELBY CALAMBOKIDIS* (No. 816008)
SETH WAYNE* (No. 816003)
Institute for Constitutional Advocacy
   and Protection
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, DC 20001
Tel.:  202-661-6599
Fax:  202-661-6730
sc2053@georgetown.edu
sw1098@georgetown.edu
* Admitted *pro hac vice*

Dated:  May 27, 2022

*Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT....................................................................................................................... 2

I.   This Court Must Apply Strict Scrutiny ........................................................................ 2

II.  Defendants Have Failed to Meet Their Burden .......................................................... 6

    A.   The State has not shown that a less-restrictive measure would fail to adequately address their interests. ................................................................... 10

    B.   Defendants' reliance on *Estes* and *Chandler* is misplaced, as they also require individualized determinations instead of blanket rules..................................... 15

    C.   Defendants have not proven the Broadcast Ban is narrowly tailored to any State interest............................................................................................................ 18

CONCLUSION .................................................................................................................. 26

CERTIFICATE OF SERVICE ........................................................................................... 27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*ACLU v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003)................................................................ 3, 4

*ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008)................................................................. 4

*Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987) ........................................... 4

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ...................................................................... 23

*Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000) ................................................................... 12

*Berger v. Battaglia*, 779 F.2d 992 (4th Cir. 1985) ......................................................... 24

*Burson v. Freeman*, 504 U.S. 191 (1992)......................................................................... 4

*Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303 (1983) ....................................... 13, 14

*Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625 (4th Cir. 2016) .................................... 4

*Chandler v. Florida*, 449 U.S. 560 (1981) ........................................................... 9, 15, 17

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975)................................................. 5, 13, 24

*El Vocero de P.R. v. Puerto Rico*, 508 U.S. 147 (1993) ................................................. 12

*Estes v. Texas*, 381 U.S. 532 (1965)................................................................. 15, 16, 21

*Fla. Star v. B.J.F.*, 491 U.S. 524 (1989)..................................................................... 3, 24

*Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982)............................ 9, 11, 12, 13

*Hartford Courant Co. v. Carroll*, 986 F.3d 211 (2d Cir. 2021) ..................................... 13

*Hollingsworth v. Perry*, 558 U.S. 183 (2010) ...................................................... 18, 19, 20

*In re Hearst Newspapers, L.L.C.*, 641 F.3d 168 (5th Cir. 2011) ...................................... 13

*In re Knight Publ'g Co.*, 743 F.2d 231 (4th Cir. 1984) ................................................... 12

*In re Providence Journal Co.*, 293 F.3d 1 (1st Cir. 2002)............................................... 12

*Mirlis v. Greer*, 952 F.3d 51 (2d Cir. 2020) ................................................................... 22

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) .......................... 7

*PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004)................................................. 3

*Recht v. Morrissey*, 32 F.4th 398 (4th Cir. 2022) ........................................................... 4

*Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015)............................................... 11, 22

*Ross v. Early*, 746 F.3d 546 (4th Cir. 2014)................................................................... 23

*Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979)................................................ 5, 21, 24

*Soderberg v. Carrion*, 999 F.3d 962 (4th Cir. 2021) ....................................................... 3

*United States v. Al-Hamdi*, 356 F.3d 564 (4th Cir. 2004) .................................................... 2

*United States v. Hastings*, 695 F.2d 1278 (11th Cir. 1983) ................................................ 18

*United States v. Index Newspapers LLC*, 766 F.3d 1072 (9th Cir. 2014) .......................... 13

*United States v. Rosen*, 487 F. Supp. 2d 703 (E.D. Va. 2007) ............................................. 12

*United States v. Salerno*, 481 U.S. 739 (1987) .................................................................. 2

*United States v. Stevens*, 559 U.S. 460 (2010) .................................................................. 3

*United States v. Wecht*, 537 F.3d 222 (3d Cir. 2008) ......................................................... 14

*United States v. Williams*, 553 U.S. 285 (2008) ................................................................ 4

*Virginia v. Hicks*, 539 U.S. 113 (2003) .............................................................................. 4

*Wash. Post v. McManus*, 944 F.3d 506 (4th Cir. 2019) ...................................................... 23

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................................... 6

Md. Rule 16-504 ................................................................................................................... 11

## INTRODUCTION

Defendants'[1] memorandum recites a list of harms that, they speculate, are addressed by Section 1-201(a)(1) of the Maryland Code of Criminal Procedure (hereinafter "the Broadcast Ban," or simply the "Ban"), which prohibits the broadcasting or dissemination of lawfully obtained recordings of court proceedings. But Defendants have not provided a shred of credible, material evidence that the Ban does any of the things they hope it does. They have conducted no investigation, review, consultation with other jurisdictions, nor anything else to determine whether the Ban actually prevents any harm. Nor do they provide any support for their assertion that the Ban is narrowly tailored to address the alleged harms. Although they note a number of limitations to the Ban—e.g., that it only applies to criminal proceedings—they fail to reckon with the fact that even with those limitations, the Ban applies in many circumstances where it serves no State interest. This fact is acknowledged by Defendants' own proffered experts. Defendants have simply presented nothing that would meet their heavy burden to show that the Ban satisfies strict scrutiny.

In particular, Defendants make absolutely no attempt to address the less-restrictive alternative already codified in Maryland law: that judges make a case-by-case determination of when court proceedings should be withheld from the public. Decades of First Amendment decisions from the Supreme Court and the Fourth Circuit have

---

[1] Defendants are state actors sued in their official capacities. Accordingly, Plaintiffs use the terms "Defendants" and "the State" interchangeably in this brief.

made clear that restrictions on access to or dissemination of court matters must be individualized to a particular case, and blanket prohibitions like the Broadcast Ban are unconstitutional. Moreover, strict scrutiny requires that Defendants show not only that their rule is narrowly tailored, but also that they have actually tried less-restrictive measures which are insufficient to serve the State's purposes. Defendants have not done so here. Accordingly, they have failed to meet their burden to show that the law passes strict scrutiny, and Plaintiffs must prevail.[2]

## ARGUMENT

## I.      This Court Must Apply Strict Scrutiny

As a preliminary matter, Plaintiffs must revisit the question of the legal standard at issue in this case. Defendants describe two standards that they suggest apply here, but they are mistaken on both counts. First, they reference language from *United States v. Salerno*, 481 U.S. 739, 745 (1987), to allege that if this were a typical facial challenge, Plaintiffs would be obligated to show that there is "no set of circumstances" under which the law would be valid, or that the Ban lacks a "plainly legitimate sweep." Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Br."), ECF No. 72-1, at 16. As explained in Plaintiffs' opening brief, this standard has been rejected, and certainly does not apply in the present context. Mem. in Supp. of

---

[2] Defendants do not brief their "prudential standing" or "waiver" defenses. *See* Second Am. Answer, ECF No. 70, at 11. Accordingly, those arguments are waived. *See United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned.").

Pls.' Mot. for Summ. J. ("Pls'. Br."), ECF No. 71-1, at 13–15.  Here, the Fourth Circuit has already held that the appropriate constitutional standard for Plaintiffs' "facial, pre-enforcement challenge to the Broadcast Ban" is "strict scrutiny review."  *Soderberg v. Carrion*, 999 F.3d 962, 966, 969 (4th Cir. 2021).  For the reasons explained in Plaintiffs' opening brief, strict scrutiny is incompatible with the language Defendants cite from *Salerno*.  Pls.' Br. 14–15.

Alternatively, Defendants characterize Plaintiffs' claims as an "overbreadth" challenge.  Defs.' Br. 16.  They accordingly contend that Plaintiffs bear the evidentiary burden, and that this Court should engage in a balancing test where the statute's constitutionally prohibited speech is weighed against its legitimate applications.  *Id.* (citing *United States v. Stevens*, 559 U.S. 460, 472 (2010)).  But overbreadth also differs from strict scrutiny.  Strict scrutiny requires Defendants to prove that the Ban is "narrowly tailored to a state interest of the highest order."  *Soderberg*, 999 F.3d at 970 n.4 (quoting *Fla. Star v. B.J.F.*, 491 U.S. 524, 541 (1989)).  Admittedly, the case law at times combines one component of narrow tailoring—"overinclusivity"—with constitutional overbreadth.  *See, e.g., PSINet, Inc. v. Chapman*, 362 F.3d 227, 233–34 (4th Cir. 2004) (applying strict scrutiny to find a statute overbroad); *ACLU v. Ashcroft*, 322 F.3d 240, 266 (3d Cir. 2003) ("Overbreadth analysis—like the question whether a statute is narrowly tailored to serve a compelling governmental interest—examines whether a statute encroaches upon speech in a constitutionally overinclusive manner.").  But a faithful reading of the law makes clear that these are separate legal questions with

materially distinct standards. *See, e.g.*, *Ashcroft*, 322 F.3d 240 (separately applying strict scrutiny and overbreadth standards in facial First Amendment challenge); *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008) (same). Plaintiffs here, unlike the plaintiffs in *Ashcroft* and *Mukasey*, have not raised an overbreadth challenge.

To survive an *overbreadth* challenge, a law need not be narrowly tailored so long as its prohibition of constitutional speech is not "*substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008) (emphasis in original). It also places the burden on the claimant to make such a showing. *Virginia v. Hicks*, 539 U.S. 113, 122 (2003). "Invalidation for overbreadth is strong medicine that is not to be casually employed." *Williams*, 553 U.S. at 293 (internal quotation marks omitted).

By contrast, *strict scrutiny* places a "heavy" burden on the party seeking to uphold the law, *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987), and "it is the rare case" in which they are able to satisfy it, *Burson v. Freeman*, 504 U.S. 191, 211 (1992). *See* Pls.' Br. 12. And unlike overbreadth, strict scrutiny does not include a balancing test. *See, e.g.*, *Recht v. Morrissey*, 32 F.4th 398, 405, 410 (4th Cir. 2022) (distinguishing First Amendment strict scrutiny, the "most demanding test," from the balancing test required by intermediate scrutiny). A statute subject to strict scrutiny must be neither overinclusive *nor* underinclusive, and the government must demonstrate that "no less restrictive alternative would serve its purpose." *Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016) (internal quotation marks omitted).

These distinctions are important.  In particular, the fact that the State bears the burden of proof is critical.   Despite the Fourth Circuit's unambiguous mandate, Defendants attempt to avoid strict scrutiny's rigorous standards by suggesting that this Court should balance competing interests in its constitutional analysis of the Ban.  They do not mention their evidentiary burden, nor do they discuss any less-restrictive alternatives.  Indeed, despite the Fourth Circuit's finding that this case is governed by the principles articulated in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 495–96 (1975), and *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 101–04 (1979), Defendants spend a portion of their brief attempting to distinguish those decisions, seemingly hoping to relitigate what was decided on appeal.  *See* Defs.' Br. 26–29.[3]  But this Court must nevertheless follow the Fourth Circuit's direction to apply strict scrutiny and place the burden squarely on Defendants.

To be clear, Plaintiffs maintain that the Broadcast Ban can satisfy neither strict scrutiny nor the less rigorous overbreadth standard.  The Ban prohibits distribution or broadcast of lawful recordings of *any and all* criminal trial proceedings.  This includes

---

[3] Defendants' extended discussion of *Cox* and *Daily Mail* focuses on the fact that those cases are distinct because the subjects of the materials had a privacy interest (in *Cox*) or the materials were confidential (in *Daily Mail*).  Defs.' Br. 27–29.  But if anything, those differences would accord *greater* protection to the items in those cases—particularly where fair trial concerns are not present, as is the case for many proceedings to which the Ban applies—and the Supreme Court still held their broadcasting could not be constitutionally punished.   The Broadcast Ban prohibits dissemination of non-confidential materials that are already public, creating a more egregious trespass on First Amendment protections.

pretrial proceedings featuring no jurors or witnesses, proceedings related to minor crimes with no individual victims, hearings where the only witnesses are law enforcement officers, and instances of significant misconduct by government actors meriting robust public discourse.  And there is nothing beyond equivocal conjecture in the record to show that the challenged portion of the law provides any meaningful benefit to the State's interests.  On this record, the Ban's prohibition on constitutional speech is substantial in relation to any legitimate sweep.  But this Court need not reach that question.  The standard for strict scrutiny is much more exacting.  As discussed further below, Defendants have fallen short of meeting their burden.  Accordingly, Plaintiffs must prevail.

## II.    Defendants Have Failed to Meet Their Burden

Defendants do not dispute the essential facts underlying this lawsuit:  Plaintiffs have lawfully obtained recordings of criminal trial proceedings from Maryland courts, and seek to use those recordings for reporting, public education, and advocacy purposes.  Defs.' Br. 13–15.  Accordingly, the parties agree on the material facts necessary to resolve this case, and Plaintiffs' motion for summary judgment should be granted.  *See* Fed. R. Civ. P. 56(a).

Far from creating a factual dispute, Defendants' statement of facts is notable for what it does *not* contain.  Despite bearing a heavy burden to show that the Broadcast Ban "is necessary to serve a compelling state interest and that it is narrowly drawn to

achieve that end," *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983), Defendants present no facts to show that any of the recordings Plaintiffs seek to broadcast would create any negative consequences or imperil State interests in any way. Instead, Defendants rely principally on general and speculative declarations given by their two proffered experts, Anne Colt Leitess and Scott D. Shellenberger, State's Attorneys for Anne Arundel County and Baltimore County, respectively.  As discussed further in Plaintiffs' opening brief and below, *see* Pls.' Br. 16–29; *infra* pp. 9, 20–21, the testimony of these proffered experts falls far short of establishing that the Ban meaningfully furthers *any* State interest, let alone is narrowly tailored to those interests.

As an overarching matter, Defendants and their proffered experts often conflate all forms of media involvement in criminal trial proceedings, including the presence of TV cameras in the courtroom broadcasting live, with what Plaintiffs ask this Court to declare they may do: broadcast state-produced recordings—in most cases, audio recordings—of proceedings that they have lawfully obtained, which would necessarily occur after those proceedings have concluded.  *See, e.g.*, Defs.' Br. 12 ("One of the most effective tools Ms. Leitess has at her disposal to secure witness cooperation is her ability to reassure them that there will be no cameras in the courtroom . . . .").  Accordingly, this Court should give little weight to Ms. Leitess's and Mr. Shellenberger's declarations, which fail to address the specific situation at issue in this case.

Moreover, Defendants cite no empirical evidence from any jurisdiction showing that what Plaintiffs seek to do creates any harmful outcomes, much less sufficient harm

to overcome the public's First Amendment interests.  Nor do they provide a single instance in which subsequent broadcast of a lawfully obtained recording has created any harm, from Maryland or any other jurisdiction where such broadcasting is permitted.  Defendants attempt to explain away this deficiency by claiming that "Maryland has had no reason to collect data" because the Broadcast Ban has long been in place, and that "such data may be exceedingly difficult to capture even though the danger is very real."  Defs.' Br. 20.  But lacking a "reason" beyond this lawsuit to have data that their policies are effective, or the potential difficulty of collecting it, does not relieve them of their evidentiary burden, particularly where they have made no attempts to get data.  Indeed, Ms. Leitess testified that she "think[s] it's probably pretty well documented that people change their behavior if they think they're going to be on television or recorded" and that she "think[s] there's been studies about it, about how people act."  Ex. 1, Deposition of Anne Colt Leitess 72:2-6.[4]  But she could not name any such studies, Ex. 11 to Pls.' Mot. for Summ. J. ("Leitess Dep."), ECF No. 71-13, at 76:12–77:6, nor have Defendants provided any.

And data is important.  In *Globe Newspaper Co. v. Superior Court*, the Supreme Court rejected a claimed interest that courts should be closed to encourage "minor victims of sex crimes to come forward and provide accurate testimony," because, among other shortfalls, the government "offered no empirical support for the claim that the rule of

---

[4] Exhibit 1 to this Reply supplements the excerpted pages to Ms. Leitess's deposition included in Exhibit 11 to Plaintiffs' Motion for Summary Judgment.

automatic closure . . . will lead to an increase in the number of . . . victims coming forward and cooperating with state authorities."  457 U.S. 596, 609 (1982); *see also Chandler v. Florida*, 449 U.S. 560, 578–79 (1981) ("Whatever may be the 'mischievous potentialities [of broadcast coverage] for intruding upon the . . . judicial process,' at present no one has been able to present empirical data sufficient to establish that the mere presence of the broadcast media inherently has an adverse effect on that process." (first alteration in original) (citation omitted)).  The same is true here.  There is no evidence—beyond a declaration from a prosecutor that she uses general statements about there being no cameras in the courtroom to encourage reluctant witnesses to attend court—that the Broadcast Ban's automatic prohibition leads to an increase in the number of witnesses coming forward and cooperating.  Indeed, Mr. Shellenberger conceded that neither he nor the prosecutors he now supervises have ever mentioned the Broadcast Ban in conversations with witnesses.  Ex. 12 to Pls.' Mot. for Summ. J. ("Shellenberger Dep."), ECF No. 71-14, at 15:5-7, 16:14-17, 43:17-20, 45:9-13, 52:9-11. As discussed more below, this is insufficient to prove that the Broadcast Ban actually is tailored, much less narrowly tailored, to addressing Defendants' asserted harms.  *See infra* Part II.C.

Finally, and critically, Defendants do not even attempt to show that they have considered or made any effort to use a less-restrictive measure to achieve the same interests the Ban purportedly protects.  *See infra* Part II.A.

In all, Defendants' proffered facts stand for the following propositions: (1) Plaintiffs seek to broadcast lawfully obtained, truthful recordings of Maryland criminal trial proceedings; (2) what Plaintiffs seek to do is prohibited by Rule 1-201; (3) Defendants do not know what outcomes, good or bad, such broadcasting may achieve; (4) in the absence of concrete evidence, Defendants fear that such broadcasting may imperil State interests; and (5) Defendants have not considered or attempted any less-restrictive measures to serve those interests.  Defendants have failed to meet their burden.

### A.   The State has not shown that a less-restrictive measure would fail to adequately address their interests.

The failure to attempt any less-restrictive measure, including the one put forth in Plaintiffs' opening brief, is fatal to Defendants' case.  Defendants' arguments rely on a false dichotomy.  They claim that, should Plaintiffs prevail, "Maryland courts will be required to choose between barring all public access to copies of recordings of criminal trial proceedings . . . or permitting the public to obtain copies of such recordings with no limitations as to how they may use them." Defs.' Br. 2.  But this is not true.  Nothing requires that release and publicity of trials be all or nothing, and, in fact, decades of Supreme Court and Fourth Circuit case law show the opposite.  There are other methods, including readily available ones, that would serve the same State interests.  The State has overwhelmingly failed to meet its burden "to *prove* that it actually *tried* other methods" and "[to] *demonstrate* that such alternative measures would fail to achieve the

government's interests." *Reynolds v. Middleton*, 779 F.3d 222, 231–32 (4th Cir. 2015) (emphases in original) (internal quotation marks and alterations omitted).

As explained in Plaintiffs' opening brief, Defendants are fully able to make a case-by-case determination of whether records, or portions of records, should be withheld from public access, or whether specific restrictions should be placed on the use of those records. Pls.' Br. 27. The means to do so is already codified in Maryland law. *See* Md. Rule 16-504 (allowing a judge to place "appropriate safeguards" on a portion of a recording, or withhold from the public when warranted). This provides that where circumstances in a case implicate an important State concern, the trial court may make a tailored decision to limit public access. It also means that in cases where there is no evidence that broadcast would imperil a State interest, the First Amendment rights of Plaintiffs and other members of the public are not unnecessarily curtailed.

For that reason, the Supreme Court has repeatedly admonished that under the Constitution, case-by-case determinations about public access to courts and court records must be used instead of blanket prohibitions. This is true even where such prohibitions are confined to a subset of cases. In *Globe Newspaper*, for example, the Supreme Court addressed a facial challenge to a Massachusetts law excluding the press and the general public from "trials for specified sexual offenses involving a victim under the age of 18." 457 U.S. at 598. Although the Court found that the State's interest in safeguarding minors was "compelling," it nevertheless "d[id] not justify a *mandatory* closure rule, for it is clear that the circumstances of the particular case may affect the

significance of the interest." *Id.* at 607–08 (emphasis in original).  Instead, "[a] trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim." *Id.*  Ultimately, the Court found that "a mandatory rule, requiring no particularized determinations in individual cases, is unconstitutional." *Id.* at 611 n.27; *see also, e.g.*, *El Vocero de P.R. v. Puerto Rico*, 508 U.S. 147, 151 (1993) ("The concern of the majority below that publicity will prejudice defendants' fair trial rights is, of course, legitimate.  But this concern can and must be addressed on a case-by-case basis[.]").

Following the Supreme Court's dictates, the Fourth Circuit, its district courts, and its sister Courts of Appeals have regularly followed the *Globe Newspaper* rule.  *See, e.g.*, *Bell v. Jarvis*, 236 F.3d 149, 168 (4th Cir. 2000) (citing *Globe Newspaper* for the proposition that closure of the courtroom is only appropriate where the judge makes a case-specific decision that it is necessary); *In re Knight Publ'g Co.*, 743 F.2d 231, 234–35 (4th Cir. 1984) (trial courts' decisions to close the courtroom or restrict access to documents must be determined on a case-by-case basis, including an opportunity to be heard by the press and public); *United States v. Rosen*, 487 F. Supp. 2d 703, 716 (E.D. Va. 2007) ("Decisions to close trials must be made on a case by case basis, with attention to the facts and circumstances of each case; statutes *per se* requiring closure in certain circumstances are impermissible."); *In re Providence Journal Co.*, 293 F.3d 1, 12 (1st Cir. 2002) (regarding restricting public access to legal memoranda, "[s]afeguards against prejudice can be implemented on a case-specific basis," which "would be a considerably

less restrictive, but equally effective, means" of addressing potential harms compared to a presumptive ban); *Hartford Courant Co. v. Carroll*, 986 F.3d 211, 222 (2d Cir. 2021) (rule sealing juvenile criminal records transferred to adult court not narrowly tailored where the State's "interest in protecting juveniles will be sufficiently served if there is a presumption of openness that can be reviewed on a case-by-case basis"); *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168, 181–83 (5th Cir. 2011) (closure of criminal proceedings must be limited to specific proceedings and feature notice to the press and public and an opportunity to be heard); *United States v. Index Newspapers LLC*, 766 F.3d 1072, 1091 n.12 (9th Cir. 2014) ("We stress that whether the transcript of a contempt hearing ancillary to a grand jury investigation should be available to the public is necessarily a case-by-case determination.").

This principle applies equally to restrictions on publication of court matters as it does to wholesale prohibitions on public access.  Directly on point here, in *Capital Cities Media, Inc. v. Toole*, Justice Brennan addressed an application for a stay of orders by a trial court in a criminal case, including orders prohibiting the public from publishing the names or likenesses of jurors.  463 U.S. 1303, 1304 (1983) (Brennan, J., in chambers).  Justice Brennan noted that in the past the Supreme Court "ha[d] not permitted restrictions on the publication of information that would have been available to any member of the public who attended an open proceeding in a criminal trial," even for obviously compelling purposes.  *Id.* at 1306 (citing, inter alia, *Globe Newspaper*, 457 U.S. at 607–09, and *Cox Broad. Corp.*, 420 U.S. at 491–95).  Although a restriction on

13

publication might be justified in an "extraordinary case," "the justifications *must be adduced on a case-by-case basis*, with all interested parties given the opportunity to participate, and less restrictive measures must be adopted if feasible." *Id.* at 1307 (emphasis added). Because in that case the orders restricting publication were "entered without a hearing, and without findings of fact that would justify it" and there was "no concern specific to th[at] case" presented, the stay was granted. *Id.*; *see also United States v. Wecht*, 537 F.3d 222, 239 (3d Cir. 2008) (although risks of publicizing juror names may be present in any given case, "we are satisfied that district judges are well-positioned to address these risks on a case-by-case basis, and in such cases, to make particularized findings on the record").

The same principle applies here. Maryland trial judges are well-positioned and empowered to determine, based on the parties' presentations, whether there are concerns specific to a case that subsequent broadcast of a recording (or portion of a recording) would imperil a State interest. For example, if a prosecutor encountered a reluctant witness who had well-founded concerns about broadcast of their voice, the prosecutor could present this to the judge and request that limits be placed on that portion of the recording. The judge could then make a reasoned decision specific to that case. Notably, neither of the State's two witnesses—experienced Maryland State's Attorneys—claim that they have ever attempted to use existing laws to shield public access to recordings of testimony, including in those cases where they allege significant concerns about witness intimidation or safety. *See* Shellenberger Dep. 73:9-17 ("Q. So

you could move to close the courtroom? A. You could. It's rarely done, but you could. Q. Could you move to shield certain testimony from public access? A. You could. Q. Have you ever done that? A. Not that I recall."); Leitess Dep. 93:7–94:10; 120:21–121:9 (similar).  Indeed, Ms. Leitess described the standard for case-specific restrictions in Maryland as "narrowly tailored," Leitess Dep. 90:17-18, in contrast to the Broadcast Ban.

Given the mandates of strict scrutiny, even without considering other alternative measures the State could employ, the existence of this less-restrictive alternative is dispositive, and the Court need not consider further arguments.

> **B.  Defendants' reliance on *Estes* and *Chandler* is misplaced, as they also require individualized determinations instead of blanket rules.**

Defendants rely heavily on *Estes v. Texas*, 381 U.S. 532 (1965), and its successor *Chandler v. Florida*, 449 U.S. 560 (1981), for the proposition that broadcasting trial proceedings is inherently dangerous, arguing that these cases must factor into the Court's analysis.  But these cases are inapposite.  To the extent they are relevant, they stand for application of the same rule set out in *Globe Newspaper* that an individualized determination must be made, and a blanket prohibition on broadcasting trial proceedings is unacceptable.

*Estes* involved a convicted petitioner who raised a due process challenge to his conviction.  The case had generated "[m]assive pretrial publicity," which "had given it national notoriety."  381 U.S. at 535.  The proceedings were broadcast live by radio and

television, and the activities of reporters present in the courtroom had "led to considerable disruption of the hearings." *Id.* at 536.  The petitioner had objected to the publicity throughout the case.  The question before the Court was whether the press activities, including their presence and disruption in the courtroom, had prejudiced the trial.  The Court's opinion focused on the influence of live television broadcasting of a trial, including its effect on jurors.  Notably, the Court acknowledged that "the ever-advancing techniques of public communication and the adjustment of the public to its presence may bring about a change in the effect of telecasting upon the fairness of criminal trials." *Id.* at 551–52.  But based on the circumstances in 1962 and the facts in that particular case, the Court found that there had been prejudice, and reversed the conviction.

The situation before this Court is fundamentally different from *Estes*.  Even putting aside how the nature and public perception of media has changed in the 60 years since 1962, the challenged portion of the Broadcast Ban does not involve private actors' television cameras in the courtroom or live broadcasting.  It equally applies to cases where the criminal defendant has raised no objection to publicity, and proceedings where there are no jurors who may be influenced.  It prohibits the public use of recordings from cases that have long ended, where the possibility of court or juror prejudice has long passed.  The Ban also does not control whether any Maryland proceedings are recorded in the first place or whether recording devices are present in the courtroom; the proceedings are recorded by the courts themselves and those

recordings are publicly available even with the Ban in place.  In any event, *Estes* only stands for the proposition that the facts *in that case* resulted in disruption and an unfair trial, and cannot be extrapolated to justify a broader blanket ban in dissimilar circumstances decades later.

This was made clear by the subsequent decision in *Chandler*.  That case involved a challenge to a Florida rule permitting public broadcast of criminal trials over the objection of the accused.  449 U.S. at 562, 566.  In upholding the rule, the Court *rejected* the argument that *Estes* created a *per se* rule forbidding electronic coverage of trials.  *Id.* at 570–74.  Instead, it held that the question must be decided on a case-by-case basis:

> The risk of juror prejudice in some cases does not justify an absolute ban on news coverage of trials by the printed media . . . .  The risk of juror prejudice is present in any publication of a trial, but the appropriate safeguard against such prejudice is the defendant's right to demonstrate that the media's coverage of his case—be it printed or broadcast—compromised the ability of the particular jury that heard the case to adjudicate fairly.

*Id.* at 575; *see also id.* at 581 (broadcast of a trial is not "inherently a denial of due process," but defendants may show that prejudice occurs "in a specific case").  Accordingly, far from supporting the Broadcast Ban, these cases stand for the same proposition discussed above: prohibitions on publicity must be determined by courts based on the circumstances in an individual case.  Blanket rules, like the Broadcast Ban, are unacceptable.  Because Defendants have presented no evidence to show that this situation is exceptional and individualized determinations would not serve their interests, they have failed to satisfy strict scrutiny.

### C.   Defendants have not proven the Broadcast Ban is narrowly tailored to any State interest.

Eliding the proposition of less-restrictive alternatives, Defendants assert two interests that the Broadcast Ban purportedly serves.  First, they argue that it protects "the fairness and integrity of criminal trials."  Defs.' Br. 18.  Second, they claim that it preserves the "integrity of their official records," *id.* at 20, and "increase[s] the accuracy of the essential truth-seeking function of the trial," *id.* at 20–21 (quoting *United States v. Hastings*, 695 F.2d 1278, 1283 (11th Cir. 1983)).  It is not apparent whether Defendants are asserting these as two separate interests, or whether the second is merely a recharacterization of the first.  Regardless, Plaintiffs do not contest that these are compelling interests.  However, Defendants have failed to present evidence that the Broadcast Ban actually does any of those things, and it certainly is not narrowly tailored to either of them.

First, Defendants' argument about the fairness and integrity of their criminal trials rests on the notion that the Ban "guard[s] against the harm to the trial process that would result from the distraction of jurors and intimidation of witnesses, if they knew that their participation in criminal trials might be televised on the nightly news, or disseminated worldwide via the internet."  *Id.* at 18 (citation omitted).  Their proof that it actually does this rests upon the Supreme Court's decisions in *Estes* and *Hollingsworth v. Perry*, 558 U.S. 183 (2010), and the testimony of Ms. Leitess and Mr. Shellenberger.

At the outset, Defendants' own words show how, even accepting their arguments, the Ban is not narrowly tailored.  It applies equally to proceedings that have neither jurors nor witnesses.  There are myriad less restrictive alternative measures that would address that same concern, particularly the case-specific measures discussed above.  But Defendants' arguments need not be accepted if they are not supported by evidence.

With regard to *Estes* and *Hollingsworth,* case law provides no evidence specific to the Broadcast Ban.  And as discussed in Part II.B *supra*, Defendants' reliance on *Estes*, a decades-old case addressing a vastly different factual scenario, cannot be considered proof that the Broadcast Ban actually does what it purports to do.

Nor does *Hollingsworth* support Defendants' argument.  In that case, the Supreme Court found that the likelihood of irreparable harm from an amendment to the local rules allowing live broadcasting of civil trials was sufficient to grant a stay of the rule's immediate implementation in a high-profile case involving a challenge to a controversial same-sex marriage ban.  In the unique circumstances of that case, where the evidence submitted showed that both proponents and opponents of the ban had received threats and been subject to boycotts, vandalism, and physical violence, the Court stayed implementation of the rule while it was under challenge for having been adopted without notice and comment procedures.  558 U.S. at 184–86, 195.  In particular, the Court noted that multiple witnesses had said they would not testify if the trial were broadcast.  *Id.* at 195.

Those circumstances have no bearing on the Broadcast Ban, which is a state law prohibiting subsequent broadcast of (principally audio) recordings of state criminal proceedings, including cases that have not generated significant public attention, and hearings that include no witnesses. *See id.* at 198 (noting that federal courts have allowed cases to be broadcast where they "were not high profile, or did not involve witnesses" (citation omitted)).   Moreover, Defendants' witnesses acknowledged they have no specific knowledge that any witness would have not come to court but for the Broadcast Ban.  Leitess Dep. 97:14-18; Shellenberger Dep. 51:18–52:2.  They have presented no evidence of threats, harassment, or physical violence attributable to audio broadcasting after a proceeding.  Indeed, Defendants' sole witnesses have not specifically discussed the broadcasting of audio court recordings with any witnesses.  *See* Shellenberger Dep. 43:17-20, 45:9-13, 52:9-11; Leitess Dep. 83:6-12, 94:2-10, 111:15-21.

The remainder of their testimony provides little further support to Defendants. Ms. Leitess's and Mr. Shellenberger's declarations focus on witness cooperation, which has no bearing on the Broadcast Ban's application to proceedings or portions of recordings that do not include witnesses, or include witnesses who are not affected by the Ban, like law enforcement officers.  *See* Shellenberger Dep. 46:7-12 (admitting he has not spoken to law enforcement officers who expressed refusal or reluctance to testify); Leitess Dep. 94:11–96:3, 140:11–141:11 (similar).  Their testimony, even if construed liberally, shows only that the Ban may have some positive influence in certain

situations but none in many others, rendering it fatally overinclusive and not narrowly tailored.

Defendants' witnesses' testimony also establishes that the Ban is unconstitutionally underinclusive.  For example, Mr. Shellenberger testified that the basis for his opinion supporting the Ban is that witnesses are "scared to death when there's . . . people in a courtroom," and would be "petrified" if "they kn[ew] that their name, picture, likeness, story [was] going to be on the six o'clock news."  Shellenberger Dep. 49:3-17.  But as he conceded shortly thereafter, the Broadcast Ban does not prevent any of those things.  *Id.* at 49:18–50:15; *see also, e.g.*, Leitess Dep. 57:1-21 (testifying that "witnesses' names and images" are used for intimidation, but acknowledging that the Ban doesn't prohibit their transmission).  As in *Daily Mail*, where the statute did "not restrict the electronic media or any form of publication, except 'newspapers,' from printing the names of youths charged in a juvenile proceeding," the Broadcast Ban, "even assuming [it] serve[s] a state interest of the highest order," does "not accomplish its stated purpose."  443 U.S. at 104–05.

Defendants' argument about the "integrity of their official records" and the "accuracy of the essential truth-seeking function of the trial" fares no better.  Here, too, they express concern that witnesses and jurors would be distracted "if they knew their participation in criminal trials might be televised on the nightly news, or disseminated worldwide via the internet and 'available for unlimited viewing, further dissemination, and easy manipulation.'"  Defs.' Br. 18 (first citing *Estes*, 381 U.S. at 545–47; then

quoting *Mirlis v. Greer*, 952 F.3d 51, 56 (2d Cir. 2020)). Again, even taking this concern unsupported by evidence at face value, it would only justify restriction of broadcasting proceedings that involve witnesses or jurors, which is much more limited than the Broadcast Ban.

Moreover, the State's concern that people may post accurate recordings which could subsequently be manipulated by others is insufficient to establish that the Broadcast Ban satisfies strict scrutiny. The State's principal argument about the potential for manipulation cites several law review articles about "deepfake" technology to assert that deepfake programs are freely available to anyone with a computer and that deepfake videos are increasingly difficult to distinguish from authentic videos and tough to eradicate once they are created. Defs.' Br. 21. As Plaintiffs' opening brief points out, a narrowly tailored solution to this problem would be to ban that practice, rather than prohibiting one potential precursor. Pls.' Br. 21. In response, the State asserts that it cannot protect its interest in preventing the alteration of official recordings by simply banning deepfakes because "once a recording is posted on a public website or social media platform, it is no longer within the control of the original poster," Defs.' Br. 24, and even if the perpetrator could be identified, they might be located outside the United States and thus "outside the jurisdictional reach of any such prohibition," *id.* at 25. But the State has failed to "*prove* that it actually *tried*" this or any other method to address deepfakes. *Reynolds*, 779 F.3d at 231. That alone is enough to find that Defendants have not met their burden.

Regardless, the State has offered no real evidence that broadcast would result in an increase in deepfakes or about the harms that it would cause.  *See* Defs.' Br. 20–21. For example, the State does not put forth a single instance of a recording from a different jurisdiction that was initially broadcast truthfully and subsequently manipulated to ill effect.  Nor do they present an instance where any of the public materials that Maryland does allow to be broadcast—including transcripts, photos, and names of witnesses—have been manipulated to cause harm.  The State "must supply rationales that are 'far stronger than mere speculation about serious harms'" when free speech values are at stake.  *Wash. Post v. McManus*, 944 F.3d 506, 522 (4th Cir. 2019) (quoting *Bartnicki v. Vopper*, 532 U.S. 514, 531 (2001)); *see also Ross v. Early*, 746 F.3d 546, 556 (4th Cir. 2014) (holding that even under intermediate scrutiny, "it is not enough . . . to identify an interest that is significant in the abstract," and the government must instead "make some evidentiary showing that the recited harms are real, not merely conjectural, and that the [law] alleviates these harms in a direct and material way" (internal quotation marks and alteration omitted)).  They have not done so here, and have failed to meet their burden.

There are several other problems with the State's argument.  As a basic First Amendment principle, free speech may not be restricted based on its content because of what bad actors may do in response.[5]  And the State overlooks the significance of

---

[5] Defendants' argument on this point is reminiscent of a "heckler's veto" employed to "curtail 'offensive' speech" which may cause a reaction among others, creating a "peril

the fact that it is the *State itself* that chooses to release the recordings that it claims may be used for nefarious purposes. Thus, it is the State that is the "source of [the] release." *Fla. Star*, 491 U.S. at 535.[6] The State faults Plaintiffs for not describing the steps they would take to protect recordings from alteration or manipulation following their dissemination, Defs.' Br. 24, but if any such steps are possible, it is incumbent upon Defendants to take those steps before the recordings are released. Moreover, the Ban does nothing to prevent a person who wishes to create a manipulated recording,

---

of suffering disruptions of public order." *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985). Courts appropriately reject such measures as "one of the most persistent and insidious threats to first amendment rights." *Id.*

[6] In its brief, the State contends that by conditioning release on compliance with the Broadcast Ban and making violations punishable by contempt proceedings, Maryland law "ensures that [the Ban] is enforceable" and, "[c]onsistent with . . . *Cox Broadcasting*, . . . seeks to sanction only persons who are 'the source of [the] release.'" Defs.' Br. 25 (fifth alteration in original) (quoting *Fla. Star*, 491 U.S. at 535). But in doing so, the State takes *Florida Star* out of context. In *Florida Star*, the Supreme Court explained that "where the *government* has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release." 491 U.S. at 535 (emphasis added). The Court continued:

> We noted this anomaly in *Cox Broadcasting*: "By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served." 420 U.S., at 495. The *Daily Mail* formulation reflects the fact that it is a limited set of cases indeed where, despite the accessibility of the public to certain information, a meaningful public interest is served by restricting its further release by other entities, like the press. As *Daily Mail* observed in its summary of *Oklahoma Publishing*, "once the truthful information was 'publicly revealed' or 'in the public domain' the court could not constitutionally restrain its dissemination." 443 U.S., at 103.

*Id.* Here, too, the State is the ultimate source of the release.

including a person who resides in another country, from simply requesting the recording themselves.  If anything, the Broadcast Ban stops individuals who wish to *rebut* manipulated recordings by disseminating truthful, unaltered versions of the same proceeding.

In summation, the State has simply not presented evidence to show that it has attempted any less-restrictive measures or that those measures would not work. Moreover, as to the State interests Defendants claim the Broadcast Ban serves, the Ban applies to many proceedings that do not implicate those concerns, and also fails to curtail the things that Defendants' witnesses have identified as the greatest risks.  The Ban is both unconstitutionally overinclusive and underinclusive, and therefore not narrowly tailored.  Defendants have not satisfied their heavy burden.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted, and Defendants' motion for summary judgment should be denied.

Dated:  May 27, 2022                                    Respectfully submitted,


                                                        /s/ Shelby Calambokidis
ADAM HOLOFCENER (No. 19579)                             SHELBY CALAMBOKIDIS**\*** (No. 816008)
Maryland Volunteer Lawyers for the Arts                 SETH WAYNE* (No. 816003)
120 W. North Ave., Suite 305A                           Institute for Constitutional Advocacy
Baltimore, MD 21201                                         and Protection
Tel.:   410-752-1633                                    Georgetown University Law Center
adam@mdvla.org                                          600 New Jersey Avenue NW
                                                        Washington, DC 20001
                                                        Tel.:   202-661-6599
                                                        Fax:   202-661-6730
                                                        sc2053@georgetown.edu
                                                        sw1098@georgetown.edu
                                                        **\*** Admitted pro hac vice

26

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2022, I electronically filed the foregoing brief and supporting documents with the U.S. District Court for the District of Maryland by using the Court's CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the Court's CM/ECF system.  A courtesy paper copy of the brief and its accompanying exhibit will also be filed with the Clerk of the Court within two business days of electronic filing.

*/s/ Shelby Calambokidis*
Shelby Calambokidis