IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRANDON SODERBERG, ET AL.,      *

        *Plaintiffs*,          *

        v.            *     No. 19-cv-01559-RDB

              *

AUDREY J.S. CARRION, ET AL.,

        *Defendants*.      *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**REPLY ARGUMENT**

Plaintiffs do not challenge Defendants' position that Maryland's stated goals for restricting dissemination of official recordings of court proceedings are interests of the highest order. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980) (observing that "[p]lainly it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted"). Instead, they argue that the statute and court rules are not narrowly tailored to achieve Maryland's goals. Plaintiffs' arguments fail because they are based on multiple analytical errors.

First, Plaintiffs mischaracterize Defendants' burden in this case. They contend that, because the Fourth Circuit articulated the *Cox Broadcasting* and *Daily Mail* standard as requiring strict scrutiny, Defendants must produce empirical evidence to demonstrate that Maryland's statute and court rules are narrowly tailored to promote state interests of the

highest order.  But the Supreme Court has held that that type of proof is not necessary when

applying strict scrutiny in a First Amendment challenge like the one at issue in this case.

*See Burson v. Freeman*, 504 U.S. 191, 211 (1992) (holding that state statute establishing a

100-foot-no-political-speech buffer zone survived strict scrutiny based solely on long

history, substantial consensus, and simple common sense); *id*. at 208 (rejecting dissent's

contention that states must produce any other type of proof).

Second, Plaintiffs rely on cases involving completely different types of First

Amendment regulation than what is at issue in this case.  That reliance is flawed because a

narrow tailoring analysis in First Amendment cases like this one requires consideration of

the precise factual context before the Court.  *See Ostergren v. Cuccinelli*, 615 F.3d 263,

285 (4th Cir. 2010) (observing that "the factual differences between this case and *Cox

Broadcasting* and *Florida Star* suggest the need for a more nuanced analytical approach to

the *Daily Mail* standard's narrow-tailoring requirement.").

Third, Plaintiffs continue to describe the statutory scheme they are challenging in

imprecise terms that obfuscate the actual aims of Maryland's statute and court rules.  What

is at stake here is a statute and court rules that act in concert to provide the broadest public

courtroom access possible (by providing public access to official court recordings of

criminal trial proceedings) while preventing the mischief that would entail if no conditions

were placed on such access (by conditioning access on a prohibition on further

distribution).  Plaintiffs' misapprehension of this particular regulatory scheme is evidenced

by their blind reliance on precedents that provide little to no guidance to this Court as to

how to analyze this case.  But when Maryland's goals are properly considered, it is clear that the statute and court rules withstand strict scrutiny.

## I.     Empirical Evidence is Not Required.

When the challenged state law is long-established and aims to balance conflicting constitutional interests of equal magnitude, courts applying a First Amendment strict scrutiny analysis need not require empirical evidence demonstrating such laws are narrowly tailored to achieve the stated aims of the laws.  All that may be required in such cases is reliance on history and common sense.  *Burson v. Freeman* is instructive on this point.

In *Burson*, a political party candidate brought an action to enjoin enforcement of Tennessee statutes prohibiting solicitation of votes and displays of campaign material within 100 feet of polling place entrance on election day.  504 U.S. at 193-95.  In analyzing the challenged statutes, the Supreme Court noted that they targeted political speech which is at the core of the First Amendment and is "'the essence of self-government.'"  *Id.* at 196 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964)).  The Court further noted that the challenged statutes barred speech in "quintessential public forums" "'which by long tradition or by government fiat have been devoted to assembly and debate.'"  *Id.* (quoting *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).  The Court concluded that, "[a]s a facially content-based restriction on political speech in a public forum," the statute must be subjected to strict scrutiny.  *Id.* at 198-99.

Preliminary to its application of strict scrutiny, the Court noted that analysis of the restriction involved reconciliation of two interests at the heart of our democracy: the right

to engage in political discourse and the right to vote. *Id.* at 198.  The Court thereafter

rejected the notion that Tennessee was required to present empirical evidence that its buffer

zone was narrowly tailored to protect election integrity.  Instead, it relied on "[a] long

history, a substantial consensus, and simple common sense" to find that the Tennessee

statutes fell within the rare case that survives strict scrutiny. *Id.* at 211.  Although the

record showed that similar state buffer zones ranged in size from 500 feet to less than 50

feet, the Court did not require Tennessee to look to other states for empirical evidence

demonstrating that the 100-foot size it chose was the least restrictive measure required. *See*

*id.* at 218.

The Court was not persuaded by the dissent's assertion that the evidence Tennessee

introduced at trial was exceptionally thin,[1] *id.* at 208, 219, observing that "the long,

uninterrupted and prevalent use of the statutes makes it difficult for States to come forward

with the sort of proof the dissent wishes to require," *id.* at 208.  "The fact that these laws

have been in effect for a long period of time . . . makes it difficult for the States to put on

witnesses who can testify as to what would happen without them." *Id.*  The Court also

noted the difficulty in "isolat[ing] the exact effect of these laws on voter intimidation and

election fraud . . . because they are difficult to detect." *Id.*  The Court determined that

requiring empirical evidence "would necessitate that a State's political system sustain some

level of damage before the legislature could take corrective action," but legislatures

---

[1] The evidence produced was the testimony of a sole witness who explained the
need for special restrictions inside the polling place, not within the buffer zone outside the
polling place. *Id.* at 219.

"should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Id.* at 209.

The same analysis should be applied to this case because what is at issue is Maryland's statute and court rules that, working together, seek to reconcile interests embedded in the First and Sixth Amendments that are in inherent conflict here: the integrity of the truth-finding function of our criminal trial courts and the First Amendment right of the public to access criminal trial proceedings. *See Richmond Newspapers, Inc.*, 448 U.S. at 575 ("Plainly it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted."). As in *Burson*, requiring Maryland to develop empirical evidence or try other methods to protect its interests would require that Maryland's criminal trial process sustain some level of damage, damage that may not even be subject to detection or measurement. As further discussed below, that result runs contrary to the federalism principles underlying *Chandler* and its progeny and is not required by *Cox Broadcasting* and its progeny.

That the Supreme Court cited lack of empirical evidence in *Globe Newspaper Co. v. Superior Court* should not change the analysis in this case because the challenged law in *Globe Newspaper* involved automatic closure of certain specified court proceedings when, as a matter of longstanding tradition, there is a presumption that such proceedings should be open to the public and press. 457 U.S. 596, 603-05 (1982). Significantly, this case does not involve the closure of court proceedings to the press and public. It involves restrictions on the dissemination of audio and video recordings of such proceedings, restrictions that could not have been contemplated by the drafters of the First Amendment

because the technology for such recordings did not exist. *See Globe Newspaper*, 457 U.S. at 603-04 (citing concerns of Framers of Constitution); *compare Richmond Newspapers*, 448 U.S. at 564-74 (1980) (examining history extending to pre-colonial era to conclude "that a presumption of openness inheres in the very nature of a criminal trial under our system of justice") with *Estes v. Texas*, 381 U.S. 532, 539-52 (1965) (observing that the requirement of open criminal trial proceedings does not encompass a right to broadcast them).

To pass strict scrutiny, Maryland refers this Court to the historical developments, law review articles, and expert testimony discussed in its opening memorandum. An examination of that evidence demonstrates that Maryland's statute and court rules are narrowly tailored to provide the broadest possible access to Maryland's criminal trial proceedings, by providing official recordings of those proceedings to the public, while preventing the deleterious effects that likely would ensue if there were no restraints on further dissemination of those recordings.

## II.     A Case-By-Case Approach Is Not Constitutionally Required and Will Not Achieve Maryland's Goals.

Contrary to Plaintiffs' contention, a case-by-case approach to restricting distribution of official court recordings is not required by the precedents they cite. Furthermore, such an approach would not achieve Maryland's goals.

Under Plaintiffs' interpretation of *Chandler* and its progeny, all states are required to forego restrictions on broadcasting of criminal trial proceedings except when the broadcasting would cause harm in a particular case. ECF No. 73 at 16-17. Contrary to

Plaintiffs' assertion, *Chandler* does not mandate an individualized approach to restricting

broadcasting of criminal trial proceedings.  Citing federalism concerns, the Court merely

held that it would not require Florida to abandon its particular experimentation with

broadcasting criminal trials unless the criminal defendant could demonstrate prejudice.

449 U.S. 560, 574-80.  It declined to adopt a per se restriction on broadcasting.  *Id.*  at 574.

There is no indication that the Court thereby intended to adopt the per se rule that Plaintiffs

urge here: requiring states to relinquish restrictions on broadcasting.  Such a rule would

contravene the federalism principles cited in *Chandler*.

Similarly, contrary to Plaintiffs' assertion, ECF No. 73 at 15-18, *Globe Newspaper*

and its progeny do not require a case-by-case assessment for restrictions on broadcasting.

Those cases involved the closing of court proceedings and denial of access to court records,

not the recording of court proceedings or the dissemination of such recordings.  *See, e.g.*,

*Bell v. Jarvis*, 236 F.3d 149, 165-68 (4th Cir. 2000) (involving analysis of whether

complete closure of portion of trial violated criminal defendant's Sixth Amendment right

to a public trial); *In re Knight Publ'g Co.*, 743 F.2d 231, 233-36 (4th Cir. 1984) (involving

closure of courtroom to public and sealing of court records).  Because those cases rest on

a longstanding tradition of public access to court proceedings, not a right to record or

receive recordings of such proceedings, they are inapposite.  Indeed, Maryland courts are

in accord that the presumption (grounded in the First and Sixth Amendments) that criminal

trial proceedings should be open is overcome only by a case-specific determination that

closure is required to protect an overriding state interest.  *See, e.g.*, *Carter v. State*, 356 Md.

207, 214-23 (1999).  That concept exists alongside with and is not inconsistent with the

prohibition on distribution of official court recordings embedded in Maryland's statute and court rules.

A case-by-case approach will not protect Maryland's interest in public safety and the integrity of its criminal trials because it will not prevent the inevitable chilling effect on witness cooperation that will occur if the broadcasting of audio and/or video recordings becomes routine in Maryland. And a case-by-case approach will not prevent the type of alteration and manipulation of Maryland's official court recordings that will be enabled when its restrictions on dissemination of its official recordings is invalidated.

## III. Maryland's Statute and Court Rules Are Narrowly Tailored to Achieve Maryland's Goals.

Plaintiffs are correct that Defendants spent a portion of their brief discussing and distinguishing *Cox Broadcasting* and *Daily Mail*. ECF No. 73 at 9. That discussion was required because the Court of Appeals remanded the case for application of those precedents. By contrast, Plaintiffs' discussion of *Cox Broadcasting* and *Daily Mail* is limited to two footnotes. ECF No. 73 at 9 n. 3, 28 n.6. Instead, they urge a mechanical application of strict scrutiny that is divorced from consideration of exactly what is at issue in the case. They make no attempt to address the "factual differences between this case and *Cox Broadcasting* and *Florida Star*[2] [that] suggest the need for a more nuanced analytical approach to the *Daily Mail* standard's narrow-tailoring requirement." *Ostergren*, 615 F.3d at 285.

---

[2] *Florida Star v. B.J.F.*, 491 U.S. 524 (1989).

Plaintiffs' simplistic approach to application of strict scrutiny avoids discussion of the precise parameters of Maryland's law and fails to harmonize the *Daily Mail* line of cases with the *Estes-Chandler* line of cases. *Estes-Chandler* rests on federalism concerns ignored by Plaintiffs' approach: that is, the proposition that states should be permitted to determine the limits of courtroom broadcasting as long they do so in a way that ensures a fair trial. Although many states have opted to permit more robust courtroom publicity than does Maryland, *Estes-Chandler* stands for the proposition that Maryland's selection of where to draw that line is entitled to some deference.

Maryland's statute and court rules are narrowly tailored to strike the particular balance between competing constitutional principles selected by Maryland. Maryland has devised a system where only official court personnel may record a criminal trial proceeding, Md. Rule 16-504(a), but any individual may receive an audio recording of the proceeding upon written request, Md. Rule 16-504(h), and any party may receive an audio/video recording upon written request, Md. Rule 16-504(j). Additionally, any person may go to the courthouse to view the video recording and listen to the audio recording. Md. Rule 16-504(i). The foregoing access is provided only upon written request on court-approved forms that clearly state the prohibition against copying or further disseminating such recordings. The prohibition is enforced through criminal contempt where a judge will consider the particular circumstances of any violation, including whether the violation was willful. Significantly, there has been no allegation that Maryland judges have issued contempt when the violation was unknowing or in any other circumstances where the contemnor's due process rights were violated.

Invalidating Maryland's carefully crafted scheme is contrary to the federalism principles announced in *Chandler* and is not required by *Daily Mail* and its progeny. *See* discussion at ECF No. 72-1, 29-32. Because Maryland's statute and court rules are narrowly tailored to achieve an intended result, they survive strict scrutiny.

<div style="margin-left: 50%;">

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Ann M. Sheridan

_____

ROBERT A. SCOTT
Federal Bar No. 24613
ANN M. SHERIDAN
Federal Bar No. 11137
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
rscott@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

</div>

June 17, 2022                                        Attorneys for Defendant