IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRANDON SODERBERG, *et al.*,                *

    *Plaintiffs*,                                        *

    v.                                                       *                Civil No. RDB-19-1559

HON. AUDREY J. S. CARRIÓN, *et al.*,       *

    *Defendants*.                                      *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Section 1-201 of the Criminal Procedure Article of the Maryland Code prohibits the use of "television, radio, and photographic or recording equipment" to "record or broadcast any criminal matter . . . that is held in trial court or before a grand jury." Md. Code Ann., Crim. Proc. § 1-201. The State of Maryland interprets this statute to prohibit members of the public from broadcasting official recordings of criminal proceedings that are made available to the public under the Maryland Rules. *See* Md. Rules 16-502, 16-503, 16-504. The sole issue in this case is whether this prohibition, known as the "Broadcast Ban," is consistent with the First Amendment. After careful analysis, this Court concludes that the challenged component of the Broadcast Ban "burdens too much and furthers too little" to survive strict scrutiny. *Washington Post v. McManus*, 944 F.3d 506, 523 (4th Cir. 2019). The State of Maryland remains free to prohibit live broadcasting from the courtroom, and to regulate the release of shielded records and video recordings under the Maryland Rules. However, the State may not sanction the press for broadcasting "lawfully obtained, truthful information" that the State itself has disclosed to the public. *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 101 (1979).

Plaintiffs, a collection of lawyers, activists, and civil rights organizations, filed suit in May 2019, seeking a declaration that the Broadcast Ban is facially unconstitutional to the extent that it prohibits them from publishing "lawfully obtained audio or video recordings of criminal proceedings" that the State itself has made available under the Maryland Rules. (Compl. 22–23, ECF No. 1.)[1] In January 2020, this Court dismissed this case, characterizing the Broadcast Ban as a content-neutral regulation of the time, place, and manner of speech that survives intermediate scrutiny. *See Soderberg v. Pierson*, No. RDB-19-1559, 2020 WL 206619, at *13 (D. Md. Jan. 14, 2020). In June 2021, the United States Court of Appeals for the Fourth Circuit vacated and remanded, holding that "the Ban is properly assessed as a penal sanction for publishing information released to the public in official court records" and accordingly "is subject to strict scrutiny." *Soderberg v. Carrion*, 999 F.3d 962, 964, 970 (4th Cir. 2021). This demanding standard places the burden on the State to prove that the Broadcast Ban is "narrowly tailored to a state interest of the highest order" to survive constitutional muster. *Florida Star v. B.J.F.*, 491 U.S. 524, 541 (1989); *Daily Mail*, 443 U.S. at 103; *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975).

The State of Maryland contends that the Broadcast Ban is necessary to preserve two compelling state interests: the protection of witnesses and the integrity of criminal trials. However, "when [laws] affect First Amendment rights they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 805 (2011). Although the State's interests are compelling, the Broadcast Ban is

---

[1] Defendants are the Administrative Court Judges of the Circuit Courts for Baltimore County and Prince George's County and are sued in their official capacities as stand-ins for the State of Maryland. Accordingly, Defendants shall be referred to as "the State" throughout this opinion.

not narrowly tailored to achieve them. It does precious little to protect witnesses against intimidation, harassment, and violence, as it does not prevent the widespread publication of their names, their images, and the verbatim content of their testimony. It is far more expansive than necessary to achieve its desired ends, as it restricts the publication of official recordings in all criminal proceedings held in trial court—even where there are no manifest concerns that a subsequent broadcast might undermine the fairness of the trial or endanger its witnesses. And there are already less restrictive means available to the State to pursue these objectives, as the Maryland Rules authorize judges to shield sensitive material from trial transcripts and official recordings on a case-by-case basis.

Ultimately, the State seeks to forestall the harm that may result from the publication of sensitive information that the State itself has disclosed. However, once the State has released information to the public, the First Amendment protects the right of the press to publish it. While this case does not address the component of § 1-201 that prohibits live broadcasting, or the independent restrictions on shielded records and video recordings that exist under the Maryland Rules, the Broadcast Ban's limited protections and expansive scope make it a poor fit for the interests the State asserts. Although the integrity of the judicial process and the safety of witnesses are interests of the highest order, the State of Maryland must pursue these ends through less restrictive means than by sanctioning the press and the public for publishing "lawfully obtained, truthful information" that the State has released in official court records. *Daily Mail*, 443 U.S. at 101. Accordingly, Plaintiffs' Motion for Summary Judgment (ECF No. 71) is hereby **GRANTED,** and Defendants' Motion for Summary Judgment (ECF No. 72) is concurrently **DENIED.**

## BACKGROUND

This case features a facial First Amendment challenge to a portion of Section 1-201 of the Criminal Procedure Article of the Maryland Code (the "Broadcast Ban"). "Plaintiffs are journalists, lawyers, and community organizations who seek to publish and disseminate recordings of Maryland criminal proceedings as part of their reporting, advocacy, and community-education efforts." (Pls.' Mem. Supp. Summ. J. 5, ECF No. 71-1.) Each Plaintiff has lawfully obtained recordings of Maryland court proceedings that were released under the Maryland Rules. (*Id.* at 5–7.) Collectively, they claim that the Broadcast Ban has deterred them from broadcasting these recordings, chilling their journalistic and educational endeavors. (*Id.* at 8.) They seek a declaration that the Broadcast Ban violates the First Amendment to the extent that it prohibits the press and the public from broadcasting "lawfully obtained audio or video recordings of criminal proceedings that occurred in open court," and that they may not be held in contempt for publishing these recordings. (*Id.* at 9; *see* Compl. 22–23.)

## I.     Maryland Rules Governing Broadcasts of Criminal Trials

The Maryland Code prohibits the public from recording or broadcasting criminal trials. In 1980, the Court of Appeals of Maryland implemented an eighteen-month pilot program authorizing judges to "experiment" with "extended media coverage of court proceedings." *See* 7 Md. Reg. 2252–55 (Nov. 28, 1980) (ECF No. 72-3); *see also* Md. Rule 1209 (1983 Supp.) (ECF No. 72-4) (mandating that extended coverage "be conducted so as to not interfere with the right of any person to a fair and impartial trial[] and . . . the dignity and decorum which must attend the proceedings"). This program was short-lived. In 1981, the Maryland General Assembly enacted the Broadcast Ban, which prohibits the use of any "television, radio, and

photographic or recording equipment" to broadcast "any criminal matter, including a trial, hearing, motion, or argument, that is held in trial court or before a grand jury," subject to criminal sanctions for contempt of court. Md. Code Ann., Crim. Proc. § 1-201.[2] Although bills have been proposed to amend this prohibition and allow recording or broadcasting in limited circumstances, none have passed through the General Assembly. *See, e.g.*, Md. Fisc. Note, 2020 Sess. H.B. 1376 (recounting that similar bills were introduced in the 2007, 2008, 2009, 2016, 2017, and 2019 legislative sessions).

Concurrently, the Maryland Rules require the recording of all proceedings that are held in state trial courts. Under the Maryland Rules, "[a]ll trials, hearings, testimony, and other judicial proceedings . . . shall be recorded verbatim in their entirety." Md. Rule 16-502(a) (District Court); Md. Rule 16-503(a)(1) (Circuit Court). This recording system was originally implemented in the 1990s as an alternative to the traditional court reporter system and has expanded in recent decades. (Defs.' Mem. Supp. 8, ECF No. 72-1.) Most Maryland trial courts maintain audio recordings; according to the State, only the Baltimore City and Cecil County circuit courts produce video recordings. (Pls.' Mem. Supp. 2; Supplement, ECF No. 78.)

The Maryland Rules regulate access to these recordings, and grant members of the public a qualified right to view them or to obtain copies upon written request to the court. Recordings produced pursuant to the Maryland Rules remain "under the control of the court," and are held in the custody of court employees. Md. Rule 16-504(a). However, "any person" may listen to audio-video recordings at the courthouse. *See* Md. Rule 16-504(i). Additionally,

---

[2] The Broadcast Ban was originally codified as Article 27, § 467B of the Maryland Code. 1981 Md. Laws ch. 748, at 2782. It was re-codified, without substantive change, as Section 1-201 of the Criminal Procedure Article in 2001. 2001 Md. Laws ch. 10, at 85.

"any person" may obtain copies of audio recordings upon written request. Md. Rule 16-504(h). Although audio-video recordings are only available as a matter of right to the parties to a case, their attorneys, bar counsel, and select judicial officials, *see* Md. Rule 16-504(j)(1)(A)–(I), they may also be released to "any other person authorized by the County Administrative Judge." Md. Rule 16-504(j)(1)(J).

The same rules that allow the public to view or obtain copies of official trial recordings authorize the courts to shield sensitive content from public disclosure. Rule 16-504 provides that each court "shall direct that appropriate safeguards be placed" on any portion of a recording that "should and lawfully may be shielded from public access and inspection." Rule 16-504(g); Rule 16-502(f) (district court). Additionally, court recordings may be withheld from the public "as ordered by the court" or when a court proceeding is "closed pursuant to law." Md. Rule 16-504(h)(1)(C), (i)(1), (j)(2). In either case, the custodian of a recording is required to redact safeguarded portions from any copy of a recording released to the public. Md. Rule 16-504(h)(2), (i)(2). Unredacted copies of shielded recordings may be obtained only by the parties to a case, their attorneys, bar counsel, and select judicial officials, and are available to others only upon approval of the County Administrative Judge. Md. Rule 16-504(h)(3).

This case covers the interaction of the Broadcast Ban and the recording requirements of the Maryland Rules. The State of Maryland construes the Broadcast Ban "to cover not only broadcasts of live court proceedings but also broadcasts of court *recordings* that the State itself has made available to the public" under the Maryland Rules. (Pls.' Mem. Supp. 4.)[3] However,

---

[3] As Plaintiffs note, a Baltimore City Circuit Judge considered holding the producers of *Serial* in contempt for playing excerpts of the 2000 murder trial of Adnan Syed on their podcast. (*Id.*) Additionally, in 2019, a Baltimore City Circuit Judge "sent a letter to HBO admonishing the network

the Broadcast Ban does not "prohibit any person from describing, transcribing, or reenacting any portion of a criminal trial." (Defs.' Mem. Supp. 8.)

## II.     Procedural History

As noted above, Plaintiffs are a collection of lawyers, journalists, and civil rights organizations who seek to disseminate official recordings of criminal proceedings "as part of their reporting, advocacy, and community-education efforts." (Pls.' Mem. Supp. 5.) Plaintiffs Brandon Soderberg and Baynard Woods are Baltimore-area journalists who have lawfully obtained official audio and video recordings from the Baltimore City Circuit Court for use as part of "a documentary film about the Baltimore Police Department's Gun Trace Task Force." (*Id.*; *see also* Decl. of Brandon Soderberg ¶¶ 3–6, ECF No. 71-7; Decl. of Brandon Woods ¶¶ 3–5, ECF No. 71-6.) Plaintiffs Open Justice Baltimore and the Baltimore Action Legal Team are community organizations advocating for criminal justice reform, who have lawfully obtained official audio recordings that they plan to post online and play at "know-your-rights events for community members and legal training for volunteer lawyers." (*Id.* at 5–6; *see also* Decl. of Zach Zwagil ¶¶ 2–4, ECF No. 71-8; Decl. of Matthew Zernhelt, ¶¶ 2–4, ECF No. 71-9.) Finally, Plaintiff Qiana Johnson and the nonprofit organization she founded, Plaintiff Life After Release, have lawfully obtained official audio recordings from Prince George's County, and plan to distribute them "in order to highlight the impact of [their] participatory-defense work and to teach others how to become effective community advocates." (*Id.* at 6–7; *see also* Decl. of Qiana Johnson ¶¶ 2–6, ECF No. 71-10.)

---

for using video footage of the same trial in a documentary," and "sent a similar letter to a local journalist, warning her that it would be unlawful for her to include courtroom audio (from a different case) on her podcast." (*Id.* (citing Pierson Letter 3, ECF No. 71-5).)

Although Plaintiffs lawfully obtained these recordings, they have yet to publish them. (*See* Pls.' Mem. Supp. 5–7; Defs.' Mem. Supp. 13–15; *see also* Soderberg Decl. ¶ 4; Woods Decl. ¶¶ 4–5; Zwagil Decl. ¶ 3; Zernhelt Decl. ¶¶ 3–4; Johnson Decl. ¶ 7.) In May 2019, Plaintiffs contacted the respective administrative judges for Baltimore City and Prince George's County to seek clarification regarding whether their intended use of these recordings would violate the Broadcast Ban. (Pls.' Mem. Supp. at 7–8; Letters to Judge Pierson, ECF Nos. 1-1, 1-2; Letter to Judge Adams, ECF No. 1-3.) They received no response. (Pls.' Mem. Supp. 7–8.) Accordingly, Plaintiffs assert that the legal uncertainty attendant to the Broadcast Ban "has chilled their speech and deterred them from using the recordings in all of the ways that they otherwise would." (Pls.' Mem. Supp. 8; *see also* Soderberg Decl. ¶ 6; Woods Decl. ¶ 8; Zwagil Decl. ¶ 6; Zernhelt Decl. ¶ 8; Johnson Decl. ¶ 8.)

Plaintiffs filed the instant lawsuit on May 28, 2019, alleging that the Broadcast Ban violates the First Amendment freedom of expression and is alternatively void for vagueness. (Pls.' Mem. Supp. 8–9.) They seek a declaratory judgment that Md. Code Ann., Crim. Proc. § 1-201 is unconstitutional "insofar as it prohibits them from disseminating court recordings that they acquired through lawful means." (*Id.* at 9; Compl. 22–23.) In January 2020, this Court granted Defendants' motion to dismiss, characterizing the Broadcast Ban as a content-neutral regulation of the time, place, and manner of speech that survives intermediate scrutiny. *See Soderberg v. Pierson*, No. RDB-19-1559, 2020 WL 206619, at *13 (D. Md. Jan. 14, 2020). On June 15, 2021, the Fourth Circuit vacated the dismissal of Plaintiffs' First Amendment claim and remanded, holding that the Broadcast Ban "is properly assessed as a penal sanction for

publishing information released to the public in official court records" and accordingly "is subject to strict scrutiny." *Soderberg v. Carrion*, 999 F.3d 962, 964, 970 (4th Cir. 2021).[4]

Now pending are motions for summary judgment filed by both parties. (ECF Nos. 71, 72.) A hearing was held on November 3, 2022. Both motions are ripe for review.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences "in the light most favorable to the nonmoving party." *Libertarian Party of Va.*, 718

---

[4] Although the Fourth Circuit vacated the dismissal of Plaintiffs' First Amendment claim, it did not disturb this Court's dismissal of Plaintiffs' Fourteenth Amendment void-for-vagueness claim. *See id.* at 967 n.2. Accordingly, Plaintiffs' vagueness claim is not before this Court on remand.

F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that a trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866–68 (2014).

When both parties file motions for summary judgment, as here, this Court applies the same standard of review to both motions, considering "'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Defenders of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond*, 475 F.3d 633, 638 (4th Cir. 2007)). "[B]y the filing of a motion [for summary judgment,] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (citation omitted); *see also Sherwood v. Washington Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989) ("[N]either party waives the right to a full trial on the merits by filing its own motion."). "However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they 'may be probative of the non-existence of a factual dispute." *Syncrude Canada Ltd. v. Highland Consulting Grp., Inc.*, 916 F. Supp. 2d 620, 624 (D. Md. 2013) (quoting *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983)); *Ge. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015).

## ANALYSIS

This case involves a facial First Amendment challenge to a portion of Section 1-201 of the Criminal Procedure Article of the Maryland Code (the "Broadcast Ban"). The Fourth Circuit has held that the Broadcast Ban "is properly assessed as a penal sanction for publishing information released to the public in official court records" and "is subject to strict scrutiny." *Soderberg v. Carrion*, 999 F.3d 962, 964, 970 (4th Cir. 2021). Plaintiffs assert that § 1-201 cannot survive this rigorous analysis. They seek a declaration that the Broadcast Ban violates the First Amendment to the extent that it prohibits them from broadcasting "lawfully obtained audio or video recordings of criminal proceedings that occurred in open court," and that they cannot be held in contempt for publishing official state recordings obtained under the Maryland Rules. (Compl. 22–23.) Accordingly, Plaintiffs do not challenge the portion of § 1-201 that would prohibit them from providing live coverage inside the courtroom—only the Ban's "distinct prohibition on the broadcasting of the official court recordings of state criminal proceedings." *Soderberg*, 999 F.3d at 969.

Plaintiffs bring a facial challenge to the Broadcast Ban. "The difference between a facial challenge and an as-applied challenge lies in the scope of the constitutional inquiry." *Educ. Media Co. at Va. Tech. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013). To succeed in a typical facial challenge, plaintiffs must demonstrate that "no set of circumstances exists under which [the challenged law] would be valid, or that the statute lacks any 'plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 472 (2010) (quoting *United States v. Salerno*, 481 U.S. 739,

745 (1987); *Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 (1997)).[5] In the First Amendment context, "a plaintiff asserting a facial challenge may also prevail if he or she 'show[s] that the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Insley*, 731 F.3d at 298 n.5 (quoting *Stevens*, 559 U.S. at 473) (alteration in original). This more permissive analysis reflects the concern that an overbroad law risks curtailing protected speech and chilling the First Amendment freedom of expression. *See United States v. Williams*, 553 U.S. 285, 292 (2008).[6]

The parties litigate the Broadcast Ban under both prongs of strict scrutiny and contest the appropriate First Amendment principles to apply. The State argues that this case implicates Supreme Court authority "involving electronic media coverage in the courtroom," and that the Broadcast Ban is carefully crafted to provide the broadest possible access to criminal trials while preserving the integrity of the judicial process and protecting witnesses from harm. (Defs.' Mem. Supp. 4; Defs.' Repl. 2, ECF No. 74.) Plaintiffs contend that this Court should proceed under First Amendment authority governing laws that sanction "the publication of lawfully obtained, truthful information," and that the Broadcast Ban is not narrowly tailored

---

[5] Plaintiffs argue that the "no set of circumstances" language cited in *Stevens* and *Salerno* is dicta and should not be applied. *See City of Chicago v. Morales*, 527 U.S. 41, 55–56 n.22 (1999); *see, e.g., Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016) (emphasizing that strict scrutiny must be applied "without trying to dream up whether or not there exists some hypothetical situation in which . . . the statute might be valid"). As this Court proceeds under the more permissive overbreadth facial analysis mandated by First Amendment caselaw, it is unnecessary to evaluate this argument.

[6] Plaintiffs erroneously characterize overbreadth as a "less rigorous" alternative to the strict scrutiny standard. (Pls.' Repl. Supp. Summ. J. 4–5.) This characterization is incorrect. The overbreadth analysis is a more permissive form of *facial challenge*, not a less rigorous *strict scrutiny*. *See Stevens*, 559 U.S. at 472 (characterizing overbreadth as "a second type of facial challenge" (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008))). Expressed differently, while most plaintiffs asserting a facial challenge must show that there is "no set of circumstances" where the challenged law is valid, First Amendment plaintiffs need only show that the law is invalid in a "substantial number" of circumstances. The overbreadth doctrine helps the plaintiffs; it does not harm them.

to serve the state's objectives. (Pls.' Mem. Supp. 1; Pls.' Repl. 1–2, ECF No. 73.) After careful review of the parties' arguments, this Court finds that the challenged portion of the Broadcast Ban cannot survive strict scrutiny. Accordingly, the Broadcast Ban is facially unconstitutional, and Plaintiffs are entitled to the declaration they request.[7]

## I.    First Amendment Framework

The First Amendment to the United States Constitution prohibits laws "abridging the freedom of speech, or of the press." U.S. Const. amend. I.[8] These guarantees reflect a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Accordingly, "the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975); *accord Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979); *Florida Star v. B.J.F.*, 491 U.S. 524, 533 (1989). However, these freedoms are "subject to the maintenance of absolute fairness in the judicial process," and there is no "unlimited right of access to the courtroom on the part of the broadcasting media." *Estes v. Texas*, 381 U.S. 532, 539–40 (1965); *accord Chandler v. Florida*, 449 U.S. 560, 581 (1981); *Nixon v. Warner Comm'ns*, 435 U.S. 589, 598 (1978); *see also Estes*, 381 U.S. at 589 (Harlan, J., concurring) ("Within the courthouse the only relevant constitutional consideration is that the accused be accorded a fair trial.").

---

[7] In its Answer, the State raises affirmative defenses under the prudential standing doctrine and the doctrine of waiver. (*See* Amended Answer 11–12, ECF No. 70.) The State has abandoned its waiver argument. (Defs.' Mem. Supp. 29 n.11.) Additionally, this Court already rejected the State's standing argument in its opinion addressing the State's motion to dismiss, and that ruling was not disturbed by the Fourth Circuit. *See Soderberg*, 999 F.3d at 967 n.2. Moreover, the State does not address its prudential standing defense anywhere in its briefings, indicating that it has been abandoned.

[8] The First Amendment has been incorporated against the states through the Due Process Clause of the Fourteenth Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964).

As a threshold matter, the parties dispute which First Amendment principles govern the analysis of the Broadcast Ban. The State argues that the perils of online broadcasting call for a "harmonization of the *Estes v. Texas* line of cases involving electronic media coverage in the courtroom with the *Cox Broadcasting* line of cases upon which the Court of Appeals relied." (Defs.' Mem. Supp. 3–4.) Plaintiffs aptly note that this Court should apply the "longstanding Supreme Court precedent[] that the First and Fourteenth Amendments forbid the state from punishing the publication of lawfully obtained, truthful information except where necessary to further a state interest of the highest order." (Pls.' Mem. Supp. 1.) The *Cox Broadcasting* line of cases address state efforts to punish the publication of "truthful information about a matter of public significance"—precisely the circumstance at issue here. *Daily Mail*, 443 U.S. at 103. Although *Estes* and *Chandler* recognize that broadcasting may harm the truth-seeking process in some cases, they primarily address the prejudicial effects of live, in-court broadcasting. *See Estes*, 381 U.S. at 589 (Harlan, J., concurring). The Supreme Court has never extended this reasoning to validate laws that punish the publication of "information the state has released to the public in official court records." *See Soderberg*, 999 F.3d at 964.

A. Penal Sanctions for Publishing Information Released in Court Records

The First Amendment constrains the government's authority to prohibit the press and the public from publishing matters of public importance. "As a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'" *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (quoting *Daily Mail*, 443 U.S. at 102). In *Smith v. Daily Mail Publishing Co.*, the Supreme Court held that "if a [news organization] lawfully obtains truthful information about a matter of public significance then state officials may not

constitutionally punish publication of the information, absent a need to further a state interest

of the highest order." 443 U.S. at 103; *see, e.g.*, *Bartnicki*, 532 U.S. at 528; *Florida Star*, 491 U.S.

at 533; *Landmark Comm'ns, Inc. v. Virginia*, 435 U.S. 829, 837–39 (1978); *Okla. Publ'g Co. v. Okla.*

*Cnty. Dist. Ct.*, 430 U.S. 308, 310 (1977); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 496 (1975). As

the Broadcast Ban "is properly assessed as a penal sanction for publishing information released

to the public in official court records," it must be analyzed in accordance with these principles.

*Soderberg*, 999 F.3d at 964.

In *Cox Broadcasting Corp. v. Cohn*, the Supreme Court held that the First Amendment

precluded a lawsuit against a news organization for broadcasting the name of a rape victim

that a reporter had obtained from court records. 420 U.S. 469, 472–74 (1975). The plaintiff,

the father of the victim, brought an invasion of privacy action against a reporter who learned

the victim's name after reviewing indictments which had been made publicly available in the

courtroom. *Id.* at 472. The reporter, who had taken notes during an open hearing and obtained

the indictments from a clerk of court during a recess, *id.* at 473 n.4, argued that the First

Amendment protected his reports, *id.* at 474. The trial court granted summary judgment to

the plaintiff, and the Georgia Supreme Court affirmed over the defendant's First Amendment

objections, holding that a Georgia law which "ma[de] it a misdemeanor to publish or broadcast

the name or identity of a rape victim" was a "legitimate limitation on the right of freedom of

expression contained in the First Amendment." *Id.* at 472, 475.

The Supreme Court reversed, emphasizing that imperative First Amendment interests

protect "accurate reports of judicial proceedings" in light of their critical importance to public

awareness and scrutiny of government conduct. *Id.* at 492, 495. The Court reasoned that "[t]he

15

commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions" are "without question events of legitimate concern to the public," *id.* at 495, and that press coverage of judicial proceedings "serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice," *id.* at 492. In light of these policy considerations, the Court held:

> [T]he First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.
>
> * * *
>
> If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information. Their political institutions must weigh the interests in privacy with the interests of the public to know and of the press to publish. Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it.

420 U.S. at 495–96. Accordingly, the State must protect sensitive information "by means which avoid public documentation," not by sanctioning the press for publishing it. *Id.* at 496. As the defendant reporter had "based his televised report upon notes taken during the court proceedings and obtained the name of the victim from the indictments," the First Amendment protected his reports from liability. *Id.* at 496–97.

Fourteen years later, in *The Florida Star v. B.J.F.*, the Supreme Court held that the same principles precluded a lawsuit against a newspaper for publishing the full name of a rape victim in violation of Florida law. 491 U.S. 524, 526 (1989). In *Florida Star*, a police department prepared a report detailing a robbery and sexual assault and left this report in its press room. *Id.* at 527. When a reporter for the Florida Star transcribed the report and released a short article about the crime that featured the victim's name, the victim filed a negligence action

based on a Florida statute that proscribed printing, publishing, or broadcasting names of sexual offense victims "in any instrument of mass communication." *Id.* at 526, 528. The trial court rejected the paper's First Amendment defense, concluding that the law was narrowly tailored to a compelling state interest, "as it applied only to a narrow set of 'rather sensitive . . . criminal offenses.'" *Id.* at 528. A jury awarded damages, and a state appellate court affirmed. *Id.* at 529.

The Supreme Court again reversed, applying the same principle, and emphasizing that "where a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order." 491 U.S. at 541.[9] The Court grounded this rule in "the overarching 'public interest, secured by the Constitution, in the dissemination of truth,'" as supported by three underlying considerations. *Id.* at 534 (quoting *Cox Broadcasting*, 420 U.S. at 491). First, the Court observed that the government "retains ample means of safeguarding significant interests" that may be endangered by the widespread publication of information within its control. *Id.* Specifically:

> To the extent sensitive information is in the government's custody, it has [great] power to forestall or mitigate the injury caused by its release. The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissemination. Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts.

*Id.* Second, and relatedly, the Court observed that "punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests

---

[9] As the Fourth Circuit has observed, "the [*Florida Star*] Court expressly avoided deciding whether Florida's asserted interest constituted 'a state interest of the highest order'—resolving the case instead solely on narrow-tailoring grounds." *Ostergren v. Cuccinelli*, 615 F.3d 263, 275 n.10 (4th Cir. 2010) (citing *Daily Mail*, 443 U.S. at 103).

in the service of which the State seeks to act." *Id.* at 535. Third, and finally, the Court observed the potential for "timidity and self-censorship" if media outlets are prohibited from publishing truthful information contained in court records. *Id.* at 535–36.

These cases demonstrate that strong First Amendment interests protect the right of the press to publish lawfully obtained, truthful material the state has released to the public— and that laws punishing the press for doing so can rarely be upheld. As the Court emphasized in *Cox Broadcasting*, public records of judicial proceedings serve imperative public interests, and their dissemination "serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice." 420 U.S. at 492. Furthermore, as the Court recognized in *Florida Star*, laws that punish the publication of those records are more restrictive of First Amendment freedoms, and less effective at serving the state's interests, than laws that prevent the release of sensitive information in the first place. 491 U.S. at 534–36. If the state wishes to protect sensitive information against the myriad dangers of widespread publication in the digital age, it must do so "by means which avoid public documentation or other exposure of private information"—not by sanctioning the publication of material it has already chosen to release. *Cox Broadcasting*, 420 U.S. at 496.[10]

The Supreme Court has counselled that the conflict between privacy interests and the First Amendment must be assessed "in a discrete factual context." *Florida Star*, 491 U.S. at 534. Following this logic, the State argues that *Cox Broadcasting* and its progeny are distinguishable, as each addressed lawsuits against the media for publishing information that was inadvertently

---

[10] While this rule is presented in stark terms, it is not absolute. The Supreme Court has declined to hold that the publication of truthful information can *never* be constitutionally punished. *Florida Star*, 491 U.S. at 532.

released—and none evaluated the constitutionality of a statewide law such as the Broadcast Ban, which restricts the publication of information the state has intentionally disclosed. (Defs.' Mem. Supp. 2, 28–29.) *See, e.g.*, *Florida Star*, 491 U.S. at 527 (lawsuit for publishing identity of rape victim disclosed in discarded police report); *Daily Mail*, 443 U.S. at 100 (prosecution for publishing identity of juvenile suspect obtained by monitoring police radio); *Cox Broad.*, 435 U.S. at 496 (lawsuit for publishing materials given to reporter by clerk during court recess); *Okla. Publ'g*, 430 U.S. at 310 (lawsuit for publishing information disclosed at closed juvenile hearing). Thus, the State contends that applying these cases "would constitute an extension of [their doctrine] not contemplated by the Supreme Court." (Defs.' Mem. Supp. 2.)

Even assuming this distinction is accurate,[11] these cases are not limited to inadvertent disclosures. In *Cox Broadcasting* and its progeny, the Court concluded that First Amendment interests attached because the press had "lawfully obtain[ed] truthful information about a matter of public significance"—not because that information had been inadvertently released. *Daily Mail*, 443 U.S. at 103. Regardless of whether "the government itself provided or made possible access to the information," or the media "relied upon routine newspaper reporting techniques" to obtain it, punishing the press for reporting truthful information is rarely permissible. *Id.* The fact that disclosure was accidental in some of these cases only underscores the strength of the First Amendment interests the Supreme Court has identified. *See Ostergren*

---

[11] Not all of these cases featured information that was obtained inadvertently, and at least one addressed a statewide publication ban with accompanying criminal sanctions. In *Cox Broadcasting*, the defendant-reporter obtained the identity of the victim from documents that were readily provided by court officials upon request. 435 U.S. at 472 n.3 ("[N]o attempt was made by the clerk or anyone else to withhold the name and identity of the victim . . . and the said indictments were available for public inspection upon request."). Additionally, in *Florida Star*, the plaintiff's negligence action was predicated on a statute that barred the press from publishing the identity of a rape victim "in any instrument of mass communication," with criminal penalties for noncompliance. 491 U.S. at 526 & n.1.

*v. Cuccinelli*, 615 F.3d 263, 280 (4th Cir. 2010) ("Even where disclosure to the press was accidental, *Florida Star* indicates that the press cannot be prevented from publishing the private information."); *see, e.g.*, *Bartnicki*, 532 U.S. at 528, 530 (holding that press could not be punished for publishing information that it lawfully obtained from a "non-law-abiding third party," who had *unlawfully* intercepted it in violation of a federal wiretap statute).

### B. Regulation of Live Broadcasts in the Courtroom

In applying *Cox Broadcasting*, the State notes that "the right of the press and the public to court access stops at the courthouse door," and argues that this Court should apply Supreme Court precedent considering the dangers of "electronic media coverage in the courtroom." (Defs.' Mem. Supp. 4, 22.) It is well established that "the right to attend criminal trials is implicit in the guarantees of the First Amendment." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980) (footnote omitted); *accord Press-Ent. Co. v. Superior Ct.*, 478 U.S. 1, 13 (1986); *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 610 (1982); *Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 598, 610 (1978). Nevertheless, "[a]lthough the right of access to criminal trials is of a constitutional stature, it is not absolute," *Globe Newspaper*, 457 U.S. at 606–08, and "must be balanced against other compelling interests protected by the Constitution, such as the right of the accused to a fair trial," *In re Knight Pub. Co.*, 743 F.2d 231, 233 (4th Cir. 1984) (citing *Press-Enterprise Co.*, 487 U.S. at 511). Among other limitations, the Supreme Court has emphasized that there is no "unlimited right of access to the courtroom on the part of the broadcasting media." *Estes v. Texas*, 381 U.S. 532, 539–40 (1965).

In *Estes v. Texas*, a criminal defendant who had been convicted of swindling argued that a Texas court deprived him of his due process rights by televising and broadcasting his trial.

381 U.S. 532, 534–35 (1965). The pretrial hearings and portions of the trial had been broadcast live, and the presence of the media in the courtroom had been highly disruptive. *Id.* at 536. When the defendant appealed his conviction on due process grounds, the Court rejected the state's argument that "the freedoms granted in the First Amendment extend a right to the news media to televise from the courtroom," *id.* at 539; *accord id.* at 588 (Harlan, J., concurring) ("No constitutional provision guarantees a right to televise trials."). The Court cautioned that "[t]elevision in its present state and by its very nature[] reaches into a variety of areas in which it may cause prejudice to an accused," and emphasized that "[w]hile maximum freedom must be allowed the press in carrying on [its] important function in a democratic society its exercise must necessarily be subject to the maintenance of absolute fairness in the judicial process." *Id.* at 539; *accord id.* at 573 (Warren, C.J., concurring) ("There would be a real threat to the integrity of the trial process if the television industry and trial judges were allowed to become partners in the staging of criminal proceedings.") Applying this principle, and noting the disruptions the press had caused,[12] the Court held that the presence of the media and its coverage of the trial had violated the defendant's due process rights. *Id.* at 551.

---

[12] These disruptions were substantial. As the Supreme Court recounted:

> at least 12 cameramen were engaged in the courtroom throughout the hearing taking motion and still pictures and televising the proceedings. Cables and wires were snaked across the courtroom floor, three microphones were on the judge's bench and others were beamed at the jury box and the counsel table. . . . The hearing was televised live and repeated on tape in the same evening, reaching approximately 100,000 viewers. In addition, the courtroom was a mass of wires, television cameras, microphones and photographers. The petitioner, the panel of prospective jurors, who were sworn the second day, the witnesses and the lawyers were all exposed to this untoward situation.

*Id.* at 536, 550–51. Moreover, although the structure of the courtroom was altered by the time of trial to reduce disruption, substantial portions of the trial were televised—some in the entirety, others with limited audio or video. *Id.* at 551. Trial recordings were also broadcast on the evening news following

Two decades later, in *Chandler v. Florida*, the Supreme Court held that "*Estes* is not to be read as announcing a constitutional rule barring still photographic, radio, and television coverage in all cases and under all circumstances." 449 U.S. 560, 573 (1981). In 1977, the Supreme Court of Florida established a 1-year experimental program allowing electronic media to cover all judicial proceedings in the state. *Id.* at 564–65. Thereafter, a group of defendants convicted of offenses related to a burglary argued that the presence of a television camera during their trial violated their due process rights, and requested "a constitutional rule that all photographic or broadcast coverage of criminal trials is inherently a denial of due process." *Id.* at 570, 574. The Court declined to pronounce this rule, observing that "no one has been able to present empirical data sufficient to establish that the mere presence of the broadcast media inherently has an adverse effect on [the trial] process." *Id.* at 578–79. Accordingly, "[t]o demonstrate prejudice in a specific case a defendant must show something more than juror awareness that the trial is such as to attract the attention of broadcasters." *Id.* at 581. As the defendants could not show "that any participant in [their] case was affected by the presence of cameras," or that "[their] trial was compromised by television coverage, as was the case in *Estes*," their due process claim was unavailing. *Id.* at 581–82.

In its briefings and at the summary judgment hearing, the State urged this Court to analogize *Estes* and *Chandler*, asserting that these cases demonstrate the inherent risks created by broadcast media, and that the Broadcast Ban is necessary to guard against these dangers. (Defs.' Mem. Supp. 4, 17–20.) Both cases recognize that broadcast coverage of a trial "may

---

each day of proceedings, with reporters commenting in the foreground with excerpts of testimony and editorial remarks. *Id.* As a result of this extended coverage, four jurors had seen portions of the broadcasts, and "the trial judge was himself harassed." *Id.* at 551.

adversely affect the conduct of the participants and the fairness of the trial, yet leave no evidence of how the conduct or the trial's fairness was affected." *Chandler*, 449 U.S. at 577; *Estes*, 381 U.S. at 544 ("Television . . . by its very nature, reaches into a variety of area in which it may cause prejudice to an accused."). Referencing these decisions and embracing their reasoning, the appellate courts have universally upheld laws restricting live broadcasts of criminal proceedings. *See, e.g.*, *United States v. Kerley*, 753 F.2d 617, 621 (7th Cir. 1985); *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 21–22 (2d Cir. 1984); *United States v. Hastings*, 695 F.2d 1278, 1281 (11th Cir. 1983); *United States v. Edwards*, 785 F.2d 1293, 1295 (5th Cir. 1986) ("The First Amendment does not guarantee a positive right to televise or broadcast criminal trials.").

However, Plaintiffs do not challenge Maryland's ban on live coverage of criminal trials. Plaintiffs acknowledge that they do not have a constitutional right to bring cameras into the courtroom, and the requested declaration would not affect the portion of the Broadcast Ban that makes it unlawful to do so. (Pls.' Repl. 7, 16.) As the Fourth Circuit observed in its opinion remanding this case, Plaintiffs seek only a declaration that they may not be held in contempt of court for publishing recordings that the State has released to the public in accordance with the Maryland Rules. *Soderberg*, 999 F.3d at 969. Justice Harlan, casting the deciding vote in *Estes*, observed that other forms of press coverage do not implicate the same concerns as live broadcasting of proceedings from inside the courthouse:

> The rights to print and speak, over television and elsewhere, do not embody an independent right to bring the mechanical facilities of the broadcasting and printing industries into the courtroom. Once beyond the confines of the courthouse, a news-gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; . . . Within the courthouse the only relevant constitutional

consideration is that the accused be accorded a fair trial. If the presence of television substantially detracts from that goal, due process requires that its use be forbidden.

*Estes*, 381 U.S. at 589 (Harlan, J., concurring); *Nixon*, 435 U.S. at 609 (adopting this language).[13] Accordingly, the State's reliance on *Estes* and *Chandler* is unavailing. These cases do not affect the strict scrutiny mandated by the Fourth Circuit and have little bearing on the declaratory judgment Plaintiffs request.[14] Regardless of the outcome of this case, Maryland's ban on the live broadcasting of criminal trials will remain in effect.

## II.    Strict Scrutiny

This Court now turns to the strict scrutiny required by the *Cox Broadcasting* and *Daily Mail* line of cases and mandated by the Fourth Circuit in its opinion remanding this case. As the Supreme Court held in *Cox Broadcasting*, and as described above, "the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." 420 U.S. at 496. Once the media "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Daily Mail*, 443 U.S. at 103; *see, e.g.*, *Bartnicki*, 532 U.S. at 528; *Florida Star*, 491 U.S. at 533; *Landmark Comm'ns,*

---

[13] The Supreme Court has observed that Justice Harlan's concurrence in *Estes* is critical to the Court's holding. *Chandler*, 449 U.S. at 573 ("Justice Harlan's opinion, upon which the constitutional holding of *Estes* turns, must be read as defining the scope of that holding.").

[14] To the extent that these cases are relevant here, they do not support a categorical prohibition on the distribution of official recordings of criminal proceedings, such as the Broadcast Ban. *Chandler*, 449 U.S. at 578–81 ("To demonstrate prejudice in a specific case a defendant must show something more than juror awareness that the trial is such as to attract the attention of broadcasters."). At most, they stand for case-by-case restrictions on broadcast coverage in cases where the risk of prejudice is apparent, as was the situation in *Estes*. *Cf. id.* at 575 ("[T]he risk of [juror] prejudice does not warrant an absolute constitutional ban on all broadcast coverage.").

*Inc.*, 435 U.S. at 837–39; *Oklahoma Publishing*, 430 U.S. at 310; *Cox Broadcasting*, 420 U.S. at 496. As the Broadcast Ban "is properly assessed as a penal sanction for publishing information released to the public in official court records," it is subject to strict scrutiny, and must be "narrowly tailored to a state interest of the highest order" to survive constitutional muster. *Soderberg*, 999 F.3d at 964.

The State bears a high burden to sustain the Broadcast Ban under this rigorous analysis. Under the First Amendment, strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)); *accord Republican Party of Minn. v. White*, 536 U.S. 765, 774– 75 (2002); *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 798 (1988). "To survive strict scrutiny . . . the State must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992). "With respect to narrow tailoring, [courts] require the government to prove that no 'less restrictive alternative' would serve its purpose." *Central Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)). "'[I]t is the rare case' in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015) (quoting *Burson*, 504 U.S. at 211); *accord Wash. Post. v. McManus*, 944 F.3d 506, 520 (4th Cir. 2019) ("[S]trict scrutiny, in practice, is virtually impossible to satisfy.").

Plaintiffs challenge the facial validity of the Broadcast Ban to the extent that it prohibits members of the public from publishing recordings of criminal trials released by the State under

the Maryland Rules.[15] The State argues that the Broadcast Ban is necessary to preserve the integrity of criminal trials and to protect witnesses against intimidation and harassment. Although these interests are compelling, the Broadcast Ban is not narrowly tailored to achieve them. Any member of the public may obtain official trial recordings under the Maryland Rules. Once they have, the Ban does little to protect witnesses, as it does not shield their identities or the contents of their testimony. *Cf. Florida Star*, 491 U.S. at 534. ("[P]unishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act."). It sweeps too broadly, as it applies even when there are no serious risks that a subsequent broadcast would imperil the safety of witnesses or the fairness of a trial. Less restrictive alternatives are already available, as the Maryland Rules authorize judges to redact recordings on a case-by-case basis. *Cf. Cox Broad.*, 435 U.S. at 496 ("If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information."). Accordingly, the challenged portion of the Broadcast Ban is facially unconstitutional, and Plaintiffs are entitled to summary judgment.

A.  <u>Compelling State Interests</u>

Under the first prong of the *Daily Mail* strict scrutiny analysis, the State bears the burden to demonstrate that the Broadcast Ban advances a "state interest of the highest order."

---

[15] By its terms, Plaintiffs' requested declaration applies only to lawfully obtained recordings of criminal proceedings. (Compl. 22–23.) There is no serious question that these recordings constitute "lawfully obtain[ed,] truthful information about a matter of public significance." *Daily Mail*, 443 U.S. at 103. As discussed throughout this opinion, the broadcast of information released by the state serves substantial public interests in the operation of government and the transparency of the judicial process. *See Cox Broad.*, 420 U.S. at 495 ("Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of those records by the media.").

*Soderberg*, 999 F.3d at 968–69 (citing *Daily Mail*, 443 U.S. at 103). "In deciding what constitutes a state interest of the highest order, courts are not bound by 'the State's view and its conduct,'" and should consider "objective criteria." *Ostergren*, 615 F.3d at 277. "The Supreme Court has made clear that, when free speech values are at stake, states must supply rationales that are 'far stronger than mere speculation about serious harms.'" *McManus*, 944 F.3d at 522 (quoting *Bartnicki*, 532 U.S. at 531). Expressed differently, "[t]he State must specifically identify an 'actual problem' in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (quoting *Playboy*, 529 U.S. at 822–23; and citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992)).

At the first prong of the strict scrutiny analysis, the State offers four justifications for the Broadcast Ban:

    (1) Ensuring that the criminal trial process is fair, efficient, and effective;
    (2) Preventing the broadcast of altered recordings ("deepfakes");
    (3) Ensuring convictions by encouraging witness cooperation with the state;
    (4) Protecting witnesses from threats, intimidation, and harassment.

(Pls.' Mem. Supp. 16; *see* Amended Answer 11; Carrion's Resp. to Pls.' Interrog. No. 4, ECF No. 71-11; Adams' Resp. to Pls.' Interrog. No. 4, ECF No. 12.) These may be characterized as two compelling interests: (1) preserving the **fairness and integrity** of judicial proceedings, particularly criminal trials; and (2) **protecting witnesses**, particularly those who cooperate with the government, against intimidation, harassment, and violence.

There is no question that these are interests of the highest order. Decades of Supreme Court caselaw demonstrates that the integrity of the court system is of paramount importance, and that the right to a fair trial is "the most fundamental of all freedoms." *Estes*, 381 U.S. at 540; *accord id.* at 589 (Harlan, J., concurring) ("Within the courthouse the only relevant

constitutional consideration is that the accused be accorded a fair trial."); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 551 (1976) ("A fair trial in a fair tribunal is a basic requirement of due process." (citation omitted)). Additionally, as this Court has previously observed, "since well before the advent of broadcast media, witnesses who cooperate with the government have risked intimidation and retaliation by a criminal defendant's associates." *NPR v. Klavans*, 560 F. Supp. 3d 916, 926 (D. Md. 2021).[16] Those risks are "far stronger than mere speculation about serious harms." *McManus*, 944 F.3d at 522 (citation omitted). Rather, they are pressing issues in Maryland. As State's Attorney Anne Cole Leitess recounts:

> The top challenge that prosecutors have is convincing victims and witnesses to violent crimes to appear in court and testify. Witnesses fear retribution by friends or family of defendants. Based on my experience, eyewitnesses and fact witnesses are reluctant to provide even the most basic evidence to police, often refuse to be interviewed about the crime, and regularly avoid coming to court to testify. It has become so difficult to find cooperating witnesses that some police agencies do not bother interviewing witnesses at a homicide scene until they first gather video and forensic evidence and then work from there to identify potential witnesses.

(Decl. of Anne Colt Leitess ("Leitess Decl") ¶ 4, ECF No. 72-7.) Accordingly, it is beyond question that the State of Maryland has compelling interests in protecting witnesses who cooperate with criminal prosecutions and ensuring the fairness of criminal proceedings.

Whether the Broadcast Ban in fact serves these interests is a closer issue. As to fairness, the State highlights *Estes* and *Chandler* to argue that the widespread broadcast of criminal trials may have damaging effects on the truth-seeking process. (Defs.' Mem. Supp. 18–19.) *See Estes*,

---

[16] Although not directly applicable here, the Supreme Court has recognized that the State has a "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Rovario v. United States*, 353 U.S. 53, 59 (1957). This privilege is animated by "the furtherance and protection of the public interest in effective law enforcement," *id.*, and aligns closely with the interest asserted by the State in this case.

381 U.S. at 550 ("[T]he mere fact that the trial is to be televised might render witnesses reluctant to appear and thereby impede the trial as well as the discovery of the truth."); *Chandler*, 449 U.S. at 577 ("[E]lectronic coverage of a trial . . . may adversely affect the conduct of the participants and the fairness of the trial, yet leave no evidence of how the conduct or the trial's fairness was affected."). However, as detailed above, this line of cases addresses the disruptions caused by media in the courtroom and the prejudicial effects of live broadcasts.[17] Plaintiffs do not challenge § 1-201's prohibition on live broadcasts—only the statue's "distinct prohibition on the broadcasting of the official court recordings of state criminal proceedings." *Soderberg*, 999 F.3d at 969. Coverage of judicial proceedings from beyond the courthouse walls does not create the same fairness concerns as live broadcasts conducted inside the courtroom. *See Estes*, 381 U.S. at 589 (Harlan, J., concurring).

Extending *Estes* and *Chandler* to support a universal ban on broadcasts of criminal trials would require this Court to accept the proposition that expanding media coverage of criminal trials endangers the fairness of those proceedings. However, it is firmly established that "[t]he free press has been a mighty catalyst in awakening public interest in governmental affairs," *id.* at 550 (majority opinion), and that "[p]ublic scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process." *Globe Newspaper Co.*, 457 U.S. at 607; *accord Cox Broad.*, 420 U.S. at 492 ("[T]he function of the press serves to guarantee the fairness

---

[17] As noted above, to the extent that these cases are relevant, they support only case-by-case restrictions on broadcast coverage in circumstances where the risk of prejudice is apparent. *Cf. id.* at 575, 581 ("[T]he risk of [juror] prejudice does not warrant an absolute constitutional ban on all broadcast coverage. . . . To demonstrate prejudice in a specific case a defendant must show something more than juror awareness that the trial is such as to attract the attention of broadcasters."). The State offers no evidence that distributing the official recordings of trial proceedings will have a prejudicial impact in all criminal cases.

of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice."); *Press-Ent. Co.*, 464 U.S. at 508 ("Openness . . . enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system."); *Landmark Comm'ns*, 435 U.S. at 839 ("The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966))). Although the Broadcast Ban does not close the courtroom doors, these bedrock principles run counter to the idea that publishing recordings of criminal trials will distort the factfinding process and undermine the integrity of the judicial system.

Accordingly, the challenged portion of the Broadcast Ban does not advance the State's compelling interest in the fairness and integrity of criminal trials. Plaintiffs seek a declaration that they may not be held in contempt of court for publishing recordings that the State has released to the public under the Maryland Rules—they do not assert a constitutional right to cameras in the courtroom. Although the integrity of judicial proceedings is unequivocally a "state interest of the highest order," *Daily Mail*, 443 U.S. at 103, this form of press coverage furthers "the basic fairness of the criminal trial" and "guards against the miscarriage of justice." *Landmark Comm'ns*, 435 U.S. at 839; *Press-Ent. Co.*, 464 U.S. at 508. As this Court has previously emphasized, openness and publicity are "preservative—not deleterious—of fairness." *Klavans*, 560 F. Supp. 3d at 927.[18]

---

[18] The State's concern about "deepfakes" and other manipulations of trial recordings amounts only to "mere speculation about serious harm." *McManus*, 944 F.3d at 522 (quoting *Bartnicki*, 532 U.S. at 531). The State fails to show that deepfakes are a tangible concern, as it does not offer even a single example of trial recordings being manipulated in this manner in Maryland or in any other jurisdiction. (Pls.' Repl. 23.) *See Ross v. Early*, 746 F.3d 546, 556 (4th Cir. 2016) (requiring the state to "make some

The State has a stronger argument in favor of witness protection and cooperation. On this issue, the State argues that the Broadcast Ban guards against the potential for the witness intimidation if their participation in criminal trials might be "televised on the nightly news . . . or disseminated worldwide via the internet." (Defs.' Mem. Supp. 18.) The State offers the declarations of State's Attorneys Anne Colt Leitess and Scott Shellenberger for the proposition "that Maryland prosecutors already spend substantial precious time and resources attempting to procure witness cooperation in criminal cases." (*Id.* at 19 (citing Leitess Decl. ¶¶ 4–7; Decl. of Scott Shellenberger ("Shellenberger Decl.") ¶¶ 5–8, ECF No. 72-8).) Both prosecutors attest that witnesses have expressed relief that their testimony will not be broadcast online, and that allowing the press to publish recordings of criminal trials will "significantly reduce the number of witnesses who are willing to testify in criminal matters." (Shellenberger Decl. ¶ 8; Leitess Decl. ¶¶ 9, 18 (opining that broadcasts will produce "a chilling effect on witness cooperation").) Additionally, Leitess offers grave examples of threats and violence against witnesses who have testified in criminal cases. (Leitess Decl. ¶¶ 14–17.) The State argues that these dangers would be aggravated if the Broadcast Ban was lifted, and images and voiceprints of cooperating witnesses could be posted and shared online. (Defs.' Mem. Supp. 18; *see* Leitess Decl. ¶ 10 ("Permitting their recorded voices to be broadcast on radio, television or a podcast

---

evidentiary showing that the recited harms are real, not merely conjectural, and that the [law] alleviates these harms in a direct and material way" (citations and alterations omitted)). In any case, this issue may be more narrowly addressed by a law prohibiting misleading alterations of trial recordings. *Cf. Bartnicki*, 532 U.S. at 529 ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."). Moreover, as the Maryland Rules allow anyone to request recordings, there is already a risk that malicious actors could engage in this conduct. In such instances, § 1-201 makes it more difficult "to *rebut* manipulated recordings by disseminating truthful, unaltered versions of the same proceeding." (Pls.' Repl. 24 (emphasis in original).)

won't be any different than having a defendant's friend, family member or gang associate also obtain a copy of the hearing and play it over . . . social media.").)

The dangers faced by cooperating witnesses are very real, and very compelling. In light of these serious concerns, this Court concludes that the Broadcast Ban supports the State's compelling interest in protecting witnesses from harm. As noted above, witnesses have risked retaliation, intimidation, and harassment "since well before the advent of broadcast media." *Klavans*, 560 F. Supp. 3d at 926. However, technology is evolving at a rapid pace, requiring states and institutions to respond to new challenges that may jeopardize the judicial process. In the age of the internet, when information posted online is made "available in perpetuity for unlimited viewing, further dissemination, and easy manipulation," *Mirlis v. Greer*, 952 F.3d 51, 56 (2d Cir. 2020), the Broadcast Ban slows the spread of that information, reducing the exposure faced by witnesses who participate in criminal cases. Accordingly, this Court holds that § 1-201 has at least a marginal impact on the State's compelling interest in witness safety. Whether the Ban is ultimately effective at serving this interest, and whether its needs can justify its breadth, are questions properly addressed under the narrow tailoring analysis.

B. <u>Narrow Tailoring</u>

To satisfy the "narrow tailoring" prong of strict scrutiny, "a State must do more than assert a compelling state interest—it must [also] demonstrate that its law is necessary to serve the asserted interest." *Burson*, 504 U.S. at 199. "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808–10 (1984)). "With respect to narrow tailoring, [courts] require the government to prove

that no 'less restrictive alternative' would serve its purpose." *Central Radio*, 811 F.3d at 633 (quoting *Playboy*, 529 U.S. at 813). Accordingly, "when [laws] affect First Amendment rights, they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 879 F.3d 101, 112 (4th Cir. 2018) (quoting *Brown*, 564 U.S. at 805) (alteration in original).

Although the State's interests in preserving the integrity of criminal trials and protecting witnesses are clearly compelling, the government has chosen to advance them by imposing "a penal sanction for publishing information released to the public in official court records." *Soderberg*, 999 F.3d at 964. As the Fourth Circuit held in *Ostergren v. Cuccinelli*, the *Cox Broadcasting* line of cases demonstrate that this is rarely a narrowly tailored solution:

> *Cox Broadcasting* and its progeny indicate that punishing truthful publication of private information will almost never be narrowly tailored to safeguard privacy when the government itself released that information to the press. . . . Even where disclosure to the press was accidental, *Florida Star* indicates that the press cannot be prevented from publishing the private information.

615 F.3d at 280 (citations omitted); *see also Florida Star*, 491 U.S. at 534 ("Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts."). The same is true of the Broadcast Ban. This Court concludes that the challenged portion of the Ban is both fatally underinclusive and seriously overinclusive, and that less restrictive alternatives could serve the State's compelling interests in witness protection and trial fairness.

1. The Broadcast Ban is fatally underinclusive

The Broadcast Ban's first shortcoming is its failure to meaningfully advance the State's interests. A challenged statute may be "fatally underinclusive if it 'leav[es] appreciable damage

to [the government's] interest unprohibited.'" *Cent. Radio*, 881 F.3d at 633 (quoting *Reed*, 135 S. Ct. at 2232) (alterations in original); *accord Am. Ass'n of Pol. Consultants, Inc. v. FCC*, 923 F.3d 159, 167 (4th Cir. 2019); *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015). This is because a statute's "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes." *Brown*, 564 U.S. at 802 (citing *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994); *Fla. Star*, 491 U.S. at 540)). A challenged law "cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *White*, 536 U.S. at 780 (quoting *Fla. Star*, 491 U.S. at 541–42 (Scalia, J., concurring in judgment)); *see also Nat'l Fed'n of the Blind v. F.T.C.*, 420 F.3d 331, 346 (4th Cir. 2005) (enumerating circumstances in which "an underinclusive restriction of speech [may be] impermissible").[19]

In *Smith v. Daily Mail*, the Supreme Court addressed penalties imposed under a West Virginia law that made it a crime "for a newspaper to publish, without the written approval of the juvenile court, the name of any youth charged as a juvenile offender." 443 U.S. 97, 98 (1979). Recognizing that the law sanctioned the publication of "lawfully obtained, truthful information," the Court synthesized the *Cox Broadcasting* cases and reasoned that the state could not punish the press "absent a need to further a state interest of the highest order." *Id.* at 101–04. Although the State asserted that the law was necessary "to protect the anonymity

---

[19] Underinclusive regulations may also be impermissible "where the law represents an attempt by the government to give one side of a public debate an advantage over the other," or "where the regulation is so broad or narrow in scope that it 'undermines the likelihood of a genuine governmental interest.'" *Nat'l Fed. of the Blind*, 420 F.3d at 346 (citing *City of Ladue*, 512 U.S. at 51; then quoting *F.C.C. v. League of Women Voters of Cal.*, 468 U.S. 364, 396 (1984)). These categories are not at issue here. The Broadcast Ban does not discriminate between viewpoints, and there is no serious doubt that the State's interests in protecting witness and preserving trial fairness are genuine.

of the juvenile offender," the Court rejected this argument, observing that the challenged statute "does not restrict the electronic media or any form of publication, except 'newspapers,' from printing the names of youths charged in a juvenile proceeding." *Id.* at 104–05. Accordingly, "even assuming the statute served a state interest of the highest order, it does not accomplish its stated purpose." *Id.* at 105; *accord Soderberg*, 999 F.3d at 969 (observing that the *Daily Mail* Court viewed "the limited nature of the ban" as "significant to the applicable strict scrutiny analysis and fatal to the constitutionality of the statute").

Likewise, in *Washington Post v. McManus*, the Fourth Circuit applied exacting scrutiny to review a Maryland statute imposing disclosure and recordkeeping requirements on paid digital advertisements in the wake of the 2016 election. 944 F.3d 506, 510–12 (4th Cir. 2019).[20] To defend the challenged statute, the State insisted that these requirements were necessary to combat "pervasive attempts by foreign nationals to influence American elections by way of the internet." *Id.* at 511. While acknowledging that the integrity of elections was an important state interest, the Fourth Circuit held that the law "burdens too much and furthers too little" to survive exacting scrutiny. *Id.* at 523. The statute did "surprisingly little to further its chief objective:" Where the law regulated paid advertising, "Russian influence [in the 2016 election]

---

[20] Exacting scrutiny is a "more permissive framework" than strict scrutiny, requiring the state to demonstrate "a 'substantial relation' between an 'important' government interest and 'the information required to be disclosed.'" *Id.* at 512, 520 (citing *Buckley v. Valeo*, 424 U.S. 1, 64–66 (1976)). As the Fourth Circuit noted, "strict scrutiny, in practice, is virtually impossible to satisfy, while exacting scrutiny is merely difficult." *Id.* at 520. Accordingly, the form of narrow tailoring required by exacting scrutiny does not require the state to employ "the least restrictive means" of achieving its objective. *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 218 (2014) (plurality opinion) (citation omitted); *Bd. of Trs. of St. Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (requiring "a fit that is not necessarily perfect, but reasonable"). As the law addressed in *McManus* could not satisfy this more permissive standard, it would not survive strict scrutiny, which requires the government to show that the challenged statute is the least restrictive means of achieving a compelling state interest. *Central Radio*, 881 F.3d at 663.

was achieved 'primarily through unpaid posts' on social media." *Id.* at 521 (citation omitted). As the State could not identify "a single foreign-sourced paid political ad that ran on a news site, be it in 2016 or at any other time," its law was not narrowly tailored to address the threat of foreign interference. *Id.* at 521 (citation omitted). Moreover, the statute was overbroad, as it regulated news outlets "[w]ithout direct evidence . . . of meddling on news sites," while also "fail[ing] to distinguish between platforms large and small." *Id.* at 522.

Like the statutes at issue in *Daily Mail* and *McManus*, the challenged portion of the Broadcast Ban "does not accomplish its stated purpose." *Daily Mail*, 443 U.S. at 105. The State insists that § 1-201 serves compelling interests in preserving the integrity of criminal trials and protecting witnesses from intimidation, harassment, and violence. Although these dangers are real, the statute does little to prevent them. The Maryland Rules permit "any person" to obtain audio recordings of proceedings upon written request, Md. Rule 16-504(h)(1), and further allow anyone to obtain a video recording with the approval of an Administrative Court Judge, Md. Rule 16-504(j)(1)(J). Any member of the public, whether a journalist, an attorney, or a concerned citizen, may walk into a courthouse and request a recording of a criminal trial. Their ability to do so is regulated exclusively by the Maryland Rules—not by the Broadcast Ban.[21]

---

[21] Plaintiffs do not challenge the restrictions placed on video recordings under the Maryland Rules, and this Court expresses no opinion regarding their constitutionality. Pursuant to Md. Rule 16-504(j)(1), video recordings are available to the parties to a case, their attorneys, Bar Counsel, and select judicial officials as a matter of right, and may be released to "any other person" with approval of the County Administrative Judge. Md. Rule 16-504(j)(1)(J). Individuals who receive recordings under this section may be held in contempt if they copy or transmit video recordings without court approval. Md. Rule 16-504(j)(2). As this rule allows judges to make case-by-case determinations as to the release of these recordings, sanctions for copying such recordings might be narrowly tailored to the State's interests in trial fairness and witness safety. *Cf. Bartnicki*, 532 U.S. at 529 ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."); *Nixon*, 435 U.S. at 609 (holding that the press had no right to make copies of the Nixon White House tapes, "to which the public has never had *physical* access"). However, once a judge has released

The Broadcast Ban does nothing to stop motivated and aggrieved individuals, such as gang members or a defendant's friends and relatives, from viewing or obtaining these recordings, or from requesting others to do so on their behalf.

Once someone has obtained a recording, the Broadcast Ban does nothing to prevent them from disclosing the identities of trial participants. Although the Ban prohibits the release of the recordings themselves, both parties acknowledge that it does *not* prohibit anyone from publishing the "names, addresses, and photographs of witnesses and verbatim content of their testimony," or "from describing, transcribing, or reenacting any portion of a criminal trial." (Pls.' Mem. Supp. 24–26; Defs.' Mem. Supp. 8; *see also* Shellenberger Dep. 49:18–50:15, ECF No. 71-14; Leitess Dep. 57:1–21, ECF No. 71-13.) Today, anyone who possesses an audio or video recording obtained under the Maryland Rules may post the name and address of a witnesses online, or share a complete transcript of their testimony on social media, without violating the Broadcast Ban. Accordingly, the Broadcast Ban is no more effective at serving the State's compelling interests than the Florida law at issue in *Daily Mail*, which barred "newspapers" from publishing the identities of juvenile offenders without imposing any limitations on "the electronic media or any [other] form of publication." 443 U.S. at 104–05. Much like that law, § 1-201 restricts only one method of publication without shielding the sensitive information that is the focus of the State's concerns. At bottom, it "does very little

---

video recordings to the public and the press has lawfully obtained them, the same analysis applies, and the Broadcast Ban cannot be used to sanction their distribution.

to materially advance witness protection when their identities are public record." (Pls.' Mem. Supp. 25–26.)[22]

The State's evidence demonstrates this problem. While both Leitess and Shellenberger discuss the serious dangers that witnesses face, they fail to illustrate how the Broadcast Ban forestalls those dangers in any meaningful way. Leitess offers "compelling examples of cases involving real dangers to cooperating witnesses," (Defs.' Mem. Supp. 19), including instances where witnesses were intimidated on the stand or threatened with death following their testimony, (Leitess Decl. ¶¶ 11–16). She also recounts that "inmates, even in prison, keep track of other criminal trials, know about other criminal defendants, and learn about witness testimony by watching television and listening to the radio." (*Id.* ¶ 14.) However, these incidents occurred with the Broadcast Ban in place. As both prosecutors acknowledge, "witnesses' names and images" are used for intimidation, and the Broadcast Ban does not prohibit their distribution. (Leitess Dep. 57:1–21; *see also* Shellenberger Dep. 49:3–50:15.) Accordingly, just as a law regulating paid advertising does "surprisingly little" to prevent foreign election interference achieved primarily through unpaid social media posts, *McManus*, 944 F.3d at 521, a law prohibiting the dissemination of trial recordings does little to prevent witness intimidation when trials are open to the public, recordings are available to any person

---

[22] The State argues that these limitations render the statute narrowly tailored, as the confluence of the Maryland Rules and the Broadcast Ban "expands the public's access to court proceedings while providing narrowly tailored prevention of the particular harms posed by broadcasting: the widespread dissemination of criminal trial participants' voiceprints and video images 'in perpetuity for unlimited viewing, further dissemination, and easy manipulation.'" (Defs.' Mem. Supp. 24 (quoting *Mirlis*, 952 F.3d at 56).) However, as the Fourth Circuit noted, the *Daily Mail* Court viewed "the limited nature of the ban" at issue in that case as being "fatal to the constitutionality of the statute," as it prevented the law from accomplishing its stated purpose. 999 F.3d at 969. Here, too, the Broadcast Ban's failure to protect the identities of cooperating witnesses renders it ineffective as a measure promoting witness safety. It is a mismatch to the interests that the State of Maryland asserts.

upon request, and witnesses' identities are public record. "The State has not shown that the ability to broadcast [official recordings], distinct from the ability to publish witnesses' names or testimony, performs any additional or distinct role in dissuading witnesses from testifying or in putting them at risk." (Pls.' Mem. Supp. 26.)

As the Supreme Court noted in *Florida Star*, "punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." *Id.* at 535. Such is the case here. None can deny the risks faced by witnesses who testify in criminal trials, and none can deny the importance of protecting them against intimidation, harassment, and violence. However, the Broadcast Ban does too little in service of this goal to justify the burden it places on freedom of the press. It does not prevent malicious actors from obtaining trial recordings, and it does not stop any member of the public with access to those recordings from sharing witnesses' identities, addresses, images, and testimony online. As the Broadcast Ban "leaves appreciable damage to [the government's] interest unprohibited," it is not narrowly tailored to achieve the State's goals. *Cent. Radio Co.*, 811 F.3d at 633 (citation omitted).

   2.  The Broadcast Ban is unconstitutionally overinclusive

The Broadcast Ban also sweeps far too broadly, burdening freedoms of expression and of the press in circumstances where it offers no meaningful benefit to the State. A regulation is "unconstitutionally overinclusive if it 'unnecessarily circumscrib[es] protected expression.'" *Cent. Radio*, 881 F.3d at 633 (quoting *White*, 536 U.S. at 775) (alteration in original); *accord FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 265 (1986) (reasoning that such a law "infring[es] on speech that does not pose the danger that has prompted regulation"). This rule reflects the

requirement that a law may only survive strict scrutiny if it is the "least restrictive means" of achieving the interest it serves. *Sable Comm'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). Accordingly, the law must "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485 (citation omitted). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813. "To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit." *Id.*

The Broadcast Ban burdens far more expression than is necessary to achieve its goals. It applies to all criminal trial proceedings, regardless of whether the government's concerns about witness protection and fairness are manifest in a given case. (Pls.' Mem. Supp. 22.) The Plaintiffs aptly summarize this concern in their briefings:

> By its own terms, the Broadcast Ban applies to recordings from 'any' criminal proceedings—regardless of when the proceeding occurred, who participated, and what transpired. The statute applies equally to pending cases and cases that ended years ago; to high-profile matters and obscure ones; to lengthy jury trials with numerous witnesses and brief status conferences with no witnesses and no evidence presented. The statute also applies equally to audio and video recordings. In short, the statute draws no distinction between the types of recordings whose dissemination might implicate Defendants' stated interests and those that surely will not.

(*Id.* at 22–23.) "Even if the Broadcast Ban were to serve a state interest in a particular case— say, by convincing a reluctant witness to testify or reducing the chance a witness would be harmed—it applies equally in cases where these issues do not arise." (*Id.* at 23.)

Less restrictive laws could serve the State's interests in witness protection and fairness. By sanctioning the publication of official recordings, the State seeks to forestall the harm that may result from the dissemination of sensitive information that the State itself has released.

The *Cox Broadcasting* line of cases hold that a more effective and less restrictive way to prevent this harm is to avoid disclosing sensitive information in the first place. 420 U.S. at 495–96; *accord Florida Star*, 491 U.S. 524 (reasoning that the state "may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government" for inadvertent disclosures); *Ostergren*, 615 F.3d at 284 ("[P]unishing truthful publication of private information [is] not narrowly tailored because the government could have initially refused to disclose that information to the press."). A rule authorizing judges to redact the record on a case-by-case basis or to limit the dissemination of official recordings in sensitive situations would be less restrictive than a blanket ban.[23] *Cf. Chandler*, 449 U.S. at 582 ("[T]he risk of prejudice to particular defendants is ever present and must be examine carefully as cases arise."). But once the state has released sensitive information to the public, the horse is out of the barn—punishing the press is neither the least restrictive means of preserving the state's interests nor a particularly *effective* means of doing so.

One such alternative is already available to the State: The Maryland Rules enable courts to redact sensitive information from trial recordings on a case-by-case basis, allowing judges to address public safety and fairness concerns as they arise. Specifically, Rule 16-504 directs judges to place "appropriate safeguards" on any portion of a trial recording that "should and lawfully may be shielded from public access and inspection." Md. Rule 16-504(g). The court

---

[23] The Maryland Judiciary is already considering amendments to Rule 16-504 that would limit the circumstances in which recordings are released. Current proposals include limiting the prohibition on broadcasts until a certain time after judgment becomes final in a criminal matter or limiting the individuals who may receive a copy of a recording. (*See* Supplement to Record 41, ECF No. 78-1.) Although not immediately dispositive, these discussions suggest that the State already recognizes the availability of less restrictive alternatives.

is then required to redact shielded materials "from any copy of a recording made for a person." Md. Rule 16-504(h)(2). As Plaintiffs aptly note, "Maryland trial judges are well-positioned and empowered to determine, based on the parties' presentations, whether there are concerns specific to a case that subsequent broadcast of a recording . . . would imperil a State interest." (Pls.' Repl. 11.) *Cf. United States v. Wecht*, 537 F.3d 222, 239 (3d Cir. 2008) (holding that while "in a given case, a risk of jury tampering or excessive media harassment may exist[,] . . . district judges are well-positioned to address these risks on a case-by-case basis, and in such cases, to make particularized findings on the record"). Redacting sensitive materials from the public record is a less restrictive and more effective means of safeguarding witnesses than punishing the press for publishing material the State has already released.

At the summary judgment hearing, the State argued that this rule may only be used to redact private information such as Social Security Numbers, and that it does not apply to the identities of witnesses or the content of their testimony. As an initial matter, Rule 16-504 does not appear to include this limitation. But even if the State's reading was correct, strict scrutiny asks whether a less restrictive law could be enacted—not whether one is already on the books. *Playboy*, 529 U.S. at 813 ("If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."). Even if Rule 16-504 does not authorize the State to shield witnesses who fear harassment and intimidation, or to redact their testimony from the recordings released to the public under the Maryland Rules, there is no reason why the legislature could not craft such a provision.[24]

---

[24] Notably, many states that grant public access to trial recordings allow judges to restrict access when the distribution of those recordings would undermine the fairness of a trial or endanger its participants. *See, e.g.*, N.D. Sup. Ct. Admin. R. 40 (authorizing judge to withhold recordings if judge

The State fails to show that anything more is necessary. First, the State claims that "[a] case-by-case approach . . . will not prevent the inevitable chilling effect on witness cooperation that will occur if the broadcasting of audio and/or video recordings becomes routine." (Defs.' Repl. 7.) However, it is the State's burden to satisfy strict scrutiny, *Reed*, 576 U.S. at 171, and the State offers little to no evidence that this chilling effect would occur, much less that it is "inevitable." Shellenberger has never mentioned the Ban to potential witnesses, Leitess has not spoken to any witness who would not have testified if the Ban was not in place, and neither could point to a single case where Maryland's recording system has led to witness intimidation. (*See* Shellenberger Dep. 43:17–20, 45:9–13, 52:9–11; Leitess Dep. 83:6–17, 94:2–10, 97:14–18, 111:15–21.) Moreover, the State offers no evidence that the Broadcast Ban has actually incentivized cooperation or curbed witness intimidation, or that other jurisdictions that allow broadcasting have seen lower rates of cooperation or higher rates of harassment, retaliation, and violence. (Pls.' Mem. Supp. 21.)

At most, Leitess and Shellenberger assert that witnesses fear public exposure, and would be deterred from testifying if their testimony could be recorded and broadcast online. (*See* Shellenberger Dep. 49:3–17 (recounting that witnesses are "scared to death when there's . . . people in a courtroom" and that they would be "petrified" if "their name, picture, likeness, [and] story" was going to be on the news); Leitess Dep. 83:16–17 (recounting that witnesses

---

concludes that the recording "would materially interfere with a party's right to fair trial" or "a witness or party has objected and shown good cause"); Vt. R. Civ. P. 79.2(e)(3) (permitting judge to restrict or prohibit "the recording or transmitting of all or any part of a proceeding" after considering several non-exclusive factors that include "the impact of recording or transmitting on the rights of the parties to a fair trial" and "the likelihood that physical, emotional, economic, or proprietary injury may be caused to a witness, a party, the alleged victim, or other person or entity"). These laws exemplify less restrictive alternatives to Maryland's Broadcast Ban, which proscribes the release of official recordings of criminal proceedings in all circumstances.

have found it "reassuring" that their testimony "is not going to be on TV or the like").) However, many of these risks exist with the Broadcast Ban in place. (*See* Leitess Dep. 57:1-21 (acknowledging that "witnesses' names and images" are already used for retaliation, and that the Ban does not prohibit their publication).) More fundamentally, if a witness's reluctance to testify and fear of exposure is sufficient to sustain the Broadcast Ban, virtually any restriction on trial publicity could survive strict scrutiny by the same reasoning. *Cf. Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Restrictions on newspaper coverage of criminal trials could be upheld by the prospect that witnesses will fear retaliation and decline to cooperate once their name, likeness, and testimony are released in print. This is particularly true in the age of the internet, where news articles, no less than audio or video broadcasts, are made "available in perpetuity for unlimited viewing, further dissemination, and easy manipulation." *Mirlis*, 952 F.3d at 56. Such a result would be anathema to the First Amendment.

Compounding these concerns, the Fourth Circuit has held that "the burden of narrow tailoring requires the [government] to prove that it actually tried other methods to address the problem," to "show [] that it seriously undertook to address the problem with less intrusive tools readily available to it," and to "demonstrate that [such] alternative measures would fail to achieve the government's interests." *Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir. 2015) (quoting *McCullen v. Coakley*, 573 U.S. 464 (2014))) (emphasis omitted). The State does not claim to have used Rule 16-504 or any other mechanism to redact sensitive information from trial recordings on a case-by-case basis. Likewise, Leitess and Shellenberger acknowledge that they could not recall a single case in which they have attempted to use this provision to shield witness testimony. (*See* Shellenberger Dep. 73:11–17; Leitess Dep. 93:7–94:10, 120:21–121:9.)

To whatever extent recordings released under the Maryland Rules may jeopardize the State's interests, the State has not shown that the "readily available" mechanism provided by those Rules is insufficient to achieve them. *Reynolds*, 779 F.3d at 231 (citation omitted).

Second, the State claims that it should not be required to provide empirical evidence that the Broadcast Ban is necessary to prevent witness intimidation. (Defs.' Repl. 3–5.) In so arguing, the State cites *Burson v. Freeman*, in which the Supreme Court upheld a statute that prohibited campaigning within 100 feet of a polling place, relying on a "widespread and time-tested consensus" among states that such restricted zones are necessary to avoid voter intimidation. 504 U.S. 191, 206, 211 (1992). The State argues that "the historical developments, law review articles, and expert testimony" it offers demonstrates a similar consensus, (Defs.' Repl. 6), and that the Broadcast Ban has been in place since 1981, limiting the State's ability to collect evidence of its effects without jeopardizing the critical interests it is trying to protect. (Defs.' Repl. 4–5.) *Cf. Burson*, 504 U.S. at 208 ("The fact that these laws have been in effect for a long period of time . . . makes it difficult for the States to put on witnesses who can testify as to what would happen without them.").[25]

---

[25] To support this argument, the State also cites *Hollingsworth v. Perry*, in which the Supreme Court granted a preliminary injunction staying the implementation of a local rule that would have permitted the media to conduct a live broadcast of a high-profile case addressing a same-sex marriage ban. 558 U.S. 183, 192 (2010). However, the rule addressed in *Hollingsworth* would have "permit[ted] the trial to be broadcast live via streaming audio and video to a number of federal courthouses around the country." *Id.* at 184. As discussed throughout, live broadcasting is not at issue in this case. Moreover, the opponents of the broadcasting rule produced evidence that live broadcasts could have a chilling effect on witnesses given the high-profile nature of the case. *Id.* at 713 (observing "71 news articles detailing incidents of harassment related to people who supported [the same-sex marriage ban at issue]"). Accordingly, *Hollingsworth* does not stand for the proposition that no evidence is required to restrain broadcast coverage of judicial proceedings.

In making this argument, the State at once overestimates the national consensus and underestimates its own ability to collect evidence of the Broadcast Ban's effects. In *Burson*, the Supreme Court observed that "all 50 states, together with numerous Western democracies" had adopted laws prohibiting campaigning near polling places, evincing a broad consensus in support of such regulations. 504 U.S. at 206. But there is no historical consensus in this case. This case features a law that regulates rapidly evolving modern media, and courts around the country permit electronic access to criminal proceedings in some manner. Plaintiffs reference at least ten states that allow the public to obtain state-produced recordings of most criminal proceedings, and fourteen that allow spectators to record trials *themselves* in certain conditions. (Pls.' Mem. Supp. 21–22 n.6–7.)[26] The divergence in the states' approach to this issue indicates both that there is no "widespread and time-tested consensus" in favor of the Broadcast Ban, *Burson*, 504 U.S. at 206, and that there are ample comparators that could be used to evaluate whether the Ban is necessary to further the State's compelling interests. As noted above, the State offers no evidence that other jurisdictions without similar prohibitions have faced lower rates of witness participation or higher rates of witness intimidation.

Third, and finally, the State claims that redacting information from public records, as suggested by *Cox Broadcasting* and its progeny, would be more restrictive of First Amendment rights than the Broadcast Ban. (Defs.' Mem. Supp. 27.) This is incorrect. "The Supreme Court

---

[26] Beyond Maryland, the Plaintiffs reference Alaska, Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, North Dakota, Utah, Vermont, and Wisconsin as states that allow members of the public to obtain recordings of criminal proceedings upon request. (Public Access to Trial-Court Recordings in Other States, ECF No. 71-15.) Many individual courts in other states do the same. (*Id.*) Additionally, the following states allow members of the press and the public to record criminal trials under certain conditions: Arizona, Connecticut, Florida, Massachusetts, Michigan, Mississippi, New Hampshire, New Mexico, North Carolina, Ohio, Rhode Island, Tennessee, Utah, and Vermont. (*See* Pls.' Mem. Supp. 21 n.7.)

has ruled that the First Amendment does not 'guarantee the public a right of access to information generated or controlled by government.'" *Fusaro v. Cogan*, 930 F.3d 241, 249 (4th Cir. 2019) (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 16 (1978) (Stewart, J., concurring in judgment)); *see also Nixon*, 435 U.S. at 609 ("The First Amendment generally grants the press no right to information about a trial superior to that of the general public."). "Rather, the decision to make government information available to the public is generally a 'question of policy' for the 'political branches.'" *Fusaro*, 930 F.3d at 249 (quoting *Houchins*, 438 U.S. at 12); *accord Cox Broad.*, 420 U.S. at 495 ("Their political institutions must weigh the interests in privacy with the interests of the public to know and of the press to publish."); *Florida Star*, 491 U.S. at 538 ("[W]here the government itself provides information to the media, it is most appropriate to assume that the government had, but failed to utilize, far more limited means of guarding against dissemination than the extreme step of punishing truthful speech."). Accordingly, the State of Maryland must exercise its judgment as a matter of policy to determine whether to release information within its control. Once the State has disclosed information to the public, the First Amendment protects the right of the press and the public to publish it.

For the foregoing reasons, this Court concludes that the Broadcast Ban is not narrowly tailored to achieve the State's compelling interests. While witness protection and trial fairness are "interest[s] of the highest order," *Daily Mail*, 443 U.S. at 105, the Broadcast Ban "burdens too much and furthers too little" to survive strict scrutiny under the First Amendment. *McManus*, 944 F.3d at 523. It "does not accomplish its stated purpose," as it does not prevent the widespread dissemination of witnesses' identities and the contents of their testimony, *Daily*

*Mail*, 443 U.S. at 105, and it "unnecessarily circumscribes protected expression," as it restricts publication in all criminal proceedings, regardless of whether the state's compelling interests are manifest, *Cent. Radio*, 881 F.3d at 633 (citation and alteration omitted). In light of the Broadcast Ban's expansive reach and narrow protections, this Court concludes that it is unconstitutionally overbroad: "[A] substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Insley*, 731 F.3d at 298 n.5. Accordingly, Plaintiffs' Motion for Summary Judgment (ECF No. 71) is hereby **GRANTED,** and Defendants' Motion for Summary Judgment (ECF No. 72) is hereby **DENIED.**

## CONCLUSION

Witness protection and the integrity of criminal trials are interests of the highest order, but the State must achieve these objectives through means consistent with the Constitution. The State remains free to limit broadcasting from the courtroom, and to regulate the release of recordings under the Maryland Rules. *See Chandler*, 449 U.S. at 577; *Estes*, 381 U.S. at 544. However, the Supreme Court has held that states may rarely, if ever, sanction the publication of lawfully obtained, truthful material that the government has disclosed in official court records. *See Cox Broadcasting*, 420 U.S. at 496; *Daily Mail*, 443 U.S. at 103; *Florida Star*, 491 U.S. at 533. The Broadcast Ban, Md. Code Ann., Crim. Proc. § 1-201, "burdens too much and furthers too little" to survive strict scrutiny under this framework. *McManus*, 944 F.3d at 523. Accordingly, Plaintiffs' Motion for Summary Judgment (ECF No. 71) is hereby **GRANTED,** and Defendants' Motion for Summary Judgment (ECF No. 72) is hereby **DENIED.**

A separate order follows.

Dated: December 9, 2022

                    _____/s/_____

                    Richard D. Bennett
                    United States Senior District Judge